UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| | |
| AVIATION SAFETY RESOURCES, INC., | Case No. 6:23-bk-4639-GER |
| S.E., INC., | Case No. 6:23-bk-4641-GER |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-4643-GER |
| | |
|     Debtors. | *Jointly Administered Under* |
| _____/ | *Case No. 623-bk-4639-GER* |
| | |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-4643-GER |
| | |
|     Applicable Debtor. | |
| _____/ | |

## <u>NOTICE OF FILING OF CONNECTICUT STALKING HORSE APA</u>

PIONEER AEROSPACE CORPORATION D/B/A ASR-PIONEER ("**Pioneer**") hereby

gives notice of filing the attached Asset Purchase Agreement by and between Pioneer and Space

Exploration Technologies Corp. as the Connecticut Stalking Horse APA.

Dated: November 9, 2023

                                */s/ Daniel R. Fogarty*_____
                                Daniel R. Fogarty (FBN 0017532)
                                Stichter Riedel Blain & Postler, P.A.
                                110 East Madison Street, Suite 200
                                Tampa, Florida   33602
                                Telephone: (813) 229-0144
                                Email: dfogarty@srbp.com
                                Attorneys for Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing notice has been furnished on November 9, 2023, by the Court's electronic noticing system to all parties receiving electronic service.

/s/ Daniel R. Fogarty
Daniel R. Fogarty (FBN 0017532)

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made and entered into this ___ day of November, 2023 (the "<u>Effective Date</u>"), by and between Space Exploration Technologies Corp., a Delaware corporation or its designee ("<u>Buyer</u>"), and Pioneer Aerospace Corporation, a Delaware corporation d/b/a ASR-Pioneer ("<u>Seller</u>"), on the other hand.  Each of Seller and Buyer is a "<u>Party</u>" and collectively they are the "<u>Parties</u>" to this Agreement.

## RECITALS

WHEREAS, Seller is engaged in the business of manufacturing parachutes, pallets, and/or related products for use in the space, defense, and aviation industries; (collectively, the "<u>Business</u>");

WHEREAS, Seller, S.E. Inc., a Florida corporation d/b/a Strong Enterprises (an affiliate of Seller) ("<u>Strong</u>"), and Aviation Safety Resources, Inc., a Florida corporation (the parent of Seller) (collectively, the "<u>Debtors</u>"), have commenced a voluntary case for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "<u>Bankruptcy Court</u>"), in jointly administered Case No. 6:23-bk-4641-GER (the "<u>Bankruptcy Case</u>");

WHEREAS, Seller has assets and operated different branches of its business at three separate leased locations located in Bloomfield, Connecticut (the "<u>Connecticut Location</u>"), Columbia, Mississippi (the "<u>Mississippi Location</u>"), and Milton, Florida (the "<u>Milton Location,</u>"), and Strong has assets and operated its business at a location in Orlando, Florida (the "<u>Orlando Location</u>," and together with the Connecticut Location, the Mississippi Location, and the Milton Location, each a "<u>Location</u>" and, collectively, the "<u>Locations</u>");

WHEREAS, Seller's business division that it operates at the Connecticut Location is principally and traditionally known as "Pioneer Parachute" or "Pioneer Aerospace," and it designs, manufactures, repairs, packs, and conditions parachutes and other aerodynamic deceleration systems for commercial and government use in military, aerospace, and related industries (the "<u>Connecticut Business</u>");

WHEREAS, in the Bankruptcy Case, Seller has been or will be in possession of its assets and in control of its business divisions and their respective operations as a debtor in possession pursuant to the applicable provisions of the Bankruptcy Code;

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, substantially all of the assets, personal and mixed, tangible and intangible, associated with or employed in the operations of the Connecticut Business and/or owned by Seller at the Connecticut Location as set forth specifically in the schedules attached hereto, and Buyer agrees to assume certain of the obligations of Seller associated with the Connecticut Business under specified contracts from and after the Closing (as defined below), on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code (the "<u>Transaction</u>");

WHEREAS, Bankruptcy Court approval is required to consummate the Transaction; and

WHEREAS, the Purchased Assets (as defined below) and the Assumed Liabilities (as defined below) include assets and liabilities of Seller which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving the Transaction (the "Sale Order") pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which Sale Order shall include the authorization for the assumption and/or rejection by Seller of certain executory contracts and/or unexpired leases and the assignment of all assumed executory contracts and/or unexpired leases to Buyer pursuant to Section 365 of the Bankruptcy Code and shall further state and conclude that Buyer is not a successor to Seller, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and in reliance upon the representations, warranties, conditions and covenants contained herein and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS

**Section 1.1 Purchase and Sale of Purchased Assets**. Subject to the terms and conditions of this Agreement, Seller shall sell, transfer, convey, assign and deliver to Buyer and Buyer shall purchase, acquire, assume and accept from Seller, effective as of 12:01 a.m. on the Closing Date (as defined in Section 3.1 below) (the "Effective Time"), all of the right, title and/or interest of Seller in and to the following assets, free and clear of any interest of Seller or, subject to and dependent upon the successful cooperation between Buyer and other buyer(s) as to the Additional Assets (as defined herein) as contemplated by the Cooperation Protocol referenced in Section 3.4(d) hereof (the "Cooperation Protocol"), any third party holding or granted an interest in Seller's right, title, and/or interest in such property and all Encumbrances (as defined herein) (collectively, the "Purchased Assets"). Without limiting the foregoing, the Purchased Assets shall include the following:

(a)    all tangible personal property, including all machinery, rolling stock, equipment, furniture, computer hardware, instruments, supplies, materials, vehicles, and other items of tangible personal property and all rights in tangible personal property in the possession of others owned by Seller and used in the operation of the Connecticut Business and/or Connecticut Location;

(b)    all inventories, including supplies, work-in-process, spare parts, accessories and finished goods, if any, owned by Seller (whether in-transit, held in a warehouse, or in the possession of Seller or another third party) at the Connecticut Location or elsewhere if principally associated with the Connecticut Business;

(c)    all prepaid assets, customer sales orders, customer deposits related to customer orders, prepaid expenses, prepaid insurance, deposits, utility deposits, credits, refunds, rights to

2

set-off, recoupment, and other similar items to the extent related to the operation of the Connecticut Location and/or the Connecticut Business;

(d)    all operating data and records of Seller, including books, records, sales and sales promotional data, correspondence, e-mails, databases, data compilations and collections, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, advertising materials, customer lists, customer purchasing histories, credit information, cost and pricing information, supplier lists, business plans, reference catalogs, computer programs, and electronic data or processing software related to any of the foregoing items at or related to the Connecticut Business (the "Seller Data"), except that minute books and corporate records, tax returns, and litigation files of Seller, along with the other records described in Section 1.2(f) shall not be included in the Purchased Assets; provided however that Buyer shall be entitled to receive copies of such materials upon its reasonable request;

(e)    all proprietary information in the possession, custody and/or control of Seller, including, but not limited to, all engineering and production designs, drawings, plans, blue prints, formulae, source code, technology, trade secrets, technical information, research, product specifications, processes, process technology, quantity control protocols, confidential information, know-how and other similar data of Seller related to the Connecticut Business and/or the Purchased Assets ("Proprietary Information");

(f)    all claims and rights to and under all contracts, licenses, real property leases, equipment leases, instruments, commitments, agreements and other legally binding arrangements of every type and description relating to the Connecticut Business and to which Seller is a party or by which any of the Purchased Assets is bound (the "Contracts") which Seller may assume and assign to the Buyer (and may not be rejected by Seller), as set forth on Schedule 1.1(f) attached hereto.  In accordance with Section 1.4 hereof, Buyer may designate each such Contract on Schedule 1.1(f) as an "Assumed Contract" to be assumed and assigned by Seller to Buyer upon or following the Closing, or as a "Delayed Designation Contract" that may be either assumed and assigned or rejected by Seller at Buyer's sole direction during the Post-Closing Period or the Novation Period, as applicable.  Any Contracts not listed on Schedule 1.1(f) attached hereto, and Contracts that are later removed from Schedule 1.1(f) in accordance with the terms of Section 1.4, shall be "Excluded Contracts";

(g)    all right, title and interest in and to any and all intellectual property, Proprietary Information, or other general intangibles owned and utilized by Seller in the Connecticut Business, including, without limitation, all patents, patent applications, inventions and discoveries that may be patentable, registered and unregistered trademarks, all fictional business names (including Pioneer Aerospace Corporation and any d/b/a associated therewith), trade names, service marks, registered user entries, copyrights in both published works and unpublished works and all right, title or interest of Seller in any application for any of the foregoing, including but not limited to all right, title, or interest of Seller in those assets listed on Schedule 1.1(g), all proprietary and licensed

software and all contract rights relating thereto, Seller's e-commerce tools (if any), and all of Seller's protections, restrictions on use, or claims and causes of action relating to any of the foregoing or in any other intellectual property rights held with respect third-parties' intellectual property, including claims and causes of action for past infringement (collectively, the "Intellectual Property Assets"), provided however, that if Seller does not own and/or cannot convey its interest in any Intellectual Property Assets to Buyer, Seller shall, consistent with the Sale Order, grant to Buyer a non-exclusive, perpetual, royalty-free license to use any such Intellectual Property Assets utilized by Seller in the Connecticut Business, and provided further that nothing herein shall indicate either (i) that Seller intends to or shall transfer any right, title, or interest in any Intellectual Property Assets that are not held by Seller as of the Closing Date, nor (ii) that the Closing is contingent upon the delivery to Buyer of any tangible or digital embodiments of such Intellectual Property Assets that are not in the possession Seller as of the Closing Date at the Closing;

(h)    all the right, title and interest of Seller in, to and under all websites, domain names, email addresses, IP addresses, and similar assets used in the operation of the Connecticut Business;

(i)    all the right, title and interest of Seller in, to and under all telephone numbers, including all extensions thereto, used in the operation of the Connecticut Business;

(j)    subject to applicable laws and regulations, all transferable licenses, certifications, qualifications, accreditations, permits, certificates, franchises, approvals and other governmental or regulatory authorizations (each, a "Permit") together with the underlying attributes of the Connecticut Business appurtenant to or required to retain any such Permit, that is necessary or desirable for or incident to the ownership and operation of the Connecticut Business and/or the Connecticut Location and/or Purchased Assets;

(k)    all accounts receivable, notes receivable, and other similar rights to payment in favor of Seller from any party other than the Buyer related to the Connecticut Business and/or the Connecticut Location and/or Purchased Assets;

(l)    all goodwill of Seller relating to, attributable to, or arising from the Connecticut Business and/or the Connecticut Location and/or Purchased Assets;

(m)    rights under outstanding or prospective bids, confidentiality agreements, proposals, offers, or similar items made (i) by Seller to potential customers or contract parties of the Connecticut Business or (ii) to Seller in connection with a bid or proposed bid as to the Connecticut Location by a third-party, unrelated entity to purchase assets of Seller ("Bids") that are identified on Schedule 1.1(m), which schedule shall be updated from time to time prior the Closing Date ("Assumed Bids"); provided however that if such Assumed Bid is accepted prior to the Closing or during the Post-Closing Period or the Novation Period, as applicable, it may be treated by Buyer as a Contract hereunder; and further provided, that if a Bid is has either been made by Seller to potential customers of contract parties that would be customers or contract parties with more than one Location, or to Seller in connection with a bid or proposed bid as to the Connecticut Location together with other Location such Bids shall be treated as Shared Assets, and allocated among the Buyer and other proposed buyers pursuant to the Cooperation Protocol; and

4

(n)    "<u>Assigned Causes of Action</u>" shall include all Causes of Action related to the Connecticut Location or the Connecticut Business, rights thereto, and benefits to any proceeds thereof, or rights that arises out of or with respect to the Purchased Assets or any Assumed Contract, including, without limitation, those arising from: (i) any insurance policies of Seller, including any and all credits, premium refunds with respect to any policies insuring any Purchased Assets, excluding any policies or any and all credits, premium refunds with respect to any policies covering any Fiduciary Causes of Action, (ii) all purchase orders submitted by Seller to its vendors, together with any rights of return, offset, counterclaims, deductions, unpaid allowances with respect to any supplier, (iii) all warranties (express or implied), representations and guarantees made or provided by third parties to Seller relating to any Purchased Assets, and (iv) any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of Seller or the bankruptcy estate of Seller under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of §§ 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code that could be asserted by Seller or its bankruptcy estate (such bankruptcy actions, the "<u>Avoidance Actions</u>") if such Avoidance Action can be asserted against (x) Buyer, any of its Affiliates, or (y) a counter-party to any Assumed Contract, or (z) any continuing customer or supplier of the Connecticut Business.  The Assigned Causes of Action shall not include any Fiduciary Causes of Action (as defined below).  For the purposes of this Agreement, "<u>Cause of Action</u>" shall mean any and all of Seller's claims, demands, rights, defenses, counterclaims, suits or actions and all other claims of any value whatsoever of Seller, whether known or unknown, in law, equity or otherwise, against any third party and the proceeds or benefits thereof.

**Section 1.2 Excluded Assets**. Notwithstanding anything else contained herein, the following assets are excluded from the Purchased Assets being acquired by or transferred to Buyer at the Closing (collectively, the "<u>Excluded Assets</u>"):

(a)    restricted and unrestricted cash and cash equivalents, including cash, cash accounts, insurance policies or programs, marketable securities, certificates of deposit, deposits made with respect to the Excluded Contracts or other Excluded Assets, and utility deposits (the "<u>Retained Cash Equivalents</u>");

(b)    all inventory that is (i) not owned by Seller, or (ii) sold, obselete, fully utilized, or exhausted prior to the Effective Time in the ordinary course of business, including but not limited to any inventory, goods, or materials that have been supplied by a customer on a consignment or bailment basis and is not owned by Seller;

(c)    all items of personal property that are (i) not owned by Seller, or (ii) transferred or disposed of prior to the Effective Time in the ordinary course of business, including but not limited to any inventory, goods, or materials that have been supplied by a customer on a consignment or bailment basis and is not owned by Seller;

(d)    all assets, rights and funds in connection with any "employee benefit plans," as defined in § 3(3) of ERISA, all benefit plans as defined in § 6039D of the Code and the rules and regulations promulgated thereunder, and all other stock purchase, stock option, equity-based, retention bonus, bonus, incentive compensation, deferred compensation, profit sharing, severance, change in control, supplemental unemployment, layoff, salary continuation,

retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit, welfare and other employee benefit plans (whether oral or written, qualified or non-qualified) and employment agreements, programs, policies or other arrangements and any trust, escrow or other funding arrangement related thereto ("Benefit Plans");

(e)     all rights unrelated to the Purchased Assets (i) under any insurance policies or programs to refunds due, self-insured retentions and deposits, and/or cash surrender values with respect to such insurance policies or programs, and (ii) under or pursuant to all warranties (express or implied), representations and guarantees made or provided by third parties;

(f)     Seller's corporate record books, minute books, and tax records, and any other records which Seller is required to retain by Law (copies of which may be given to Buyer), but only to the extent that such books and records cannot be transferred to Buyer if Buyer agrees to grant Seller access to such books and records and to maintain them for the period required by Law. For purposes of this Agreement, "Law" means any statute, rule, regulation, code, ordinance, resolution, Order, writ, injunction, judgment, decree, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority, and "Governmental Authority" means the government of the United States and any government of a foreign country, state or province, or a U.S. state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality thereof, or any tribunal or arbitrator(s) of competent jurisdiction and any self-regulatory organization;

(g)     any right, title or interest of Seller in any Federal, state, local or foreign (i) Tax refunds (and any income with respect thereto), Tax credits, Tax benefits, or (ii) other governmental charges or refunds thereof that do not arise from the actual or proposed delivery of goods or services after the Closing Date to or for the benefit of such Governmental Authority.  For purposes of this Agreement, "Tax" means (i) any and all federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, ad valorem, unclaimed property, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other tax, fee, assessment or charge of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (ii) any liability for payment of amounts described in clause (i) as a result of transferee liability or otherwise through operation of law, and (iii) any liability for the payment of amounts described in clauses (i) or (ii) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify any other Person, and "Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or government (whether federal, state, county, city or otherwise, including, without limitation, any instrumentality, division, agency or department thereof);

(h)     any and all Causes of Action that are not Assigned Causes of Action, and including Causes of Action for breach of fiduciary duty, professional negligence or director and officer liability ("Fiduciary Causes of Action"). For the avoidance of doubt, all claims of Seller

against Zodiac US Corporation, Safran USA, Inc., or Safran, S.A., or their respective related parties, shall be Excluded Assets;

(i)    any rights of Seller under this Agreement or any other Transaction Document entered into with Buyer;

(j)    the Excluded Contracts;

(k)    subject to Sections 1.1(f) and 1.4, any Contract or Permit not assumed and assigned to Buyer;

(l)    the capital stock of Seller or any of its Affiliates;

(m)    Purchased Assets which are later designated as Excluded Assets pursuant to a written notice transmitted from Buyer to Seller prior to or within thirty (30) days after Closing; and

(n)    any other item set forth on Schedule 1.2 attached hereto and made a part hereof.

**Section 1.3 Assumption and Exclusion of Liabilities**.

(a)    Except as set forth on Schedule 1.3 attached hereto and made a part hereof, or otherwise set forth in this Agreement, Buyer will not assume any debts, liabilities, obligations, expenses, taxes, Contracts or commitments of Seller of any kind, character or description, whether accrued, absolute, contingent or otherwise, no matter whether arising before or after the Closing, and whether or not reflected or reserved against in the financial statements, books of accounts or records of Seller.  With the exception of those items as specifically set forth on Schedule 1.3 attached hereto, Seller will retain all liabilities directly or indirectly arising out of or related to the ownership and operation of the Purchased Assets, Connecticut Location, and/or the Business before or on the date of the Closing, and directly or indirectly arising out of or related to the ownership and operation of the Excluded Assets before, on or after the Closing. The liabilities and obligations of Seller in connection with any Assumed Contract or Assumed Bid with respect to (i) matters occurring thereunder on or after the Closing Date, (ii) the Cure Amounts, and (iii) any other liabilities identified on Schedule 1.3, which items (i), (ii) and (iii) above are collectively herein referred to as the "Assumed Liabilities." For purposes of this Agreement, (x) "Cure Amounts" means the amounts determined by a Final Order of the Bankruptcy Court to be necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults on the part of Seller under any of the Assumed Contracts as required by Section 365(b)(1) of the Bankruptcy Code, and (y) "Final Order" means an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Bankruptcy Case for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (1) no appeal, petition for review, re-argument, rehearing, reconsideration or certiorari has been taken and, unless otherwise agreed by the Buyer, is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (2) such appeal or petition has been

7

heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.

(b)    Subject to the terms of this Agreement, Buyer agrees to assume any and all existing warranty obligations given by Seller to its customers arising directly from any Assumed Contracts before the Closing and to honor such warranties following the Closing during the respective applicable term of such warranties, without recourse or indemnity to Seller.  Such warranty obligations shall be Assumed Liabilities.

(c)    Other than the Assumed Liabilities, Buyer is not assuming nor agreeing to manage, discharge, or otherwise be liable for, and shall be deemed not to have assumed any liabilities or obligations of Seller.  Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement and under any Contracts, Buyer will not assume any obligation of Seller, other than the Assumed Liabilities.  In furtherance and not in limitation of the foregoing, neither Buyer nor any of its Affiliates shall assume, and shall not be deemed to have assumed, other than as specifically set forth in Section 1.1 or this Section 1.3 hereof, any debt, claim made against, obligation or other liability of the Business or of Seller or its Affiliates whatsoever, including, but not limited to, (i) any environmental harms, costs or liabilities for any act, omission, condition or event caused by or attributable to Seller, including without limitation all environmental harms, costs, and liabilities relating in any manner to Seller's direct or indirect handling, transportation, or disposal of any hazardous materials or contaminants, (ii) any of Seller's liabilities in respect of Taxes (other than those arising directly out of this Transaction with Buyer) or escheat, (iii) any investment banking, financial advisory, brokers or finders fees arising by reason of Seller's dealings with brokers or other third parties, or other liability of Seller for costs and expenses (including legal fees and expenses) incurred in connection with this Transaction, (iv) any indebtedness of Seller, including any insurance payables and trade payables and expenses arising prior to the Closing Date, (v) any obligations, liabilities, or losses for Seller's employees, officers, directors, managers, advisors, or consultants, including severance, termination pay, pension, profit sharing or any other Benefit Plans, compensation or retiree medical and other benefits and obligations, or any obligation, loss or amount under the Workers Adjustment and Retraining Notification Act or similar state statutes or regulations ("WARN Act"), (vi) any obligation or liability arising as a result of or whose existence is a breach of Seller's representations, warranties, agreements or covenants contained in this Agreement or otherwise, (vii) any Excluded Assets, (viii) any obligations due to any Affiliate of Seller, (ix) any liability subject to compromise, except to the extent same constitutes an Assumed Liability, (x) any tort, product liability or similar claim for injury to any person or property arising out of or based on a breach of Seller's representations, warranties, or agreements, express or implied, failure to warn, label, or advise customers of such risks, (xi) any recall, design defect or related claims with respect to any products manufactured or sold or any service performed by Seller, (xii) rebates, allowances, deductions and/or price discrepancies relating in any manner to products sold in pursuit of the Business prior to the Closing Date, (xiii) any claim of infringement or misuse of any Intellectual Property Asset by Seller; and (xiv) any obligations or liabilities with regard to any unpaid Purchased Assets in inventory (whether such payments came due prior to, on or following the date of Seller's filing its bankruptcy petition) for which the Buyer is unable to reach a consensual resolution with the counterparty of such inventory, including any liabilities relating to any inventory for which Seller has not fully paid all amounts due with respect such inventory that is presently held by Seller.  Disclosure of any obligation or liability on any schedule to this Agreement shall not create an Assumed Liability

or other liability of Buyer, except where such disclosed obligation has been expressly assumed by Buyer as an Assumed Liability in accordance with the provisions of this Section 1.3.

**Section 1.4 Assumption and Assignment of Contracts**.

(a)     Seller agrees to cooperate with Buyer to obtain consents, waivers, registrations, transfers, or novations that may be required in connection with any Assumed Contracts, Permits, or Assumed Bids, or any other Contracts, Permits, or Bids which are not subject to assumption and assignment under their terms or applicable law without the consent or approval of the counterparty to the Contract, Permit, or Bid. Subject to the terms of this Agreement and the Sale Order, upon the Closing or thereafter during the Post-Closing Period or the Novation Period, as applicable, Seller shall assume and assign to Buyer or a Person designated by Buyer all Assumed Contracts that may be assigned, transferred, or novated by Seller to Buyer or a Person designated by Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code.  Delayed Designation Contracts which are not also Government Contracts (as defined below) may be designated by Buyer to be assumed and assigned by Seller to Buyer or a Person designated by Buyer between the Closing Date and the date that is forty five (45) days after the Closing Date, as may be reasonably extended by the Parties (the "Post-Closing Period"). Any Contract not designated as an Assumed Contract or a Delayed Designation Contract as of the Closing shall be rejected by Seller.

(b)     Buyer shall, no later than two (2) days prior to the Closing, without adjustment to the Purchase Price, provide to Seller in writing a list of the Assumed Contracts, the Delayed Designation Contracts and the Assumed Bids.

(c)     During the Post-Closing Period, Buyer shall have the right to notify Seller in writing of any Delayed Designation Contract that it wishes to reject. Seller shall not reject any Delayed Designation Contracts prior to expiration of the Post-Closing Period. Any Delayed Designation Contract (or other Assumed Contract not assigned at the Closing) designated by Buyer in accordance with Section 1.4(b) that is not assigned, transferred, or novated as contemplated in Section 1.4(a) hereof prior to the expiration of the Post-Closing Period shall be rejected upon the expiration of the Post-Closing Period. Notwithstanding the foregoing, Buyer acknowledges that Seller shall have no obligation to comply with or perform under any Delayed Designation Contract.

(d)     Anything in this Agreement to the contrary notwithstanding, except as otherwise authorized under the Bankruptcy Code and approved in the Sale Order, this Agreement shall not constitute an agreement to assign, and the Purchased Assets shall not include, any claim, contract, instrument, agreement, license, lease, commitment, sales order, purchase order, or any claim or right, or any benefit arising thereunder or resulting therefrom, if an attempted assignment thereof, without the consent of a third party thereto, would constitute a breach thereof or in any way affect the rights of Buyer or Seller thereunder. As necessary, Seller will use its good faith efforts to obtain the consent of any and all third parties to the assignment of any such Assumed Contract or agreement prior to the Closing and during the Post-Closing Period, as applicable. Except as otherwise authorized under the Bankruptcy Code and approved in the Sale Order, if such consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect such rights, Seller will cooperate with Buyer (but shall not be obligated to incur any expenses in such efforts) in any arrangement designed to provide for Buyer the benefits under any such claims, contracts, instruments, agreements, licenses, Permits, leases, commitments, sales orders or

9

purchase orders, including, without limitation, (i) enforcement for the benefit of Buyer of any and all rights of Buyer or Seller against a third party thereto arising out of a breach or cancellation by such third party or otherwise and any transfer or assignment to Buyer of any property or property rights or any contract or agreement; and/or (ii) operating as a beneficiary or designee of Seller's benefits under such claims, contracts, instruments, agreements, licenses, Permits, leases, commitments, sales orders or purchase orders. Any transfer or assignment to Buyer of any Purchased Asset, property or property rights or any Contract which shall require the consent or approval of any third party shall be made subject to such consent or approval being obtained, or as provided otherwise in the Sale Order.

(e)      Seller agrees to provide such cooperation (but shall not be obligated to incur any expenses in such efforts) as reasonably necessary to enable Buyer to request and obtain consents, waivers, registrations, transfers, or novation for any Contracts or Permits which are not subject to assumption and assignment under the terms of the applicable Contract or Permits or by virtue of applicable law without the consent or approval of the counterparty to the Contract. Such cooperation may include the Parties entering into a mutually agreeable transition services agreement that provides for Seller's continuing existence during the Post-Closing Period to allow for the assignment, transfer or novation of all Assumed Contracts, Assumed Bids, and Permits. For the avoidance of doubt, Buyer obtaining approval of such consents, waivers, registrations, transfers or novations shall not be a condition to Closing.  Without limiting the generality of the foregoing, Seller shall cooperate, support and assist Buyer for a reasonable period of time to effect all novations and/or transfers of any Government Contract that is an Assumed Contract (the "Novation Period")  (but Seller shall not be obligated to incur any expenses in such efforts).  For purposes of this Agreement, a "Government Contract" means any contract or agreement between Seller and any Governmental Authority (as defined in this Agreement) that is open and has not yet been (and will not be at the Closing) completely performed.

## ARTICLE 2
## CONSIDERATION

**Section 2.1 Purchase Price**.

(a)      In consideration of and in full payment for the purchase of the Connecticut Business, the Connecticut Location, and the Purchased Assets and subject to the provisions of this Agreement, Buyer shall pay to Seller the sum of Two Million Two Hundred Thousand and 00/100 Dollars ($2,200,000.00) (the "Purchase Price").

(b)      Buyer shall pay a deposit in an amount equal to Three Hundred Thirty Thousand and 00/100 Dollars ($330,000.00) (the "Buyer Deposit") to Stichter, Riedel, Blain & Postler, P.A. (the "Escrow Agent") upon the full execution of this Agreement. The Buyer Deposit shall not become property of Seller's bankruptcy estate until immediately after Closing of the sale to Buyer. If the transaction contemplated hereunder is consummated in accordance with the terms hereof, the Buyer Deposit shall be credited to the Purchase Price. If Buyer is not the Successful Bidder, as defined herein, the Buyer Deposit, without interest, shall be repaid or returned to Buyer immediately upon the closing of an alternative transaction approved at the Sale Hearing, as defined herein.

(c)      If this Agreement is terminated by Seller pursuant to Section 10.1(c) due to: (i) the failure of Buyer to materially perform any of its obligations hereunder, or (ii) the failure of any of Buyer's representations or warranties hereunder to be true and correct in all material respects, then, in such event, Seller shall have the right to retain the Buyer Deposit free of any claims by Buyer thereto, as liquidated damages and as Seller's sole and exclusive remedy therefor.  The Parties agree that the surrender of the Buyer Deposit is not a penalty but is liquidated damages in a reasonable amount that will compensate Seller for any loss of time or value related to Buyer's failure to close the Transaction as a result of the termination hereof, and that such amount would otherwise be impossible to calculate with precision.  Seller hereby irrevocably disclaims, waives and releases any and all claims against Buyer arising from the termination of this Agreement for the reasons set forth in (i) and (ii) in this Section 2.1(c) above, other than liquidated damages in the amount of the Buyer Deposit.

(d)      At the Closing, Buyer shall pay to the Escrow Agent, by wire transfer of good and immediately available funds, the Purchase Price <u>plus</u> the Closing Costs (as defined herein) <u>less</u> the Buyer Deposit, as set forth on the Purchase Price Allocation (as defined herein).

## ARTICLE 3
## CLOSING; OBLIGATIONS OF THE PARTIES

**Section 3.1 Closing**. The closing (the "<u>Closing</u>") will take place remotely via the exchange of documents and signatures, at such place and time as may be mutually agreed upon by the Parties no later than five (5) business days after all conditions set forth in Article 8 are satisfied, or at such other time and place as the Parties mutually agree upon, orally or in writing (the "<u>Closing Date</u>").

**Section 3.2 Obligations of the Parties at the Closing**.

(a)      At the Closing, Buyer shall deliver to Escrow Agent (or Seller's agent or such other party(s) as may be designated in writing by Seller):

(i)      after taking into account the Buyer Deposit on hand with the Escrow Agent, as set forth on the Purchase Price Allocation, an amount in immediately available funds equal to the Purchase Price <u>plus</u> the Closing Costs (collectively, the "<u>Cash Payment</u>");

(ii)      executed counterparts to such bills of sale, assignments, intellectual property assignment, and other good and sufficient instruments of conveyance and transfer, in form and substance reasonably satisfactory to Buyer, as shall be effective to vest in Buyer all of the title to and interest of Seller in the Purchased Assets (collectively, the "<u>Transaction Documents</u>");

(iii)      copies of resolutions duly adopted by the board of directors / manager(s) of Buyer (as applicable) authorizing and approving Buyer's performance of the Transaction and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of the Closing by an appropriate officer of Buyer;

(iv)    certificates of existence and good standing for Buyer, certified by the Delaware Department of State, Division of Corporations, dated within ten (10) business days of the Closing; and

(v)    such other certificates and documents as Seller or their counsel may reasonably request.

(b)    At the Closing, Seller will deliver to Buyer:

(i)    the Sale Order, which shall be a Final Order, as defined herein, and shall release all Encumbrances, except as set forth in the Sale Order, encumbering any of the Purchased Assets, and which shall be in form and substance acceptable to Buyer in its sole discretion;

(ii)    executed counterparts to the Transaction Documents;

(iii)    an IRS Form W-9 executed by Seller;

(v)    titles or other documents necessary to transfer title and ownership of any titled Purchased Assets endorsed in favor of Buyer; and

(vi)    such other documents as Buyer or its counsel may reasonably request.

**Section 3.3 <u>As Is</u>.**  IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT BUYER IS PURCHASING THE PURCHASED ASSETS "AS IS" AND "WHERE IS," "WITHOUT RECOURSE," AND WITH ALL FAULTS AND DEFECTS, LATENT OR OTHERWISE, AND THAT SELLER IS MAKING NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE QUALITY, PHYSICAL CONDITION, EXISTENCE, LOCATION, OR VALUE OF THE PURCHASED ASSETS, OR THE INCOME OR EXPENSES FROM OR OF THE CONNECTICUT BUSINESS OR THE OPERATIONS OR RESULTS OF OPERATIONS OR ECONOMIC FORECASTS OR PROJECTIONS CONCERNING EARNINGS OR PROFITS, THE USE RESTRICTIONS AFFECTING THE PURCHASED ASSETS, THE ENFORCEABILITY OF ANY CONTRACT OR OTHER AGREEMENT OR RIGHT ASSIGNED HEREUNDER, OR THE COMPLIANCE OF THE PURCHASED ASSETS OR ANY PART THEREOF WITH ANY LAWS, STATUTES, RULES, ORDINANCES, DECREES OR ORDERS APPLICABLE THERETO. WITHOUT LIMITING THE FOREGOING, IT IS UNDERSTOOD AND AGREED THAT SELLER MAKES NO WARRANTY OF HABITABILITY, SUITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY PURPOSE.

Buyer acknowledges that Buyer is purchasing the Purchased Assets based solely upon Buyer's own independent investigations and findings and not in reliance upon any information provided by Seller or Seller's agents or representatives. Seller shall not be liable or bound in any manner by any verbal or written statements, representations or information pertaining to the Purchased Assets, furnished by any agent, employee, or other person representing or purporting to represent Seller except for the representations and warranties provided by Seller pursuant to this Agreement. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**Section 3.4.  Delivery of Purchased Assets**.

At the Closing:

(a)     Seller shall deliver or cause to be delivered to Buyer duly executed instruments of transfer and assignment in form and substance satisfactory to Buyer and its attorneys, sufficient to vest in Buyer good title to, and all the right, title and interest of Seller in and to, the Purchased Assets, free and clear of all liens, pledges, charges, security interests, claims, options, imperfections of title, tenancies, mortgage, deed of trust, hypothecation, assignment, preemptive purchase right, judicial lien, community property interest, right-of way, easement, covenant, condition, equitable interest, setoff or recoupment rights, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attributable right of ownership, or other rights, interests or encumbrances of any kind or nature (collectively, "Encumbrances," and each, an "Encumbrance"), except for the Assumed Liabilities.

(b)     Seller and Buyer shall execute and deliver, or cause to be executed and delivered, such other certificates, documents and instruments as are set forth in Article 3 hereof.

(c)     The Sale Order shall direct any third-party in possession, dominion or control of any Purchased Assets to turnover and immediately make available to Buyer, upon its request, such Purchased Assets.

(d)     Each of Buyer and Seller acknowledges that it will participate in and implement the Cooperation Protocol as set forth in the Sale Procedure Order, which requires that Seller, Buyer and the buyer(s) of any of the Seller's other assets agree to mutually cooperate prior to and following the Closing to properly identify and allocate any of the Seller's assets being purchased among the Buyer and such other buyer(s) of Seller's assets.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

As of the date hereof and as of the Closing Date, Seller represents and warrants to Buyer the following:

**Section 4.1 Corporate Capacity**.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.   Subject to and by virtue of the entry of the Sale Order, Seller has the requisite power and authority to enter into this Agreement and the Transaction Documents and perform its obligations thereunder.

**Section 4.2 Corporate Powers.** Subject to and by virtue of the entry of the Sale Order, Seller's execution, delivery and performance of this Agreement and all other agreements referenced herein or ancillary hereto to which it is a party, and Seller's consummation of the transactions contemplated hereby or thereby are within Seller's corporate powers and are not in contravention of the terms of its articles of incorporation and bylaws, and have been approved by all requisite corporate action.

**Section 4.3 Title to Purchased Assets**.  Subject to the entry of the Sale Order, upon the sale, assignment, transfer and delivery of the Purchased Assets to the Buyer under this Agreement and the related sale documents, there will be vested in the Buyer all of Seller's right, title and interest to the Purchased Assets, free and clear of all Encumbrances, except as set forth in the Sale Order. Consistent with Section 3.4(d) and the Cooperation Protocol, Seller, Buyer, and the buyers of other Locations shall use good faith efforts to ensure that the electronic (i.e., non-tangible) Seller Data transferred and sold as part of the Purchased Assets has been segregated from the other assets of Seller at the Milton Location and Mississippi Location.

**Section 4.4 Binding Agreement.**   Subject to the entry of the Sale Order, this Agreement has been and, on the Closing Date, all of the agreements and documents to which Seller shall be a party in connection with this Agreement shall have been, duly executed and delivered by Seller, and shall be the valid and legally binding obligations of Seller, enforceable in accordance with their respective terms and the Sale Order in all respects.

**Section 4.5 Legal Proceedings.** Except as disclosed in Seller's Bankruptcy Schedules, otherwise known to the Buyer or as set forth on Schedule 4.5 attached hereto, there is no arbitration, audit, hearing, investigation, litigation, suit or other similar action by or before a Governmental Authority (each a "Proceeding") or any judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority (each an "Order") pending or, to the knowledge of Seller, threatened against or affecting Seller, any of its officers or directors, or any of the Purchased Assets, or its properties or rights.  Seller expressly represents and warrants that, to its knowledge, there are no Proceedings or Orders currently pending or, to the knowledge of Seller, threatened against or affecting Seller, any of its officers or directors, or any of the Purchased Assets, or its properties or rights that challenge or may otherwise have the effect of preventing, delaying, making illegal or otherwise interfering with or increasing the costs of any of the transactions contemplated by this Agreement.  To the knowledge of Seller, no event has occurred or circumstance exists that may give rise to a basis for such a Proceeding or Order.

**Section 4.6 Brokers and Finders.**  With the exception of the engagement of Seller's financial advisor, payment for which will come solely from Seller or an Affiliate, neither Seller nor any Affiliate thereof nor any employee, officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereby.  For purposes of this Agreement, "Affiliate" means, with respect to any Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, (b) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, twenty-five percent (25%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (c) any other Person who is a director, officer, joint venture or partner (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

14

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES BY BUYER

As of the date hereof and as of the Closing Date, Buyer represents and warrants to Seller the following:

**Section 5.1 Corporate Capacity.**  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to enter into this Agreement and the Transaction Documents, perform its obligations hereunder and to conduct its businesses as now being conducted.

**Section 5.2 Corporate Powers; Consents; Absence of Conflicts With Other Agreements.**  Buyer's execution, delivery and performance of this Agreement and all other agreements referenced in or ancillary hereto to which Buyer is a party, and all other actions to be taken by Buyer in connection with the consummation of the transactions contemplated hereby or thereby:

(a)    are within Buyer's corporate powers and are not in contravention of the terms of Buyer's articles of incorporation or bylaws and have been approved by all requisite corporate action;

(b)    as required, have been or will be approved by or consented to by any Governmental Authority which is required by Law or the regulations of any Governmental Authority;

(c)    shall not violate any Law to which Buyer may be subject;

(d)    shall not violate any order of any court or Governmental Authority to which Buyer may be subject;

(e)    shall not render Buyer insolvent or otherwise unable to pay its debts as they become due; and

(f)    are not subject to any financing contingencies.

**Section 5.3 Binding Agreement.**  Subject to the entry of the Sale Order, this Agreement has been and, at the Effective Time, all of the agreements and documents to which Buyer is a party in connection with this Agreement shall have been duly executed and delivered by Buyer, and shall be the valid and legally binding obligations of Buyer, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

**Section 5.4 Legal Proceedings.** There is no Proceeding or Order pending or, to the knowledge of Buyer, threatened against or affecting Buyer or any of its properties or rights that challenges or may otherwise have the effect of preventing, delaying, making illegal or otherwise

15

interfering with any of the transactions contemplated by this Agreement. To the knowledge of Buyer, no event has occurred or circumstance exists that may give rise to a basis for such a Proceeding or Order.

**Section 5.5 Brokers and Finders.**   Neither Buyer nor any Affiliate thereof nor any employee, officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereby.

**ARTICLE 6**
**COVENANTS AND AGREEMENTS OF SELLER**

**Section 6.1 Bankruptcy Court Approval.**

(a)     No later than five (5) business days following the execution and delivery of this Agreement, Seller shall file a motion (the "Sale Motion"), with the Bankruptcy Court, in form and substance acceptable to Buyer in its sole and absolute discretion, seeking the entry of an order, in form and substance acceptable to Buyer in its sole and absolute discretion, approving the sale of the Purchased Assets to Buyer and the Transaction pursuant to the terms and conditions of this Agreement, subject to higher and better bids, and approving certain bid procedures and bid protections in connection with the sale of the Purchased Assets as each are set forth in the Sale Motion (the "Sale Procedure Order").

(b)     The Sale Procedure Order shall prescribe the procedures that shall govern an auction sale of the Purchased Assets (the "Auction"), including but not limited to (i) approving this Agreement as the sole approved stalking horse bid for the Connecticut Location, the Connecticut Business, and the Purchased Assets; (ii) establishing the date and location of the Auction (the "Auction Date"); (iii) a requirement that in order to be qualified to bid on the Purchased Assets at the Auction, prospective bidders must deposit the cash amount of not less than the greater of (1) ten percent (10%) of any Initial Upset Bid (as defined herein), or (2) Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00), with Escrow Agent as an earnest money deposit (the "Bidder's Deposit") and submit a signed asset purchase agreement in substantially the same form as this Agreement (black-lined to show the changes against this Agreement), in each case by no later than 5:00 p.m. (Eastern Prevailing Time) on the date that is two (2) business days prior to the Auction Date (the "Bid Deadline"); (iv) the nature of the financial information that prospective bidders must submit to establish their financial capacity to consummate a successful bid for the Purchased Assets (in at least the amount of the Initial Upset Bid, as defined herein), which shall be delivered by no later than the Bid Deadline; (v) the nature of the notice of the Auction and the Sale Motion that must be disseminated to creditors of the Seller, parties in interest in the Bankruptcy Case, and potential interested prospective bidders; (vi) the minimum upset bid required to start the auction sale which in any event shall be no less than $250,000.00 above the Purchase Price (the "Initial Upset Bid"); (vii) in the event Buyer is not the successful bidder at the Auction for all (and not less than all) of the Purchased Assets proposed to be purchased by Buyer hereunder and such alternative transaction is approved at the Sale Hearing and closes (such successful bidder, the "Successful Bidder"), then the Successful Bidder shall pay the Termination Fee due to Buyer consistent with the Sale Procedures Order; (viii) following an Initial Upset Bid, the incremental amount by which each bid must exceed the prior bid, which amount shall be $100,000.00 (the "Overbid Amount"); (ix) setting the date for the hearing to be

16

held by the Bankruptcy Court on the Sale Motion (the "Sale Hearing"); (x) setting the deadline for the filing with the Bankruptcy Court of objections to the Sale Motion, which shall be two (2) business days prior to the Auction Date; (xi) setting procedures for the assumption and assignment of the Assumed Contracts and for asserting Cure Claims; and (xii) such other procedures as requested by the Sellers and approved by the Bankruptcy Court as reasonable under the circumstances of the Bankruptcy Case (and as acceptable to Buyer in its sole and absolute discretion).

(c)      Any proposed Initial Upset Bid for the assets described in Section 6.1(b)(i), above, that is not in the increments and/or amounts set forth in Section 6.1(b) above, shall not constitute a Qualified Bid (as defined in the Sale Procedure Order).

(d)      Should the Buyer wish to submit a bid to purchase the assets principally associated with any other Location or Strong, Buyer, upon execution of a form of agreement reflecting any proposed changes to the stalking-horse agreement with respect to such other Location or Strong, shall be deemed to be a Qualified Bidder (as defined in the Sale Procedure Order) with respect to the auction for such assets and shall be permitted to participate in such auction without further qualification or deposit.

(e)      Pursuant to Section 1.4, Seller agrees to assume in the Bankruptcy Case and assign to the Buyer any Assumed Contract, Permits, and Assumed Bids to which Seller is a party. Assumption and assignment of the Assumed Contracts, Permits, and Assumed Bids shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which Seller has rights or licenses granted in connection with or under the Assumed Contracts, Permits, and/or Assumed Bids so long as such ancillary or related agreements do not create additional obligations of Seller or the Buyer beyond those set out in the Assumed Contracts, Permits, or Assumed Bids (unless the Buyer subsequently agrees to such obligations). The Buyer shall be responsible for and shall pay all Cure Amounts in connection with the assumption and assignment of any Assumed Contract to the Buyer.  Pursuant to Section 365 of the Bankruptcy Code and the Sale Procedures Order, and as requested by parties to the Assumed Contracts and required by the Bankruptcy Court, the Buyer shall provide adequate assurance of future performance under and with respect to the Assumed Contracts. Buyer shall have the right to add or remove any executory Contract or unexpired lease from the list of Assumed Contracts, Assumed Bids, and/or Delayed Designation Contracts as provided under Section 1.4.  Upon the assumption and assignment or novation of each Assumed Contract and Assumed Bid, Seller shall be released from any further liability under the Assumed Contracts as provided for under Section 365(k) of the Bankruptcy Code.

**Section 6.2 Access; Further Assurances**. From and after the Effective Date, Buyer and its representatives and agents will have the right to access the premises of Seller during regular business hours to review, inspect and copy any and all books, records, documents or other information concerning the Purchased Assets or the operation of the Connecticut Business as Buyer or its representatives or agents may reasonably request and subject to the terms of the existing confidentiality agreement in place between Seller and the Buyer (the "Confidentiality Agreement"). At any time and from time to time after the Closing, at Buyer's request and without further consideration, Seller will execute and deliver such other instruments of sale, transfer, conveyance, assignment, and delivery and confirmation and take such action as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to

17

Buyer and to place Buyer in possession and control of, and to confirm Buyer's title to, the Purchased Assets, and to assist Buyer in exercising all rights and enjoying all benefits with respect thereto.

**Section 6.3 Confidentiality Covenant**. Following the Closing Date, neither Seller nor any agent or Affiliate of Seller, will, directly or indirectly, use for any purpose or disclose to any third party, any trade secret, supplier or patient list, financial data, price list, pricing or marketing policy or plan, financial information, prices, costs, treatment methods, strategic planning information, processes, plans, methods of doing business or any other proprietary or confidential information in a manner that interferes with Buyer's (or of any of its Affiliates') use, enjoyment and possession of a Purchased Asset. This restriction will not apply to any information that (i) is or becomes generally available to and known by the public (other than as a result of unpermitted disclosure directly or indirectly by Seller or Seller's Affiliates, advisors or representatives); or (ii) is or becomes available to Seller on a non-confidential basis from a source other than Buyer or its Affiliates, advisors or representatives, provided that, at the time of disclosure to Seller, such source was not bound by a confidentiality agreement with or other obligation of secrecy to Buyer or any of its Affiliates.  Subject to Section 3.4(d) and the Cooperation Protocol, each successor or purchaser of Seller's assets at other Locations shall be bound to similarly protect any information of Seller that is a Purchased Asset principally related to the Connecticut Location or the Connecticut Business

## ARTICLE 7
## COVENANTS AND AGREEMENTS OF BUYER

**Section 7.1 Taxes**. Buyer will be responsible for, and hereby agrees to assume and pay, all sales and use or similar taxes that may be due to any jurisdiction or governmental body arising from and as a result of the sale and transfer of the Purchased Assets as contemplated by this Agreement. Seller shall be responsible for its own income or capital gains taxes as a result of this Agreement and the transactions related thereto.

**Section 7.2 Confidentiality**.  Buyer shall, and shall use its reasonable best efforts to cause its employees, representatives and agents to hold in confidence, as if it were confidential information of Buyer, all information of any kind concerning Seller or the Business, obtained directly or indirectly from Seller or its Affiliates in connection with the Transaction, except information (a) ascertainable or obtained from public or published information, (b) received from a third party not known by Buyer to be under an obligation to Seller to keep such information confidential, (c) which is or becomes known to the public (other than through a breach of this Agreement), (d) which was in Buyer's possession prior to disclosure thereof to Buyer in connection herewith, (e) is necessary to maintain and continue Buyer's operation of the Connecticut Business or the Purchased Assets, or (f) such information is a Purchased Asset, or otherwise pertinent or essential to Buyer's use, enjoyment and possession of a Purchased Asset (the "Confidential Information"), unless compelled to disclose such information by judicial or administrative process or, in the opinion of counsel, by other legal requirements, and Buyer shall not disclose Confidential Information to any Person, except as otherwise may be reasonably necessary to carry out the Transaction, including any business or the diligence review by or on behalf of Buyer.  Notwithstanding anything contained herein or in the Confidentiality Agreement

18

to the contrary, Buyer is permitted to share or disclose Seller's due diligence and other Confidential Information with its employees, contractors, personnel, representatives, financing sources, attorneys, and other professional advisors, as may be reasonably necessary to carry out the transactions contemplated by this Agreement, including any business or the diligence review by or on behalf of Buyer.  If this Agreement is terminated, then upon Seller's written request, Buyer shall within twenty (20) days return or cause to be returned to Seller all documents and all copies thereof furnished by Seller and held by Buyer, its representatives or agents containing such Confidential Information.  Buyer recognizes that any breach of this Section would result in irreparable harm to Seller and that therefore Seller shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash or otherwise, in addition to all of their other legal and equitable remedies.

     **Section 7.3 Employment**.  As of the Effective Time, Seller shall terminate all of its employees and the Buyer shall offer employment effective as of the Effective Time to such employees of Seller that Buyer elects and determines to offer employment to, on terms and conditions determined by the Buyer in its sole and absolute discretion.  Such employees who accept the Buyer's offer of employment shall be referred to herein as the "Hired Employees".  To facilitate the Buyer's determination of which employees to whom Buyer desires to offer employment as a Hired Employee, Seller shall provide the Buyer, within a reasonable period prior to the Closing, a true and correct list of all of its employees, including with respect to any inactive employee, the reason for such inactive status and, if applicable, the anticipated date of return to active employment.  With respect to the Hired Employees, after the Effective Time, the Buyer shall be responsible for all liabilities, obligations and commitments of the Buyer and its Affiliates relating to all wages, salaries, bonuses, vacation, sick leave and other forms of compensation and related expenses, workers' compensation claims, and employee benefit liabilities under any and all plans, programs and arrangements maintained or contributed to by the Buyer and its Affiliates for the benefit of the Hired Employees, if and to the extent incurred or accrued after the Effective Time. Seller shall have no responsibility whatsoever for any liabilities or obligations that relate in any way to such Hired Employees' employment with the Buyer or any subsequent termination of employment of any Hired Employee by the Buyer.  Buyer shall not assume, and shall have no responsibility whatsoever for, any liabilities or obligations that relate in any way to any Persons' employment with Seller prior to the Effective Time, including any liabilities or obligations related to the termination of employment of such Persons by Seller. Buyer acknowledges that following the Closing, Seller shall be permitted to re-hire as of or after the Effective Time on a non-exclusive basis any officer of Seller in order to complete any remaining obligations of Seller under this Agreement or with respect to the Bankruptcy Case.

**ARTICLE 8**
**CONDITIONS TO CLOSING**

     **Section 8.1 Conditions to Buyer's Obligations.** All obligations of Buyer hereunder are subject to the fulfillment or waiver, prior to or at the Closing, of each of the following conditions:

     (a)     <u>Representations and Warranties</u>. The representations and warranties made by Seller in this Agreement and the statements contained on the Schedules attached hereto or in any instrument, list, certificate or writing delivered by Seller pursuant to this Agreement shall be true

19

in all material respects when made and at and as of the time of the Closing as though such representations and warranties were made at and as of the Closing.

(b)    <u>Sale Procedure Order</u>.  Entry by the Bankruptcy Court of the Sale Procedure Order, in form and substance acceptable to Buyer and Seller, expressly approving and authorizing bid procedures and including a provision that if Buyer is not the Successful Bidder for the Purchased Assets, then (i) Seller shall pay to Buyer upon Bankruptcy Court approval of a bid of another entity as shall be determined by the Bankruptcy Court to be "a higher and better bid" for the Purchased Assets than that of Buyer (the "<u>Higher Auction Transaction</u>") and the closing of the Higher Auction Transaction, the Buyer Deposit, and (ii) the Successful Bidder shall pay to Buyer upon Bankruptcy Court approval of the Higher Auction Transaction and the closing of the Higher Auction Transaction, the Termination Fee.  Payment of the Termination Fee and the Buyer Deposit shall be the sole remedy of Buyer for the failure of Seller to complete the sale of the Purchased Assets to Buyer as a result of a Higher Auction Transaction.

(c)    <u>Sale Order</u>.  Entry by the Bankruptcy Court of the Sale Order, in form and substance acceptable to Buyer and Seller, expressly making Section 363(m) of the Bankruptcy Code applicable to this Agreement, and the Sale Order shall be a Final Order.  For clarification, Buyer's obligation to close on the Transaction shall in all cases be subject to and contingent upon Buyer being named the Successful Bidder for all of the Purchased Assets.

(d)    <u>Performance by Seller</u>. Seller shall have performed and complied in all material respects with all covenants, agreements, obligations and conditions required by this Agreement, and any exhibits thereto, including, but not limited to, the execution and delivery of the items listed in Section 3.2(b) to the satisfaction of Buyer.

**Section 8.2 Conditions to Seller's Obligations**.  All obligations of Seller under this Agreement are subject to the fulfillment or waiver, prior to or at the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties</u>. The representations and warranties made by Buyer in this Agreement and the statements contained in any instrument, list, certificate or writing delivered by the Buyer pursuant to this Agreement shall be true in all material respects when made and at and as of the time of the Closing as though such representations and warranties were made at and as of the Closing.

(b)    <u>Purchase Price</u>.  Buyer shall have delivered the Cash Payment to the Escrow Agent or other parties as directed by Seller.

(c)    <u>Performance</u>. Buyer shall have performed and complied in all material respects with all agreements, obligations and conditions required by this Agreement and any exhibits thereto, to be so complied with or performed including payment and delivery of the Purchase Price and the execution and delivery of the items listed in Section 3.2(a) to the satisfaction of Seller.

(d)    <u>Litigation</u>. On the date of the Closing, there shall be no lawsuits pending against Buyer seeking to enjoin, prohibit, restrain or otherwise prevent the transactions contemplated hereby.

## ARTICLE 9
## SURVIVAL OF REPRESENTATIONS, WARRANTIES
## AND AGREEMENTS; EXPENSES

**Section 9.1 Survival**.  All representations and warranties of Seller and Buyer contained in this Agreement and the Transaction Documents shall survive until and expire at the Closing.

**Section 9.2 Expenses**.

(a)     Whether or not the transactions contemplated by this Agreement are consummated, each party hereto shall pay all of such party's own fees and expenses incident to the negotiation, preparation and execution of this Agreement, including the fees and expenses of such party's own legal counsel, accountants and other advisors.  Seller shall also remain solely responsible for the fees and expenses of Seller's financial advisor.

(b)     Buyer shall be responsible for all costs and expenses due to any third parties and associated with the Closing (the "Closing Costs"), including, without limitation: (i) to the extent applicable, any and all sales or other transfer, stamp or similar taxes incurred in connection with the sale, transfer and assignment of the Assets and from Seller to Buyer, (ii) any financing related expenses, and (iii) any other costs and fees incurred in connection with the sale, transfer and assignment of the Assets and from Seller to Buyer hereunder at Closing or otherwise.  For the avoidance of doubt, Closing Costs will exclude fees and expenses for which Seller is responsible under Section 9.2(a).

## ARTICLE 10
## TERMINATION

**Section 10.1 Right to Terminate**.   Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated at any time: (a) on or prior to the Closing Date by mutual written consent of Buyer and Seller; (b) by Buyer, effective upon written notice to Seller, if any of the conditions specified in Section 8.1 of this Agreement to the Buyer's obligation to close has not been satisfied and shall not have been waived by Buyer prior to or at the Closing; (c) by Seller, effective upon written notice to Buyer, if any of the conditions specified in Section 8.2 of this Agreement to Seller's obligations to close has not been satisfied and shall not have been waived by Seller prior to or at the Closing; (d) by Seller, if Seller accepts and the Bankruptcy Court approves a Higher Auction Transaction for the Purchased Assets; (e) by either party hereto, effective upon written notice to the other, if the Sale Procedure Order is not entered by the Bankruptcy Court in the Bankruptcy Case on or before the later of (i) the date that is fourteen (14) days after the filing of the Sale Motion and (ii) November 21, 2023. Further, the Buyer Deposit shall only be repayable or refundable to Buyer if (i) a Higher Auction Transaction closes pursuant to Section 8.1(b) of this Agreement; or (ii) even if a Higher Auction Transaction does not close, if the Agreement is terminated pursuant to (a), (b), (d), or (e) above (in which case Seller will cause such Buyer Deposit to be refunded to Buyer no later than five (5) business days following any such termination of this Agreement pursuant to (a), (b), (d) or (e) above).  For the avoidance of doubt, and subject to the terms and conditions of this Agreement (including Buyer's right to terminate this Agreement in accordance with this Article

10, as well as Buyer's right to receive a return of the Buyer Deposit and Termination Fee), Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of its estate in the Bankruptcy Case.

**Section 10.2 Break-up Fee**.  In the event this Agreement is terminated by Sellers pursuant to 10.1(d), the Successful Bidder shall pay to Buyer a fee equal to three percent (3%) of the of the aggregate purchase price paid to Seller by the Successful Bidder participating in the Higher Auction Transaction (the "Termination Fee") by wire transfer of immediately available funds to Buyer simultaneously with the Closing of the Higher Auction Transaction. Each of the Parties agree that the Termination Fee is not a penalty but is liquidated damages in a reasonable amount that will compensate Buyer for time its time, efforts, and contributions to the Seller's sale process in circumstances in which the Termination Fee is payable, which amount would otherwise be impossible to calculate with precision. The Termination Fee payable under this Agreement will be authorized under the Sale Order without the further order or consent of the Court, Debtors, or any creditors.

## ARTICLE 11
## MISCELLANEOUS

**Section 11.1 Assignability; Parties in Interest**.

(a)      Subject to the terms of this section, Buyer may assign any or all of its rights under this Agreement to any direct or indirect subsidiary of Buyer.  Buyer shall first advise Seller in writing of any such assignment and shall designate such party as the assignee and transferee of the Purchased Assets purchased under this Agreement.  Any such assignee shall have ability to perform all of Buyer's duties and obligations under this Agreement and shall assume all of Buyer's duties, obligations and undertakings hereunder.  Notwithstanding any such assignment, Buyer also shall remain liable hereunder for all of Buyer's duties and obligations under this Agreement.

(b)      Seller may not assign, transfer or otherwise dispose of any of its rights hereunder without the prior written consent of Buyer.

(c)      All the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the respective successors and permitted assigns, provided that the rights and obligations under all licenses of trademarks being assigned hereunder shall under no circumstances be assignable.

**Section 11.2 Allocation of Purchase Price**. Buyer and Seller agree that the Purchase Price shall be allocated among the Purchased Assets of Seller in accordance with Section 1060 of the Internal Revenue Code and the Treasury Regulations thereunder. Attached hereto as Exhibit "A" is such proposed allocation of the Purchase Price as determined by Buyer as of the Effective Date (the "Purchase Price Allocation"). Prior to the Closing, the Purchase Price Allocation shall be finalized by Buyer and Seller, and, absent agreement of the Buyer and Seller, shall be determined by the Bankruptcy Court. Such allocation shall be binding upon Buyer and Seller, and Buyer and Seller shall report the transactions contemplated hereby on all tax returns, including, but not limited to Form 8594. If it becomes necessary or appropriate to amend the allocation and any tax returns which incorporate such allocation, Buyer and Seller shall cooperate with each other in good

faith to agree on an amendment to such allocation and shall file any necessary amendments to tax returns to reflect such amendment. If, contrary to the intent of the parties hereto as expressed in this Section 11.2, any taxing authority makes or proposes an allocation different from the allocation determined under this Section 11.2, Buyer and Seller shall cooperate with each other in good faith to contest such taxing authority's allocation (or proposed allocation); provided, however, that, after consultation with the party (or parties) adversely affected by such allocation (or proposed allocation), the party (or parties) hereto may file such protective claims to tax returns as may be reasonably required to protect its (or their) interests.

Section 11.3 **Knowledge**. An individual will be deemed to have "knowledge" of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual could reasonably be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter. Buyer will be deemed to have "knowledge" of a particular fact or other matter if any individual who is currently serving as a director, officer or trustee of Buyer (or in any similar capacity) has, or at any time had, knowledge of such fact or other matter. Seller will be deemed to have "knowledge" of a particular fact or other matter if one or more of the following persons has knowledge of such fact or other matter: Mike Rinaldi, Charlie Hietala, or Allan Davis.

Section 11.4 **Entire Agreement; Amendments**. This Agreement, including the Schedules, lists and other documents and writings referred to herein or delivered pursuant hereto, which form a part hereof, contain the entire understanding of the Parties with respect to its subject matter. There are no restrictions, agreements, promises, warranties, covenants or undertakings other than those expressly set forth herein or therein. This Agreement supersedes all prior agreements and understandings between the Parties with respect to its subject matter. This Agreement may be amended only by a written instrument duly executed by all Parties or their respective successors or permitted assigns. Any condition to a Party's obligations hereunder may be waived but only by a written instrument signed by the Party entitled to the benefits thereof. The failure or delay of any Party at any time or times to require performance of any provision or to exercise its rights with respect to any provision hereof, shall in no manner operate as a waiver of or affect such Party's right at a later time to enforce the same.

Section 11.5 **Headings**. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretations of this Agreement.

Section 11.6 **References**. References to a section or subsection when used without further attribution shall refer to the particular section or subsection of this Agreement.

Section 11.7 **Severability**. The invalidity of any term or terms of this Agreement shall not affect any other term of this Agreement, which shall remain in full force and effect.

Section 11.8 **Notices**. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including electronic mail, facsimile and telex) or when delivered by overnight courier, or five days after being deposited in the

4866-5208-2829, v. 5

United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested to the following address:

|  |  |
|---|---|
| If to Seller: | Pioneer Aerospace Corporation<br>Attn: Michael Rinaldi<br>6448 Pinecastle Blvd., Suite 104<br>Orlando, Florida  32809<br>Email: Mike.Rinaldi@ASR-Pioneer.com |
|  | With Copy to Counsel: |
|  | Daniel R. Fogarty, Esq.<br>Stichter, Riedel, Blain & Postler, P.A.<br>110 East Madison Street, Suite 200<br>Tampa, Florida 33602<br>Email: dfogarty@srbp.com |
| If to Escrow<br>Agent: | Daniel R. Fogarty, Esq.<br>Stichter, Riedel, Blain & Postler, P.A.<br>110 East Madison Street, Suite 200<br>Tampa, Florida  33602<br>Email: dfogarty@srbp.com |
| If to Buyer: | Space Exploration Technologies Corp.<br>1 Rocket Road<br>Hawthorne, CA 90250<br>Email: Robin.petitprez@spacex.com |
| With Copy to Counsel: | George P. Angelich, Esq.<br>ArentFox Schiff LLP<br>1301 Avenue of the Americas, 42nd Floor,<br>New York, NY 10019<br>Email: George.Angelich@afslaw.com |

or to such other address as any Party may have furnished to the others in writing in accordance herewith, except that notices of change of address shall only be effective upon receipt.

   **Section 11.9 Governing Law**. This Agreement, and any dispute, controversy or claim arising out of or relating to this Agreement or a breach thereof, shall be governed by and construed and enforced in accordance with the laws of the State of Florida without regard to its conflict of laws rules or principles that might refer the governance or the construction of this Agreement to the law of another jurisdiction. The prevailing Party in any dispute arising out of this Agreement shall be

entitled to its reasonable attorneys' fees and costs from the other Party in addition to any other relief granted.

**Section 11.10 Waiver of Jury Trial.** EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW ANY AND ALL RIGHTS TO TRIAL BY JURY IN CONNECTION WITH ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.11 Counterparts**. This Agreement may be executed simultaneously in one or more counterparts, with the same effect as if the signatories executing the several counterparts had executed one counterpart, provided, however, that the several executed counterparts shall together have been signed by all Parties to be bound hereby. This Agreement shall be binding upon each signatory hereto when one or more counterparts, as provided above, have been signed by Buyer and Seller. All such executed counterparts shall together constitute one and the same instrument. Fax and electronic signatures (with originals to be later delivered by a nationally recognized express mail service) shall have the same effect as original signatures for all purposes under this Agreement.

**Section 11.12 Publicity**. Buyer and Seller will coordinate all publicity related to this Agreement and the activities contemplated hereunder and no Party will issue any press release, publicity statement, or other written public notice relating thereto without the prior consent of the other.

**Section 11.13 Drafting.** No provision of this Agreement shall be interpreted for or against either Party hereto on the basis that such Party was the draftsman of such provision, both Parties having participated equally in the drafting hereof, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 11.14 Time of Essence.** Time is of the essence in the performance of this Agreement.

**Section 11.15 Further Assurances.** On and after the Closing Date, Buyer and Seller will take all appropriate action and execute all documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the provisions hereof, including putting Buyer in possession of the Purchased Assets or to convey title to the Purchased Assets to Buyer.

**Section 11.16 Exclusive Jurisdiction.** The Parties acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the Parties hereto or any of Seller's creditors or other parties in interest in the Bankruptcy Case affected hereby pertaining directly or indirectly to this Agreement or to any matter arising herefrom or related hereto; provided, however, that if the Bankruptcy Court determines that it lacks or abstains from exercising such jurisdiction the Parties or creditors agree that the United States District Court for the Middle District of Florida, Orlando Division, shall have exclusive jurisdiction.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of the Buyer and Seller on the Effective Date first above written.

**BUYER:**

Space Exploration Technologies Corp.,
a Delaware corporation

By: _Robin Petitprez_____
Print Name: Robin Petitprez
Its: Vice President, Supply Chain

**SELLER:**

Pioneer Aerospace Corporation,
a Delaware corporation d/b/a ASR-Pioneer

By: _____
Print Name: _____
Its: _____

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of the Buyer and Seller on the Effective Date first above written.

**BUYER:**

Space Exploration Technologies Corp.,
a Delaware corporation

By: _____
Print Name: Robin Petitprez
Its: Vice President, Supply Chain

**SELLER:**

Pioneer Aerospace Corporation,
a Delaware corporation d/b/a ASR-Pioneer

By: _____
Print Name: Mike Rinaldi
Its: President

## INDEX TO EXHIBITS AND SCHEDULES

Exhibit "A"          Purchase Price Allocation

Schedule 1.1(f)      Assumed Contracts
Schedule 1.1(g)      Intellectual Property Assets
Schedule 1.1(m)      Assumed Bids
Schedule 1.2         Other Excluded Assets
Schedule 1.3         Assumed Liabilities
Schedule 4.5         Legal Proceedings

**<u>Exhibit "A"</u>**

**Purchase Price Allocation**

## **Schedule 1.1(f)**

### **Assumed Contracts**

[SELLER TO PROVIDE LIST OF EXISTING EXECUTORY CONTRACTS AND UNEXPIRED LEASES / BUYER TO INCLUDE SUCH CONTRACTS FOR ASSUMPTION HERE]

**Schedule 1.1(g)**

**Intellectual Property Assets**

Designs, manuals, documentation, specifications, and blueprints (and to the extent not owned by Seller, access to or copies of the foregoing in the possession of Seller consistent with any use or other rights and limitations) related to any of the following products or types of products that are designed, produced, manufactured, repaired, or held at the Connecticut Location or that are principally associated with the Connecticut Business or any Assumed Contract or Assumed Bid:

- Drag chutes (specifically inclusive of F-117 Drag Chute)
- Drogue chutes (specifically inclusive of SPX-00000432 Drogue Chute)
- Extraction slings
- Drogue mortar assemblies
- Drogue deployment bags
- Reefing lines
- Interface Controls
- Ribbon Drogues (26.5 FT DIA, 24 Gore)
- All derivatives of the foregoing
- Other component parts utilized in the manufacturing and delivering any of the foregoing

All of Seller's data, logs, documentation related to any of the following data derived from products or types of products that are designed, produced, manufactured, repaired, or held at the Connecticut Location or that are principally associated with the Connecticut Business or any Assumed Contract or Assumed Bid:

- Flown or packet parachutes and extraction slings
- Inspection reports
- Pre-flight videos
- Seam and joint test results

All systems, written instructions, instructional videos, know-how, and processes utilized by Seller in connection with products or the types of products that are designed, produced, manufactured, repaired, or held at the Connecticut Location or that are principally associated with the Connecticut Business or any Assumed Contract or Assumed Bid:

- Procure components/raw material
- Raw material requirements and test procedures
- Procedures to producing parachutes
- Procedures to producing extraction slings
- Assembly/Work instruction procedures for parachutes
- Assembly/Work instruction procedures for extraction slings
- Preparation, packing and rigging for parachutes
- Preparation and rigging for extraction slings
- Repair procedures and standard repair handbooks for parachutes

- Repair procedures and standard repair handbooks for extraction slings
- Final delivery procedures and verifications
- Quality inspection processes

All work in progress, developments, modifications, and licenses for the use thereof.

Notwithstanding anything to the contrary in the Agreement or this <u>Schedule 1.1(g)</u>:

(a) Seller does not purport to transfer, assign, or sell any right, title, or interest in any of the foregoing Intellectual Property Assets to Buyer that exceed the rights, title, and interest held by Seller with respect to such Intellectual Property Assets on the Closing Date;

(b) (i) Seller shall deliver to Buyer all physical or digital embodiments of the Intellectual Property Assets identified herein and in Section 1.1(g) only to the extent that Seller possesses and/or controls such physical or digital embodiments of the Intellectual Property Assets, (ii) Seller shall not deliver such Intellectual Property Assets to any third-party without Buyer's written consent, (iii) Seller shall have no obligation to obtain possession or control over such Intellectual Property prior to the Closing from any third-parties, and (iv) Seller's failure to deliver any physical or digital embodiments such Intellectual Property Assets shall not constitute a breach of Seller's obligations under Section 8.1 of the Agreement; and

(c)    Buyer acknowledges that Seller is unable to identify and separate from assets owned by third parties certain Intellectual Property Assets, including, without limitation, Intellectual Property Assets located at or stored among physical assets located at the Mississippi Location, and that Seller will make no effort to identify or separate those assets other than as required under Section 3.4(d) and 4.3 of the Agreement.

4866-5208-2829, v. 5

**Schedule 1.1(m)**

**Assumed Bids**

[SELLER TO PROVIDE LIST OF EXISTING BIDS TO PURCHASE SELLER'S ASSETS AND BIDS MADE BY SELLER / BUYER TO INCLUDE SUCH BIDS FOR ASSUMPTION HERE]

## Schedule 1.2

**Other Excluded Assets**

[TBD]

## **Schedule 1.3**

**Assumed Liabilities**

[TBD]

## **Schedule 4.5**

**Legal Proceedings**

[SELLER TO PROVIDE]