UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| | |
| AVIATION SAFETY RESOURCES, INC., | Case No. 6:23-bk-4639-GER |
| S.E., INC., | Case No. 6:23-bk-4641-GER |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-4643-GER |
| | |
| Debtors. | *Jointly Administered Under* |
| _____/ | *Case No. 623-bk-4639-GER* |
| | |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-4643-GER |
| | |
| Applicable Debtor. | |
| _____/ | |

## MOTION FOR AUTHORITY TO REJECT COLLECTIVE BARGAINING AGREEMENT BETWEEN PIONEER AEROSPACE CORPORATION AND SOUTHERN REGIONAL JOINT BOARD OF WORKERS UNITED

Debtor, PIONEER AEROSPACE CORPORATION ("**Pioneer**" or the "**Debtor**"), respectfully requests that this Court authorize it to reject its collective bargaining agreement related to Pioneer's formerly operating facility in Columbia, Mississippi with the Southern Regional Joint Board of Workers United (the "**Union**") with rejection to be effective as of the Petition Date, and in support of its motion, states as follows:

1.      On November 1, 2023 (the "**Petition Date**"), Pioneer, S.E., Inc. ("**Strong**") and Aviation Resources, Inc. ("**ASR**") filed their Voluntary Petitions for Relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").

2.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' Chapter 11 cases are being jointly administered for procedural purposes only.

4.      Pioneer is a recognized leader in the design and manufacture of state-of-the-art aerodynamic deceleration systems. These systems support specialized tactical, personnel, cargo, humanitarian, weapons, and space exploration programs. Additionally, Pioneer operates Airlift Technologies International, based in Milton, Florida, a manufacturing and engineering company that specializes in the design and production of aerial delivery systems, airdrop qualification testing, airdrop load design, systems related logistic support, and complete and comprehensive training of all ground and air crew personnel involved in cargo airdrops.  Strong manufactures parachutes and related products for both military solutions and commercial customers.  Both Pioneer and Strong are wholly-owned subsidiaries of ASR.

5.      By separate motions, Pioneer and Strong sought and obtained approval for the sale of substantially all of their business operating assets (the "**Purchased Assets**") located in Bloomfield, Connecticut (the "**Connecticut Location**"), Columbia, Mississippi (the "**Mississippi Location**"), Milton, Florida (the "**Milton Location**"), and Orlando, Florida (the "**Orlando Location**," and together with the Connecticut Location, the Mississippi Location, and the Milton Location, each a "**Location**" and, collectively, the "**Locations**"), subject to the terms and conditions of the separate stalking horse Asset Purchase Agreements, free and clear of any and all liens, claims, encumbrances, and interests. On November 22, 2023, the Court entered its Order (I) Authorizing the Sale of Substantially all of the Debtor's Assets Relating to the Connecticut Location Pursuant to 11 U.S.C. § 363, Free and Clear of all Liens, Claims and Encumbrances, and (II) Authorizing the Assumption and Assignment of Contracts (Doc. No. 73), and its Order Granting Debtors' Motion for Entry of an Order Authorizing (I) The Sale Of Substantially all of Their Assets Pursuant to 11 U.S.C. § 363, Free and Clear of all Liens, Claims and Encumbrances, and (II) Authorizing the Assumption and Assignment of Contracts (Doc. No. 74) (together, the

4879-9637-4160, v. 1

"**Sale Orders**").

## The Collective Bargaining Agreement with the Union

6.      The Union is the authorized representative for bargaining unit employees at Pioneer's Mississippi Facility under the Collective Bargaining Agreement between the Debtor and the Union (the "**CBA**").   The CBA is attached hereto as **Exhibit A** and is incorporated by reference.  The CBA expired on October 31, 2023, subject to renewal or termination as provided by the terms of the CBA.

7.      The CBA does not prohibit or restrict a sale of assets. Rather, the CBA merely and only governs operation of the Mississippi Facility, and the wages, hours, and working conditions of Pioneer at the Mississippi Facility.  Nor is the CBA by its terms binding on a successor to Pioneer, and thus cases interpreting a sale free and clear in the case of a successor clause are inapplicable. Finally, because the CBA is limited to the Mississippi Facility, and the assets at the Mississippi Facility consist of inventory, equipment, and records, but no on-going operations due to the closure of the facility, those cases are even more inapplicable.

8.      Under the CBA, the Debtor was also obligated to make payments to the National Retirement Fund (the "**Pension Fund**"), a multi-employer plan administrated by the National Retirement Fund. Specifically, Article XIV of the CBA provides

> "On or before the 15th of each month, the Employer shall pay to the National Retirement Fund, an amount per bargaining unit employee for each compensated hour for all payroll weeks ending in the prior calendar month at the following rates as provided in the Retirement Supplemental Agreement which is attached to this Agreement and incorporated herein…"

CBA, Art. XIV.

9.      The Pension Fund is not a benefit plan that provides for health or death benefits, and there is not a retiree benefit plan covered under § 1114(a).

10.     Due to significant operating losses, in part due to corrective action notices and requests received at the Mississippi Location prior to ASR's purchase of Pioneer, and the inability of Pioneer to raise additional capital to fund the operating losses, the Mississippi Location was closed in April/May 2023. The employees subject to the CBA were terminated at that time or shortly thereafter.

11.     For the reasons set forth in the Sale Motion and the Bid Procedures Motion, and as testified to at prior hearings in this case, Pioneer is unable to continue its business operations, and sought a going-concern sale of the Milton Location and the Bloomfield Location, and a sale of assets located at the Mississippi Location, which as set forth above has not operated since the facility was closed in May.

12.     Neither of the Stalking Horse Bidders, or any other potentially interested parties, have expressed an interest in assuming the CBA with respect to the Mississippi Location, or in operating the Mississippi Location under the CBA or otherwise.

13.     Pioneer made a proposal to the Union to reject the CBA, not later than upon the closing of the sale (the "**Proposal**").  A copy of the Proposal is attached hereto as **Exhibit B.**  The Proposal contemplates performance under the CBA through the date of closing, to the extent that any obligations continue post-petition under the terms of the CBA given the closure of the Mississippi Location months ago.  In addition, Pioneer has provided previously the Union with historical financial information for the Mississippi Location, and the sale pleadings filed by the Debtor.

14.     No response to the Proposal has been received.

**<u>Relief Requested</u>**

15.     By this Motion, Pioneer seeks the entry of an order resolving the obligations under

the CBA – either confirmation of termination or rejection, or, alternatively, rejection. To the extent

that the CBA has not terminated pre-petition or will not terminate by its terms shortly, rejection of

the CBA satisfies the requirements of § 1113.

16.     The court in *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr. D. Minn.

1984), articulated a nine-point test to determine whether a debtor may reject a CBA under §

1113(c). The factors combine the debtor's obligations in presenting the proposal for modification

and the considerations to be examined by the court under § 1113(c). Several other bankruptcy

courts have applied the *American Provision* factors when deciding whether to approve the rejection

of CBAs under § 1113. *See, e.g., In re Walter Energy, Inc.*, 542 B.R. 859, 878 (Bankr. N.D. Ala.

2015). The test requires that the following be met:

> (a) The debtor in possession must make a proposal to the union to modify the collective bargaining agreement;
>
> (b) The proposal must be based on complete and reliable information available at the time of the proposal;
>
> (c) The proposed modifications must be "necessary to permit the reorganization of the debtor;"
>
> (d) The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably;
>
> (e) The debtor must provide to the union such relevant information as is necessary to evaluate the proposal;
>
> (f) Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the union;
>
> (g) At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement;
>
> (h) The union must have refused to accept the proposal without good cause; and
>
> (i) The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*Id*. at 879.

17.     Here, the elements of the test under § 1113 are met. The Debtor has no employees subject to the CBA, and the Mississippi Location is not operating. The CBA has expired by its terms, and the Debtor indicated its intention to not be bound by the CBA following its expiration. If the CBA is not rejected, it could create further liabilities of the estate, or cause confusion as to the status of the CBA in light of the sale of assets at the Mississippi Location free and clear of claims and interests, including those under the CBA.

18.     The Debtor made the Proposal to the Union, which was based on complete and reliable information with respect to the potential for the reopening of the Mississippi Location, the significant losses that resulted in the closure, and the lack of any interest in any potential purchaser in reopening the Mississippi Location. The Proposal was necessary to permit the reorganization of the debtor through the sale under the Sale Orders, including the sale of equipment at the Mississippi Location.

19.     Rejection does not treat the Union unfairly or inequitably as compared to the other employees or creditors of Pioneer, and the balance of equities favors rejection of the CBA.  The rejection of the CBA, which has expired or been terminated prepetition and which does not cover any employees given the closure of the Mississippi Location will facilitate distributions to creditors, and the Union and any former employees subject to the Union, as well as the Pension Fund, will be treated fairly and equitably.

20.     The Debtor is ready, willing, and able to meet with the Union, and will make every effort to do so between the filing of this Motion and the hearing on the Motion.

21.     The Debtor respectfully requests that the Union be required to assert any claim of any nature whatsoever arising under or in connection with the CBA and the Debtor's rejection of same on or before thirty (30) days following the entry of an order of this Court granting this Motion

4879-9637-4160, v. 1

or be forever barred from enforcing any claim arising under or related to the CBA or the Debtor's rejection of same against the Debtor or the Debtor's estate.

22.     Because the rejection of the CBA, to the extent not already expired or terminated, results in the elimination of the obligation to make payments to the Pension Fund, the Debtor requests that the Court require that the Pension Fund file any claim of any nature whatsoever arising under or in connection with the CBA and the Debtor's rejection of same, including but not limited to any claims for contributions or for withdrawal or other liability, on or before thirty (30) days following the entry of an order of this Court granting this Motion or be forever barred from enforcing any claim arising under or related to the CBA or the Debtor's rejection of same against the Debtor or the Debtor's estate.

WHEREFORE, the Debtor respectfully requests that the Court (a) grant this motion, (b) authorize the Debtor to reject or terminate the CBA, and (c) grant such other and further relief as is just and proper.

DATED:  December 11, 2023

/s/ *Daniel R. Fogarty*
Daniel R. Fogarty (FBN 0017532)
Stichter Riedel Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida   33602
Telephone: (813) 229-0144
Email:  dfogarty@srbp.com
Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing *Motion for Authority to Reject Collective Bargaining Agreement between Pioneer Aerospace Corporation and the Southern Regional Joint Board of Workers United* has been furnished on December 11 2023, by the Court's electronic CM/ECF transmission or by U.S. Mail and electronic mail to:

Chris Baumann, Southern Region Director
Southern Region, Workers United, SEIU
1777 Phoenix Parkway
Suite 230
Atlanta, GA 30349
baumann2468@gmail.com
sregionunite@bellsouth.net

Workers United, Southern Regional Joint Board
c/o Michael Schoenfeld, Stanford Fagan, LLC
2540 Lakewood Ave.
Atlanta, GA 30315
MichaelS@sfglawyers.com

Workers United
Attn: Lynne Fox, International President
22 South 22nd Street
Philadelphia, PA 19103
Fax (215) 575-9065

National Retirement Fund
c/o    Amalgamated    Employee    Benefits
Administrators, Plan Administrator
333 Westchester Ave
White Plains, NY 10604

National Retirement Fund
c/o Amalgamated Employee Benefits Administrators, Plan Administrator
Attn. David Sapp, Executive Director, Litigation Counsel
dsapp@amalgamatedbenefits.com

National Retirement Fund
Attn: Plan Trustees, c/o Richard N. Rust
333 Westchester Ave
White Plains, NY 10604

National Retirement Fund
c/o Amalgamated Employee Benefits Administrators, Plan Administrator
Attn. Galina Stiler, attorney
gstiler@amalgamatedbenefits.com

/s/ *Daniel R. Fogarty*
Daniel R. Fogarty (FBN 0017532)

Label Matrix for local noticing
113A-6
Case 6:23-bk-04641-GER
Middle District of Florida
Orlando
Tue Dec  5 11:27:08 EST 2023

Aerial Delivery Solutions, LLC
3601 Commerce Blvd.
Kissimmee, FL 34741-4604

Airtech
Mittelstraße 69
Mittelstraße 69, 33181 Bad
Wunnenberg, Germany

Aviation Safety Resource, Inc.
6448 Pinecastle Blvd., Suite 104
Orlando, FL 32809-6682

Bally Ribbon
23 N. 7th PO Box D
BALLY, PA 19503-1004

Bourdon Forge, Co., Inc.
99 Tuttle Rd
Middletown, CT 06457-1827

(p)CREDIT CONTROL  LLC
ATTN CORRESPONDENCE
3300 RIDER TRAIL S
SUITE 500
EARTH CITY MO 63045-1338

Daesung Forge
144-17 Gongdan-ro
Jain-Myeon Gyeongsan-si
Gyeongsanbuk-do, South Korea

Die - Matic Products LLC
130 Express St Engineers Hill
Plainview, NY 11803

Duke Energy
PO Box 1094
Charlotte, NC 28201-1094

Employers Preferred Insurance
26000 Cannon Rd.
Bedford, OH 44146-1807

GlobalTranz
One Glenlake Parkway Ste 700
Atlanta, GA 30328-3496

Guardian
PO Box 826486
Philadelphia, PA 19182-6486

HLC Industries
P.O. Box 1036
Charlotte, NC 28201-1036

Para-Gear Equipment Co.
3839 W. Oakton
Skoie, IL 60076-3483

Parachute Laboratories
1665 N. Lexington Ave., #106
Deland, FL 32724-2187

S.I.R. Webbing
P.O. Box 501
Hawthorne, NJ 07507-0501

(p)TFORCE FREIGHT
ATTN ANTHONY SCHRUNK
PO BOX 1216
RICHMOND VA 23218-1216

Tape Craft
P O Box 2027
Anniston, AL 36202-2027

UPS
PO Box 650116
Dallas, TX 75265-0116

United Health Care
PO Box 94017
Palatine, IL 60094-4017

Westmark Corporation
PO Box 98 42 Industrial Park Drive
Sterling, CT 06377-0098

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Credit Control LLC
Re:  Bank of America
3300 Rider Trail S., #500
Earth City, MO 63045

T-Force
1000 Semmes Avenue PO Box 1216
Richmond, VA 23218

End of Label Matrix
Mailable recipients    21
Bypassed recipients     0
Total                  21

```
Label Matrix for local noticing       ABB, Inc.                              AT&T
113A-6                                 Attn: Real Estate Group               P.O. Box 5019
Case 6:23-bk-04643-GER                 305 Gregson Dr.                       Carol Stream, IL 60197-5019
Middle District of Florida             Cary, NC 27511-6496
Orlando
Tue Dec  5 11:26:40 EST 2023

Bluegrace Logistics                    Bourdon Forge Co Inc                  C Spire
Dept. 108                              99 Tuttle Road                        P.O. Box 748168
Box 4964                               Middletown, CT 06457-1827             Atlanta, GA 30374-8168
Houston, TX 77210-4964


(p)CATERPILLAR FINANCIAL SERVICES CORPORATION   Cistech Inc                  Comcast Business
2120 WEST END AVENUE                   10590 Independence                    P.O. Box 37601
NASHVILLE TN 37203-5341                Pointe Pkwy. #202                     Philadelphia, PA 19101-0601
                                       Matthews, NC 28105


(p)DE LAGE LANDEN FINANCIAL            Eagle Packaging                       HLC Industries
ATTN LITIGATION & RECOVERY             1075 S. Fairfield Drive               4 East Montgomery Ave
1111 OLD EAGLE SCHOOL ROAD             Pensacola, FL 32506-8927              Bala Cynwyd, PA 19004-3300
WAYNE PA 19087-1453


Mississippi Power Company              National Institute for Aviation Research   National Retirement Fund
P.O. Box 245                           Wichita State University              c/o Amalgamated Employee Benefits Adm
Birmingham, AL 35201-0245              1845 Fairmount St.                    333 Westchester Ave.
                                       Wichita, KS 67260-0093                White Plains, NY 10604-2938


Paradigm Parachute and Defense, Inc.   Seko Worldwide Llc                    Sturges Manufacturing Company Inc
Greenspoon Marder, LLP                 1100 Arlington Heights Rd 600         2030 Sunset Ave
525 Okeechobee Blvd., Suite 900        Itasca, IL 60143-3180                 Utica, NY 13502-5500
West Palm Beach, FL 33401-6306


Terry Service Inc                      Town Of Bloomfield Connecticut        UPS
P.O. Box 1557                          Attn Town Clerk                       P.O. Box 809488
Ridgeland, MS 39158-1557               P.O. BOX 337                          Chicago, IL 60680-9488
                                       Bloomfield, CT 06002-0337


Xerox Corporation
PO Box 827598
Philadelphia, PA 19182-7598




          The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
          by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


Caterpillar Financial Services         De Lage Landen                        End of Label Matrix
2120 West End Ave.                     P.O. Box 41602                        Mailable recipients    21
Nashville, TN 37203                    Philadelphia, PA 19101-1602           Bypassed recipients     0
                                                                             Total                  21
```

**Exhibit A**

Copy of the CBA

# PIONEER AEROSPACE

## And

# SRJB WORKERS UNITED/SEIU

## Collective Bargaining Agreement

**November 1, 2020 – October 31, 2023**

# TABLE OF CONTENTS

ARTICLE I — RECOGNITION ................................................................................... 1

ARTICLE II — UNION MEMBERSHIP AND OBLIGATION ........................................... 2

ARTICLE III — HOURS OF WORK ............................................................................ 2

ARTICLE IV — HOLIDAYS ..................................................................................... 3

ARTICLE V — FACTORY RULES AND REGULATIONS .................................................. 5

ARTICLE VI — SENIORITY .................................................................................... 12

ARTICLE VII — EQUAL DIVISION OF WORK ............................................................ 16

ARTICLE VIII — LEAVE OF ABSENCE ..................................................................... 17

ARTICLE IX — GRIEVANCES ................................................................................. 17

ARTICLE X — WAGES .......................................................................................... 18

ARTICLE XI — NO STRIKE — NO LOCKOUT ........................................................... 20

ARTICLE XII — VACATIONS .................................................................................. 20

ARTICLE XIII — DISCHARGES ............................................................................... 21

ARTICLE XIV — INSURANCE & RETIREMENT FUNDS ............................................... 22

ARTICLE XV — SEPARABILITY .............................................................................. 22

ARTICLE XVI — BEREAVEMENT PAY ..................................................................... 22

ARTICLE XVII — PLANT CLOSINGS ....................................................................... 23

**ARTICLE XVIII — JURY PAY** .................................................................................... **23**

**ARTICLE XIX — NON-DISCRIMNATION** ................................................................... **23**

**ARTICLE XX —MISCELLANEOUS** ............................................................................. **23**

**ARTICLE XXI —TERM OF AGREEMENT** .................................................................... **24**

**SCHEDULE A** ............................................................................................................. **26**

AGREEMENT dated this 1st day of November, 2020, by and between Southern Regional Joint Board of Workers United, hereinafter designated as the Union, and Pioneer Aerospace Corporation, hereinafter referred to as the Company or the Employer.

WHEREAS, the Company and the Union desire to reach an Agreement by means of collective bargaining that will facilitate peaceful adjustment of any difficulties arising between them and will continue to maintain, promote and improve the welfare of the employees of the Company for whom the Union is the collective bargaining agent and that will enable the Company and the Union to carry out their respective obligations in an efficient manner to that end, so that the parties hereto may benefit mutually, the Company and the Union hereby contract and agree as follows:

## ARTICLE I — RECOGNITION

Section 1. The Employer recognizes the Union as the sole and exclusive bargaining representative for its employees with reference to wages, hours and working conditions (as hereinafter defined) of the Employer in its plant located in Columbia, Mississippi.

Section 2. The terms "employee" or "employees" as used in this Agreement mean all of the production employees, including receiving, shipping, and stock clerks, but excluding office-clerical employees, guards, professional employees and supervisory employees as defined in the National Labor Relations Act, as amended, employed by the Employer at its plant located in Columbia, Mississippi.

Section 3. An International Representative of the Union shall have access to the plant for the purpose of adjusting grievances, negotiating the settlement of disputes and investigating working conditions. Whenever possible he shall make an appointment in advance for such visits. In any event, the Union representative shall on arrival at the plant, clear through the regular channel of the Employer for the express purpose of avoiding hazardous areas within the plant which may jeopardize the safety of said Union representative.

Section 4. Employees not in the bargaining unit will do no production operations except by mutual agreement when the performance of such production operations by employees not in the bargaining unit shall cause employees in the bargaining unit to lose time on their regular jobs, except as provided in Article VII, Section 2.

Section 5. The Union shall have the right to post notices, that have been approved by the factory superintendent, on the bulletin board provided by the Employer for such purpose.

Section 6. Unless by mutual agreement or in case of emergency, all conferences, meetings and negotiations for the purpose of discussing and settling grievances and for all other purposes shall be held after working hours.

Section 7. Union Orientation. The Company agrees to introduce the Steward to all new hires at the time of hire. In addition, all new employees shall be entitled to receive a fifteen (15) minute orientation provided by a Union representative as scheduled by the Company. The Union will provide the Company with a copy of the Union agenda, if any, for the orientation.

Section 8. SOUTHERN REGIONAL EDUCATION FUND, Effective January 1, 2012, the Company agrees to contribute one thousand dollars, ($1000.00) per calendar year to the Southern Regional Education Fund. The Union represents to the Company that this Fund has been established for the purposes described in 29 U.S.C.§175(a)(1)(B), and operates in accordance with §302 (c)(9) of the Labor Management Relations Act of 1947, 29 U.S.C.§186(c)(9). Payment to the Southern Regional Education Fund shall be made each year in January for the life of this contract. Such monies shall be held in trust and utilized for the purposes set forth above.

## ARTICLE II — UNION MEMBERSHIP AND OBLIGATION

Section 1.  The first ninety (90) days of service of a new employee with the Employer shall constitute a trial period. The provisions of Article XIII ("Discharges") shall not apply during the trial period, Employees will become eligible for union membership after having been employed for thirty (30) days.

Section 2. Within a reasonable time after the end of each month the Union will be furnished with a list of new employees in the bargaining unit. The Union will be furnished with notices of termination and the reasons therefore, within three (3) working days following actual termination. Section 3. In the manner and to the extent permitted by law the Employer agrees to deduct monthly from the wages of each of its employees who are members of the Union and who have authorized the same, the prescribed dues, initiation fees, assessments, and union political action committee contributions. Each authorization shall be in writing, signed by the employee and shall be delivered by the Union to the Employer. The amounts so deducted by the Employer shall be transferred with a list of names of the employees from whom deductions were made on forms provided by the Union. Such funds shall be kept separate and apart from the Employer's general funds, and shall be deemed trust funds.

## ARTICLE III — HOURS OF WORK

Section 1. The regular hours of work for all employees shall not be more than eight (8) hours in any one day from Monday to Friday inclusive. The daily schedule of hours shall be agreed upon by the Employer and the Union and until otherwise so mutually agreed upon shall follow existing plant practices. The Employer and Employees can mutually agree that the Employee can start work thirty (30) minutes early. No work of any nature whatsoever shall be performed by or requested of any employee during the employee's lunch hour, except if the employer and employee mutually agree that the employee can work thirty (30) minutes during lunch, as long as thirty (30) minutes are still always taken for lunch.

Section - OVERTIME

(A)     A rate of time and one-half shall be paid for work performed in excess of eight (8) hours in any one work day or for work performed on a holiday. Overtime pay for work performed on a designated holiday shall be in addition to holiday pay to which the employee is entitled pursuant to Article IV. The part of this provision requiring time and

one-half pay for hours in excess of 8 in a day shall be suspended for a period of twelve (12) months from the date of signature of this agreement. This suspension shall permanently expire after such time.

(B)     A rate of time and one-half shall be paid for work performed in excess of forty (40) regular hours in any one work week. All work performed on a Saturday will be paid at time and one-half, and after the forty (40) regular hour threshold has been reached in a week, all work performed on a Sunday or a seventh consecutive day of work will be paid at double time.

(C)     Approved time off during any regularly scheduled work day or work week due to an official lay off, holiday, approved union leave, or paid time off for bereavement leave, shall be counted as hours worked for determining if overtime payments are owed.

(D)     Overtime pay shall be based upon the Employee's regular rate of pay, as defined by the Fair Labor Standards Act.

(E)     In allocating overtime work on any job or operation, preference shall be given to employees regularly employed on such job or operation, and insofar as practical, such overtime shall be equally distributed. The Employer agrees to give reasonable notice to the employees and the appropriate Union representative when overtime is to be worked.

The Company and the Union agree that in requesting overtime the following procedures shall be followed before any employee is required to work:

1.     All daily overtime work beyond two hours (2) per day is strictly voluntary, except in cases of emergency or special projects.

2.     Overtime work hours on Saturday shall be 6 hours, 6 a.m. to 12 noon, except in cases of emergency or special projects.

(F)     The pattern of employment in the plant is that work on Saturday normally is work on the sixth day of the week, and work on Sunday normally is work on the seventh day of the week. Accordingly, the provisions of the foregoing paragraphs calling for time and one-half for hours worked after forty (40) regular hours, and double time for hours worked on the seventh day of the week (assuming the forty (40) regular hour threshold has been reached), provides for work which falls within the contractual overtime hours. It is, therefore, understood by the parties that: (1) the extra half-time pay for work after forty (40) regular hours and the extra time pay for work on Sunday constitutes true overtime premium payments which may be excluded in the regular rate of pay under the Fair Labor Standards Act; and (2) there shall be no pyramiding of overtime pay.

Section 3. Employees will be provided one fifteen (15) minute break in the morning.

## ARTICLE IV — HOLIDAYS

Section 1.  Time and one-half shall be paid for all work performed in addition to holiday pay on the holidays selected by the Union as provided in Section 4 infra.

Section 2. In the event that a holiday falls on Sunday, the following Monday shall be observed and considered as a holiday.

Section 3. Anything to the contrary herein notwithstanding, no work shall be performed by or requested of any employees (other than those employees who traditionally work on holidays) on Labor Day.

Section 4. All employees covered by the Agreement shall receive ten (10) holidays with pay irrespective of the day of the week on which the holiday falls. The specific days to be celebrated during the term of this Agreement shall be:

New Years Day
Martin Luther King Day
Washington's Birthday
Good Friday
Memorial Day
July 4th
Labor Day
Thanksgiving Day
Day after Thanksgiving
Christmas Day

Section 5.  In the case of hourly workers, the pay for each holiday shall be eight (8) times the employee's regular rate of pay for the last payroll period that Employee worked immediately prior to the holiday.

Section 6.  In order to be eligible for pay for the holiday, the individual employee shall have worked on the regular work day preceding the holiday and on the regular work day following the holiday provided that work is available on those two days, and except that this provision shall not be construed to deny benefits to an employee who has absences for either of those days, for which the employee provides a documented excuse from a doctor, dentist, court of law or education facility, or if the absence is otherwise excused by the Employer or is for the exceptions listed in Article V, Section 4(A).

The day "before and after" rule shall apply to all holidays with the exception that should separate holidays fall either simultaneously or successively, an employee absent (without reasonable cause as heretofore defined) either the day before or the day after, shall lose only one of the holidays. In the event an employee is absent (without reasonable cause as heretofore defined) both the day before and the day after, the employee shall lose holiday pay for all intervening holidays.

Section 7. If a holiday occurs during a week in which an employee receives a vacation, each such employee shall receive pay for the holiday in addition to his vacation pay regardless of whether or not such employee qualifies for holiday pay under Section 6 supra.

Section 8. When an employee is laid off for five consecutive weeks as follows:

(A)    the entire two weeks immediately preceding the week in which the holiday occurs;

4

and

(B)     the entire week during which the paid holiday occurs; and

(C)     the entire two weeks immediately following the week in which the paid holiday occurs, then in that event the Company will not be obligated to pay the said holiday to said employee.

Section 9. New hires shall receive holiday pay after being employed for thirty (30) days.

Section 10.  The Company agrees to shut down the plant at noon on the last day before the Christmas break, but employees will be paid for the full day as long as the employee works until noon.

# ARTICLE V — FACTORY RULES AND REGULATIONS

Section 1. The Company retains the exclusive rights to manage its business, plant and facilities, to direct its working force and to exercise all the functions and prerogatives of management in the operation of its business, in such a manner as it deems advisable without being restricted or limited in any respect, subject only to the conditions expressly contained in this Agreement.

Section 2. The management of the Company and the direction of its working force reserved exclusively to the Company includes but is not limited to:

(A)     the right to determine the existence of any and all facts which are the basis of a management decision;

(B)     the right to plan, direct and control operations;

(C)     the right to establish and maintain production and quality standards;

(D)     the right to introduce new methods, materials or facilities, or to change existing methods, materials or facilities;

(E)     the right to select and to determine the number and types of employees required in any Company operations;

(F)     the right to make and enforce reasonable rules of conduct for employees;

(G)     the right to maintain order and efficiency in its plants and operations;

(H)     the right to assign work to employees in accordance with the requirements determined by management;

(I)     the right to reprimand, suspend, discharge or otherwise discipline employees by management for just cause as necessary for the orderly, efficient and profitable operation of its business;

(J)     the right to lay off or relieve employees for lack of work or for other legitimate reasons;

(K)     the right to determine the days (including Saturdays, Sundays and holidays) and hours of work for all employees;

(L)     the right to establish employee work schedules; and

(M) the right to make and enforce reasonable safety and security rules and policies, and to discipline employees for violation of any of those rules or policies.

Section 3. Disciplinary slips will normally be issued in the order of: 1) first written warning, 2) second written warning, 3) suspension, 4) termination. If a period of one year has lapsed since the issuance of slip number 1, slip numbers 2, 3 and 4 will not be issued without slip number 1 being issued again. Disciplinary slips will be issued within thirty (30) days of the event, or within 30 days of when the Company became aware of the event, or the Company shall forfeit the opportunity to issue a warning for that event. Shut down periods will not be included in calculating the 30 day period. If other instances occur between the date of the first instance and the issuance of the disciplinary slip, only one disciplinary slip will be given for the earliest instance. In case of gross misconduct, the company may exercise discipline, including discharge, without regard to progressive discipline. Examples of gross misconduct include, but are not limited to: theft, gross insubordination, fighting, use or sale of illegal drugs or alcohol, possession of weapons on company property, gross violation of the company's non-harassment or non-discrimination rules.

Section 4. - Attendance Policy

(A) The following are exceptions and will not be counted against the employee:

- FMLA — Family and Medical Leave Act Leave
- Jury Duty
- Vacation
- Holidays
- Layoff
- Bereavement Leave
- Approved Union Business
- Approved Personal Leave
- An employee is subpoenaed to court (one time per 12 months) with proof of subpoena

(B) The Verbal Counseling Warning is where the Union and the Employer will jointly counsel the Employee about the attendance problem.

(C) Occurrences older than 6 months will be removed from the employee's record.

(D) The number of occurrences within the prior six (6) month period will determine the disciplinary action taken.

(E) Partial Absence of four (4) hours or less will be counted as a ½ occurrence.

(F) Progressive discipline will proceed as follows:

Absences, Partial Absence or Tardies

For employees hired before November 1, 2011 the following will apply

- Number of Occurrences 1: No Action
- Number of Occurrences 2: No Action
- Number of Occurrences 3: No Action
- Number of Occurrences 4: No Action

6

- Number of Occurrences 5: Verbal Counseling Warning
- Number of Occurrences 6: Written Warning
- Number of Occurrences 7: Written Warning
- Number of Occurrences 8: Final Warning
- Number of Occurrences 9: Termination

For employees hired on or after November 1, 2011 the following will apply:

a.  During the employee's first year of employment the following progressive discipline will apply

- Number of Occurrences 1: No Action
- Number of Occurrences 2: No Action
- Number of Occurrences 3: Verbal Counseling
- Number of Occurrences 4: Written Warning
- Number of Occurrences 5: Written Warning
- Number of Occurrences 6: Final Warning
- Number of Occurrences 7: Termination

b.  During the employee's second year of employment (effective on the employee's first anniversary date) the following progressive discipline will apply

- Number of Occurrences 1: No Action
- Number of Occurrences 2: No Action
- Number of Occurrences 3: No Action
- Number of Occurrences 4: Verbal Counseling Warning
- Number of Occurrences 5: Written Warning
- Number of Occurrences 6: Written Warning
- Number of Occurrences 7: Final Warning
- Number of Occurrences 8: Termination

At an employee's second anniversary the employee will be subject to the same progressive discipline terms as employees hired before November 1, 2011. Current records will not be reset but one additional "no action" occurrence will be added.

(G)  An employee who maintains perfect attendance for 90 days shall have one occurrence removed from their attendance record.

Section 5. The collection of Union obligations on Employer's property, other than during working hours, shall not be considered a violation of the said rules and regulations.

Section 6. The Employer recognizes and will not interfere with the right of the employees to become members of the Union, and agrees that there shall be no discrimination, interference, restraint, or coercion by the Employer or any of its agents against any of the said employees because of their membership in the Union, or because of their lawful activities as members of the Union.

Section 7. Working conditions in the plant or other benefits which the employees are now receiving, and which are not covered by the provisions of this Agreement shall be maintained

for the life of the Agreement, except where such conditions or benefits are altered by the terms of this Agreement.

Section 8. - Labor Performance Policy -

(A)    The employer will focus on and monitor employee efficiency (on-standard performance) and not overall efficiency (off standard performance).

(B)    Employee reinforcement through training and standard rate reviews are to be used as additional tools to improve Performance.

(C)    Employee Efficiency Requirements - employee performance will be monitored and controlled as follows:

For Production Lines with an efficiency standard set by management, employees will be expected to maintain an efficiency at or above eighty percent (80%) of said standard set by management. Progressive discipline will be used.

(D)    Exception for job class transfer as a result of job bids for regular employees:

Employees transferring to a new job class (as a result of a job bid) will have four weeks exempt from efficiency tracking. Said employees will have to be running at 40% efficiency at twelve weeks, 60% efficiency by sixteen weeks, and 80% efficiency after twenty weeks. Progressive discipline will be used.

(E)    Newly Hired Employee Efficiency Exception:

Newly hired employees will be held to the same training standards as employees transferred to a new job class under Section E above.

(1)    Progressive discipline will be used for a new hire employee on a production line in which the employee's individual efficiency falls below the minimum required efficiency of 80% of the standard set by management after the trial period has ended.

(2)    New hires are subject to the job class transfer consideration, versatility, line startup and progressive discipline rules.

(3)    In no way does this procedure override the rules of Article V, section 2 in the union contract.

(F)    Versatility Exemption - employee's assigned 5 or more jobs daily for one week will be given 10% credit on their individual efficiency requirement. Employee's assigned 10 or more jobs daily for one week will be given a 20% credit on their individual efficiency requirement.

(G)    Production Startup Exception - progressive discipline is waived while an employee is on a production line for less than 4 weeks.

(H)    Formal labor performance discipline will be addressed weekly and based on the following requirements:

(1)    Progressive discipline will be enforced for consecutive occurrences.

(2)    The disciplinary progression is as follows:

- Occurrence 1:Nothing
- Occurrence 2:Verbal Warning
- Occurrence 3:Disciplinary Slip
- Occurrence 4 Disciplinary Slip
- Occurrence 5 Suspension (Performance Curve will be adjusted one week)
- Occurrence 6:Termination

Section 9. The company agrees to keep the Union involved in the process of setting standard units and job ratings for efficiency, including the ability to conduct engineering reviews to verify the company's findings. At the union's request, the company agrees to make available its rationale for setting efficiency standards and rates, subject to the restrictions placed upon technical data in accordance to the International Traffic in Arms Regulations (ITAR) and any trade control restrictions as required by law.

Section 10. If the Employer has reason to believe from observing an employee that the employee is impaired by drugs or alcohol, to the extent that the employee cannot safely or effectively perform his or her job duties, the Employer may request the employee to cease working. The Employer may then require that the employee submit to a drug and alcohol test. The employee must undergo the test within two hours of the Employer's request. If the test is positive, the employee has the choice either to resign or take administrative leave without pay for up to sixty (60) days (or longer to the extent the Family and Medical Leave applies) to enter and successfully complete a recognized rehabilitation program, at his own expense or pursuant to any medical benefits that employee may have. An employee on such leave will be considered on medical leave status. Should the employee test positive at any subsequent test, the Employer may terminate the employee.

(A)     The Employer may terminate any employee who tests positive and refuses to 1) resign, 2) enter a rehabilitation program, or 3) successfully complete a rehabilitation program within sixty (60) days of the test.

(B)     Employees who appear to be impaired while on duty, and who refuse to submit to a drug or alcohol screen, will be terminated.

(C)     Employees who undergo a drug or alcohol screen that has a negative result will be paid for their time off from work for the test and time waiting for the results. All such employees must return to work no later than the next working day following notice of the test results by the Employer.

(D)     Any employee who is required to undergo a drug and alcohol screen may consult with a Union Steward as part of the investigation, however, the timeline for providing a test sample remains intact.

(E)     Employees who are involved in an accident that results in medical treatment outside the facility for anyone involved will be subject to mandatory post-accident drug and alcohol testing. An employee refusing a drug and alcohol screen will be subject to immediate termination subject to the contract's grievance and arbitration procedures.

Section 11. The Company and Union recognize the importance of health and safety for all Employees, both within and outside the workplace, and they will form a joint health and safety committee composed of three (3) Union employees plus representation from management that will meet monthly. The Union shall select the bargaining unit representatives.

(A)     The Committee shall review all incidents of industrial accidents and "near misses," conduct periodic safety inspections, review safety practices, and review and suggest employee education programs.

(B)     The Committee shall be advisory in nature and will address its recommendations to management. The Union will retain its right to grieve unsafe conditions.

(C)     The Company agrees to provide initial safety equipment as may be required by law or applicable regulation at no cost to Employees.

Section 12. All inspectors or individuals desiring to become inspectors must receive mandatory training to insure that they possess the necessary qualifications. Inspectors must be able to read and understand instruction sheets, measure and convert measurements, document needed repairs, count stitches, and use standard inspection techniques. Individuals who complete the training will be evaluated using objective criteria on a pass/fail basis to determine whether they have learned the necessary skills to be an Inspector. If the employee fails the evaluation, the Employee will be afforded one more chance to acquire the skills through the training, If after the second attempt the employee does not pass the evaluation, the Company will return the Employee to his or her prior job category. If the Employee was not employed in another job category before becoming an Inspector, the Employee will be placed on prolong layoff.

Section 13. - QUALITY PERFORMANCE POLICY - The Quality Performance Policy will be guided by these rules to address employee defects or non-quality:

(A)     Employee defects will be summarized each day.

(B)     Poor quality performance will be addressed each day in either of two ways:

(1)     Quality Performance Counseling - Employees will be counseled on the proper methods/processes to perform their job/operation.

(2)     Quality Performance Discipline - When quality performance counseling has failed to improve performance, formal quality performance discipline will be given.

(C) Formal quality performance discipline will be issued in the following order.

1.     Quality Performance Counseling Session
2.     Quality Performance Counseling Session
3.     Quality Performance Counseling Session
4.     Verbal Warning
5.     Written Warning
6.     Written Warning
7.     Suspension
8.     Termination

(D)    Each stage of discipline will be documented with a counseling slip or discipline slip. For discipline sessions, union stewards will need to be involved if the employee so requests. The company will inform employees subject to discipline of their rights to union representation. Disciplinary slips will be summarized for each day (i.e. no more than one slip per day.)

(E)    Slips issued will be effective for a rolling 90 day period. Ninety days from the date of issuance of the slip, the counseling slip or disciplinary slip will be removed and considered inactive.

(F)    Subsequent slips will be issued based on the number of active slips in the employee file. The next slip in the sequence will be issued based on the number of active slips in the file. For example if the employee's last active slip was a verbal warning, then the next slip will be a written warning.

Section 14. — Housekeeping Policy- To ensure work areas are systematically kept clean and organized, ensuring employee safety and providing for the foundation that supports our Quality, Health, Safety, & Environmental Management System, Lean Manufacturing and 5S initiatives, all employees must comply with the following.

(A)    All employees in this facility must take an active role in daily workplace clean up activities.

(B)    Employees are expected to keep their immediate work area clean, organized and safe throughout the day.

(C)    Employee teams in conjunction with supervision will schedule housekeeping assignments as necessary to ensure the work area is systematically kept clean, organized, and safe throughout the day.

(D)    In order not to affect the employee performance efficiency, employees will be held to "Cleaning Time" off-standard during time spent cleaning.

(E)    In accordance with Article V, Section 1 and 2 (M), where employees fail to participate in keeping the work area clean, organized, and safe, Management will have the right to direct employee(s) to do so.

(F)    Employees must notify supervision of any housekeeping issue that poses a potential safety, health, and environmental hazard so the hazard can be addressed immediately.

(G)    No food or beverages will be allowed in work areas with the exception that employees are allowed one spill proof beverage container of reasonable size containing water only, Employees in Segregated Inspection Areas will not be permitted any food or beverage within the area.

(H)    Personal items should be kept to a minimum; only items that are required for an employee to do their job should be observed in a work area. Personal items should be kept within the personnel item containers or bins provided by management. Management reserves the rights to request employees to remove items from the workplace that are considered non-essential.

(I)     Janitors will continue to clean restrooms, break rooms, main walkways, along with other assigned duties and areas in the facility.

(J)     Disciplinary action may be taken for employees failing to abide by this policy.

## ARTICLE VI — SENIORITY

Section 1. Employees working in job classifications that do not have efficiency ratings and those employees working within Class 3 and 4 shall be laid off and/or recalled according to a numerical formula described in Section 2, A of this Article within classification, and pursuant to the particular rules defining temporary and prolonged layoffs.

Section 2. Employees working in job classifications (Class 1 and 2) that do have efficiency ratings (Including Inspectors) shall be laid off and/or recalled according to a numerical formula as follows:

(A)     The first group of employees laid off within any given operation in a job classification within a department shall be probationary employees. The remaining employees within any given operation in a job classification within a department shall be laid off according to a numerical rating given by the following formula utilized by management to measure objective criteria. Each employee within any given operation in a job classification within a department shall be given a numerical rating and the order of layoff shall be carried out by score from low to high. The employee with the lowest rating score shall be laid off first and subsequent employees shall be laid off in order to the highest score.

The formula shall include First Time Quality Yield weighted at 50% of the score, Efficiency weighted at 10% of the score, Conduct Discipline weighted at 10% of the score, Attendance weighted at 10% of the score, and Length of Service weighted at 20% of the score. The maximum score shall be 100 therefore each criteria will have a maximum score equal to its weight.

If Efficiency data is not available for an operation within a job classification within a department, all employees in that operation shall be afforded the maximum score for efficiency for purposes of rating within that operation.

Conduct discipline shall be measured as the following, for one write up for conduct discipline within the previous 6 months, 50% of the points allocated to conduct discipline shall be forfeited. For a second conduct write up within the previous 6 months, 100% of possible points for conduct discipline shall be forfeited.

Attendance shall be measured as the following, for each point of attendance charged to an employee within the previous 6 months 1.25 points will be deducted from the rating score allotted to attendance. This will result in 0 points for any employee that has reached the maximum number of points for attendance in a 6 month period which is 8 points currently.

Length of Service shall be calculated as the following, for each year of service that an employee has completed at the time of rating, one point will be afforded to the score up

12

to a maximum of 20 points. For example, an employee completing 20 years of service would score the maximum 20 points under the formula. An employee completing 15 years would score 15 points.

(B.)   Rules for Prolonged Layoffs-

(1)   A prolonged layoff occurs when a contract ends, the production line for that contract ceases, and there is no anticipation by the Employer that the line will start up again in the foreseeable future. When the Employer seeks to recall an Employee from prolonged layoff, it will first determine whether the Employee is qualified for the job category being recalled. The Employer will recall employees utilizing the formula rating in Part (A) above with the employees scoring highest within an operation within a job classification within a department being recalled first.

(2)   Employees have the option to refuse a job offer given the following rules:

> (a)   Upon the first refusal, the employee will maintain their seniority position on the prolong layoff list.

> (b)   Upon the second refusal, the employee will remain on the prolong layoff list but will be put at the bottom of the list in terms of numerical rating. This means they will lose their numerical rating and will be allocated a numerical rating of one point less than the last employee on that list for the purpose of layoff and recall.

> (c)   Refusal for the third offer will be grounds for termination by the employer.

(3)   The purpose of these refusal rules is to give the employee the right to refuse job without losing his/her position on the seniority list, and to be fair to the other employees by avoiding a situation in which an employee would remain on top of the list if he/she keeps refusing the job available. Employees who are qualified to work in higher job categories but are currently working in a lower job categories will be considered for recall along with employees on prolong layoff.

(4)   An employee may be recalled from prolong layoff to fulfill a "temporary" position to fill a vacancy created due to an FMLA Leave. During this time, the temporarily assigned employee will have the normal seniority rights associated with that position.

(5)   Initially, the Employer will consider employees qualified for the job being considered. Employees will be considered for the normal job position in which they hold seniority. If unable to fill the position, the Employer will then consider employees in that job class and higher for the position.

(6)   If there is a job opening and no employees are on prolonged layoff within that job category, nor are there any employees qualified for the job working in a lower job category, the Employer will open up the job for bidding as per Article VI, Section 10.

(7)   Employees recalled from prolonged layoff will receive the rate existing for that position in that classification with regards to their seniority at the time of the recall.

Employees on prolonged layoff have no right to be recalled into a particular job, at their previous hourly rate.

(8)    If there is a job opening and no employees are on prolonged layoff within that job category, the Employer will open up the job for bidding with the selection based on the formula rating from part (A) above.

(9) Recall rights under prolonged layoff shall be extended to an employee for a period of eighteen (18) months. Such period will begin on the date the employee is placed on layoff. Any employee remaining on layoff for a continuous eighteen (18) month period will be removed from layoff and their employment terminated.

(C)    Temporary layoffs are defined as being for less than thirty (30) days, or a layoff for longer than thirty (30) days that is designated as temporary by mutual agreement between the Employer and the Union. The following conditions apply to temporary layoffs.

(1)    The Employer will attempt temporarily to reassign the employee on layoff. If such reassignment is made, the Employee will receive his or her previous rate while on reassignment. When the Employee's previous job resumes, the Employee must return to that position.

(2)    If the Employer is unable temporarily to reassign the Employee, the Employee will be placed on prolong layoff. However, that Employee will have first right to restart in his or her prior position when the line resumes at his or her previous hourly rate.

(3)    Employees who refuse a temporary assignment will be placed on prolonged layoff with no right to return to the prior line or rate upon restart of that line.

(4)    Employees who are moved from temporary layoff to prolonged layoff, and who bid into another position, lose their first right to recall into their prior position if it resumes.

(D)    Employees as described in either (A) or (B) supra who worked in more than three (3) assignments during the six (6) months preceding their layoff shall be given credit in the assignment in which they had the highest average efficiency.

Section 3. Seniority of employees subject to this Agreement shall be determined by length of continuous service.

Section 4. An employee's seniority rights shall be forfeited if the employee's employment is terminated for any of the following reasons, and the employee shall be considered as a new employee for the purpose of computing seniority if again employed by the Employer:

(A)    voluntarily leaving the employ of the Employer;

(B)    discharge for cause;

(C)    overstaying leave of absence or sick leave, or working elsewhere during the same;

(D)    failure to report for work within three (3) days after receiving notification to report for work; and

(E)    if the Employer is unable to locate and is unable to notify an employee to return to work, then three (3) days after the Union has received notice that the employee should report for work.

Section 5. In the event that the Employer shall assign an employee to a job classification not included in the recognized bargaining unit as described in the Agreement, such assignment shall not break the said employee's seniority, provided the said employee is restored to work in his former job classification within twelve (12) months and the employee has not been discharged for cause. The Union agrees that any employee rendered ineligible for membership in the Union by reason of such assignment shall be readmitted to membership without penalty if such employee is later restored to work within the twelve (12) month period in a job classification in the bargaining unit, and provided further that Union membership is maintained in good standing during such period. No such employee shall be subject to any disciplinary action with second or third slips when he returns to the bargaining unit on account of any occurrence or conduct related to his work performance while employed in a classification of work outside the bargaining unit.

Section 6. In case of transfer from one job classification to another, accumulated seniority shall apply to the new job classification, unless otherwise mutually agreed between the Employer and the Union.

Section 7. The Employer and Union agree that the applicable state and federal laws shall govern the rights of any employee who shall enter into the armed forces of the United States with respect to their leave and reinstatement.

Section 8. Seniority for benefits shall be based upon continuous plant service. Leave taken pursuant to Article VIII shall not constitute a break in service.

Section 9. Employees who may be on layoff due to lack of work shall have preference over new employees on work in other departments, if such employees accept a permanent transfer to such other department. Any employee who desires such transfer, if a job is available, shall so notify the Employer.

Section 10. "Bid" Jobs. On promotional or higher paying jobs, an opportunity to take such jobs shall be afforded to employees who, under the terms of the Agreement, are entitled to consideration for said jobs primarily on the basis of seniority, subject to approval by management, before another employee is trained for the job. Employees under an active Final Warning shall be ineligible. There shall be no bidding on job classifications not included in the recognized bargaining unit. An employee so transferred shall remain on such job for a period of not less than six (6) months before exercising his bidding rights again, except where a non-employee seeks the job. An employee who successfully bids on a job, and who then refuses to take the position, cannot rebid for any position for six (6) months. Employees who have bid for and received a bid job will be afforded a maximum of thirty (30) days trial period during which it will be determined whether the employee wants to remain in that position and whether the Employer thinks that employee can do the job.

15

## ARTICLE VII — EQUAL DIVISION OF WORK

Section 1., In the event the Employer should not have enough work to keep all his employees in the plant working full time, then such work as may be available shall be equally divided among the employees thereof as far as is practicable. Work shall be divided equally among all operators or employees on each section or job. Where such division of work is not practicable, the seniority provisions of Article VI shall apply.

Section 2.  The company may hire and/or provide special task teams to perform tasks necessary to preserve the rate of production, upgrade quality, analyze production problems and prove or clarify rates, so long as the total number of such teams members does not exceed two (10%) percent of the Union work force in the plant at any time. Such team members shall not be "employees" within the meaning of Article I, Section 2 of this Agreement.

Section 3. Engineering and Special Teams Policy - From time to time Pioneer Aerospace's Columbia facility is needed to support engineering or programs/products normally completed in our South Windsor facility as well as provide special task teams to perform tasks necessary to preserve the rate of production, upgrade quality, analyze production problems, prove or clarify rates, produce First Articles, produce Production Lot Tests and produce Sample production, so long as the number of the team members does not exceed two (10%) percent of the Union work force in the plant at any time. Such team members shall not be an "employee" within the meaning of Article I, Section 2 of the Union Contract. Often these programs/products require unique skills and/or requirements that set them apart from the typical Columbia production operations. To facilitate the implementation of these special task teams or engineering programs/products within the Columbia facility, the following policy will be used:

(A)    The company reserves the exclusive right to designate a program or product as a special or an engineering program. The company also has the right to terminate these programs, relocate it back to the South Windsor facility or reclassify it as a typical production program at any time.

(B)    The company has the right to select the employees to work on these programs and they are not subject to normal seniority or bidding practices. The company will make every attempt to select workers from the current union workforce. However, the company may hire from outside the current workforce if it determines the appropriate individual(s) are not available. The company will solicit input from the union regarding the selection process but retains ultimate decision authority.

(C)    The company has the right to remove an employee from these programs at any time and without cause. This action is not subject to the grievance procedure in Article IX. Employees removed from an engineering program will be returned to their original department and job classification with work assigned based on the existing agreement.

(D)    Sewing operators assigned to these programs will be paid as job classification I on the appropriate flat rate pay matrix. In addition they will automatically qualify for the $0.50 per hour versatility rule incentive.

(E.) Employees currently classified and paid under the indirect support pay schedule who are permanently assigned to any of these programs will receive their normal pay plus the $0.50 per hour versatility rule incentive.

## ARTICLE VIII — LEAVE OF ABSENCE

Section 1. The Employer and Union agree that the employees will be granted family and medical leave pursuant to the Company's Family and Medical Leave Policy, which has been negotiated and agreed to by both parties.

Section 2. No longer than four (4) weeks' layoff or leave of absence for reasons other than those described in the family and Medical Leave Policy shall be given an employee for good cause which may be extended upon application to the management, provided, however, that the Employer shall grant leave of absence for a period which may extend for the duration of this Agreement upon the request of the Union to no more than two employees from the plant while employed on essential work by the local or International Union, and, provided further, that the Employer shall grant leaves of absence to bona fide delegates for attendance at Union conventions.

Section 3. The Company does not have responsibility for notifying an employee whose leave of absence has expired. It is the sole responsibility of the employee who has been granted a leave of absence to return to work promptly upon the expiration of the leave, or sooner, if health permits. If the Company should in one or more cases notify workers of the expiration of their leaves of absence, the same shall constitute a waiver of this clause or a precedent for the variation thereof.

Section 4. In case a job or operation has been abolished during the employee's absence, such provisions shall apply to re-employment as would have applied bad such employee been at work at the time the job or operation was abolished. An employee hired to replace an employee on leave of absence shall be advised by the Company to this effect at the time of employment. An employee on leave of absence shall notify the Company of his intention to return to work three (3) days prior to his return, except when prevented from doing so because of extenuating circumstances.

## ARTICLE IX — GRIEVANCES

Section 1. It is agreed that no grievance shall be made on the basis of any action by the Union unless it is presented within the following time limits and manner:

(A) Not later than three (3) working days after discovery of the grievance, intervening non-working days not to be counted, the grievance shall be presented, in triplicate, to the immediate supervisor of the employee concerned by the aggrieved employee or a shop steward, and if not satisfactorily adjusted, the action of the supervisor should be noted thereon and signed. The immediate supervisor's action shall be noted on the grievance forms within twenty-four (24) hours, excluding non-working days, and signed by him/her.

(B)    Not later than twenty-four (24) hours thereafter, excluding non-working days, the written grievance shall be presented to the Director of Human Resources by a representative of the Union. The Director of Human Resources' action shall be noted on the grievance forms within forty-eight (48) hours, excluding non-working days, and signed by him/her or his/her representative.

(C)    If no satisfactory judgment is reached within three (3) days after the decision of the Director of Human Resources or his/her representative is noted, the Union shall call upon an International representative and a meeting shall be held within two (2) weeks and further negotiations shall be bad at such meeting between the Employer and the International Representative.

(D)    If the International Representative and the Employer are unable to reach a satisfactory agreement, upon request by either party, the matter shall be submitted to arbitration as hereinafter provided, within thirty (30) days of the meeting between the International Representative and the Employer.

(E)    The Employer and the Union agree that all disputes arising under this contract which cannot be settled by the parties after following the grievance procedure heretofore set forth, shall be submitted to an impartial arbitrator selected by both parties who shall hear the matter and render his decision thereon. In the event the parties are unable to agree upon an arbitrator within ten (10) days after a dispute is referred to the International Representative of the Union and the Employer, the matter shall be referred to the American Arbitration Association for the designation of an arbitrator, All decisions of the arbitrator shall be final and binding on the parties hereto. The compensation of the arbitrator together with all the necessary costs of arbitration shall be borne equally by the Union and the Employer.

(F)    In the event any strike, lockout, slowdown or other manner or kind of work stoppage occurs, upon application of either party, the procedures, rules and regulations of the American Arbitration Association relative to the selection of an arbitrator shall be and are waived and the American Arbitration Association is empowered and authorized to select an arbitrator promptly to hear and determine said dispute as quickly as possible.

## ARTICLE X — WAGES

Section 1. All employees will receive the designated hourly rates shown in Schedule A during the term of this Agreement, except as modified by other sections of the Agreement. Schedule A is attached hereto and incorporated herein as part of this Agreement.

Section 2. The minimum wage guaranty for learners shall be the learner's minima provided by regulation of the Wage and Hour Administration.

Section 3. The hourly rates of pay provided for in this Article shall in no cases be subject to the grievance procedure or arbitration provided for in other sections of this contract.

Section 4. Employees who report for work at their regular starting hour, in absence of notice from the Employer to the contrary (where it is possible to give notice), or at an hour designated

by the Employer, shall be paid at their established hourly rate for all work between the hour they report for work and the hour they are dismissed for the day, but in no event for less than four (4) hours; provided, however, that this clause shall not apply in cases of power failure, fire or other causes over which the Employer has no control. Failure of other employees to report to work shall not be considered as a "cause over which the Employer has no control" unless the Employer has taken reasonable and adequate steps to train and provide relief workers and an acute emergency arises which the Employer could not foresee.

Section 5. Existing practice as of the date of this Agreement in the plant of the Employer as to the frequency of pay periods shall continue as heretofore. In such plant the Employer has a twenty-six (26) pay period per year system in effect. Paycheck errors of four (4) hours or greater will be fixed immediately by the Payroll Department. Paycheck errors of less than four (4) hours will be fixed the next scheduled pay period.

Section 6. An operator shall be compensated for delay due to a machine breakdown or lack of work at his or her regular rate of pay. The Employer shall have the privilege of assigning the operator to other work during the delay period.

Section 7. The Employer agrees to maintain conditions which will enable the individual workers to enjoy reasonably stable hourly earnings. If the average hourly earnings of the workers are adversely affected by factors fairly within the control of the Employer, the Union may resort to the grievance machinery herein established.

Section 8. The parties agree that should the Company begin the manufacture of non¬standard products (i.e. not parachutes) they will meet to discuss an appropriate pay system for the manufacture of said products.

Section 9. If there is absolutely no heating or air conditioning and the people have not been notified by radio before opening time, employees will be entitled to 2 hours pay based on Article 10, Section 5 of the current contract. This statement holds true except when the supply of gas or electricity is off in our area.

Section 10. Operators required to do company repairs will be paid their regular hourly rate.

Section 11. It is agreed that a position of Utility Operator will be added at the additional rate of $0.50 per hour while serving in that position. This position would be a versatile worker chosen by management to swing around filling in as needed and also doing special jobs and assignments.

Section 12. Any operator averaging five (5) or more different operations per day over a one week period will receive an additional $0,25 per hour for all hours worked that week. Any operator averaging ten (10) or more different operations per day over a one week period will receive an additional 50.50 per hour for all hours worked that week. If the additional operations commence in the middle of a pay cycle, the additional pay for those hours will be reflected in the employee's pay for the following week.

Section 13.  Effective January 01, 2021, the Employer shall pay the rate per hour as set on the schedule. The contract shall be reopened no later than sixty (60) days before the first and second anniversary of the Agreement for wage and health insurance negotiations.

## ARTICLE XI- NO STRIKE — NO LOCKOUT

In consideration of the foregoing provisions of this Agreement the Company agrees that it will not lock out its employees during the term thereof.

Also, in consideration of the foregoing provisions of this Agreement, the Union agrees that there will be no strikes, stoppage, slowdown or other interruption of work during the life of this Agreement. The Union agrees that it will actively discourage any interruption of work in violation of the Agreement.

## ARTICLE XII — VACATIONS

Section 1.

(A)     All employees who started work prior to October 1 of the vacation year, and who worked a minimum of twenty-six (26) weeks subsequent to June 1 of the vacation year, and are still in the Employer's employment as of the date of his vacation, shall receive one week's vacation with pay, which must be taken during the summer vacation shut down. The summer shut down will be scheduled to begin the work week that includes July 4th, and will continue through the subsequent week. If July 4th falls on a Saturday, the first week of the shutdown will be the work week prior to July 4th. If it falls on a Sunday, the first week of the shutdown will be the week after July 4th.

(B)     One week's vacation pay for each employee shall consist of forty (40) hours multiplied by his or her prevailing hourly rate at the time the vacation is taken.

(C)     An employee shall take his or her vacation in one continuous period unless the Employer approves a substitute method. Holidays falling within a vacation period are to be counted as vacation days, and no additional days off shall be taken therefore. Holiday pay shall nevertheless be paid in addition to vacation pay as provided in Article IV, Section 7. Vacation rights shall not be cumulative from year to year if not exercised.

(D)     The Employer shall make every effort to provide work for those employees who have not earned a vacation. If the Employer is unable to provide work for ineligible employees, such unemployment shall constitute a temporary layoff, as defined in Article VI, Section 2.

Section 2.

(A)     All employees who have been in the continuous employ of the Employer three (3) years or more shall receive an additional week's vacation with pay to be taken during Christmas shut down. This additional week is to be paid for on the same basis, and in addition to the one week's vacation granted above, to those qualified employees.

(B)     The December shutdown period shall always include December 25 through January 1 the following year. Depending on the calendar and business conditions, the shutdown period may be extended solely under the discretion of management after consultation with the union.

The company will inform employees of the exact shut down date no later than November 25th.

Employees who are eligible for two weeks or more of vacation will be paid for two (2) holidays and five (5) vacation days during the December shutdown.

Section 3. All employees who have been in the continuous employ of the Employer six (6) years or more shall receive a third week's vacation pay. This third week's vacation shall run consecutively with the one week summer vacation shutdown set forth above. It shall be paid on the same basis as the first week of the summer vacation.

Section 4. Workers shall earn additional 4th week of vacation as follows:

Year 15 + 1 day of vacation
Year 16 + 1 day of vacation (total of 2 days)
Year 17 + 1 day of vacation (total of 3 days)
Year 18 + 1 day of vacation (total of 4 days)
Year 19 + 1 day of vacation (total of 5 days)

Employees with 25 years or more seniority shall be entitled to a fifth week of vacation. These additional vacation weeks shall be taken during the ensuing 12 months. The vacation schedule for the fourth and fifth weeks must be approved by the Employer in accordance with production need, and individual workers may bid for available weeks in order of last hire date plant seniority. The vacation weeks must be pre-approved prior to the time being taken off by the Employee. If mutually agreed at the local level, a worker may work during this fourth and/or fifth vacation weeks at straight time in addition to vacation pay, Such employees will receive five days of pay (eight hours each) at their regular rate of pay at the time they take the fourth and/or fifth weeks of vacation. Employees with 50 or more years of service will receive a sixth week of vacation. Employees will be allowed to use unused vacation days while on layoff subject to the other sections of this article.

Section 5. Employees who have not worked one thousand (1000) hours in the year preceding the vesting date of the summer and winter vacations, but who otherwise qualify for 1, 2, 3, 4, or 5 weeks' vacation pay shall receive 2% of their gross annual earnings for the year preceding the vacation period for each vacation week for which they qualify.

## ARTICLE XIII — DISCHARGES

In the event a discharge occurs and the parties are unable to agree whether or not just cause existed, the matter shall be handled in accordance with the regular grievance and arbitration machinery hereinabove set forth. In the event a discharge case is referred to the impartial arbitrator and it is the decision of said arbitrator that the employee be reinstated, the arbitrator may order the Employer to compensate the employee for time lost as a result of the discharge.

## ARTICLE XIV — INSURANCE & RETIREMENT FUNDS

On or before the 15th of each month, the Employer shall pay to the National Retirement Fund, an amount per bargaining unit employee for each compensated hour for all payroll weeks ending in the prior calendar month at the following rates as provided in the Retirement Supplemental Agreement which is attached to this Agreement and incorporated herein:

| Effective Date: | Amount: |
|---|---|
| Current Rate | $.52 |
| June 1, 2021 | $.54 |
| June I, 2022 | $.57 |
| June 1, 2023 | $.59 |

The Employer shall provide vision, weekly disability, and life insurance benefits at the levels in effect on January 1, 2021 for all bargaining unit employees who have completed their probationary period. The Employer shall provide health insurance benefits through Blue Cross/Blue Shield of Texas from January 1, 2021 through December 31, 2021. The benefit levels shall be as presented by the Company during negotiations. Participating employee contributions shall be $11.60 per week for single coverage and $14.95 per week for Employee Child/Children coverage. The Agreement shall be reopened no later than sixty (60) days before the first and second anniversary of the agreement for wage and health insurance negotiations.

Extended insurance coverage for employees on layoff and approved leave of absence, shall be provided by the Company as long as the employee pays the weekly contributions in a timely fashion (within seven days of the due day and consistent with current practices). Such extended coverage shall be for the balance of the month, plus 2 additional months or as otherwise required by law for leaves taken by eligible employees pursuant to the Family Medical Leave Act, whichever is greater.

## ARTICLE XV — SEPARABILITY

If any provision or part thereof of this Agreement is in conflict with any federal or state law or regulation, such provision shall be deleted from this Agreement or shall be deemed to be in effect only to the extent permitted by such law or regulation. In the event any provision of this Agreement is thus rendered inoperative, the remaining provisions shall nevertheless remain in full force and effect.

## ARTICLE XVI — BEREAVEMENT PAY

Section 1. An employee who has been on the payroll of the Employer for six (6) months or more shall be granted bereavement pay in the event of a death in his/her immediate family. The immediate family is defined as father, mother, sister, brother, spouse, child, step-child, grandparents, grandchild, father-in-law, mother-in-law, son-in-law, daughter-in-law, step-parent, brother-in-law, and sister-in-law.

Section 2. Bereavement pay shall be based on the employee's regular hourly rate.

Section 3. An eligible employee shall be paid for three days bereavement between the day of the death to the working day following the funeral, when the employee would have otherwise worked, except for the death of a step-parent, brother-in-law, and sister-in-law. For step-parent, brother-in-law, and sister-in-law, an eligible employee shall be paid for one day bereavement and be allowed to take two days without pay, between the day of the death to the working day following the funeral, when the employee would have otherwise worked.

Section 4. No bereavement pay will be granted unless the employee notifies the Employer and requests leave. At his discretion, the Employer may require evidence of death and kinship.

## ARTICLE XVII — PLANT CLOSINGS

The Employer shall be required to notify and discuss with the Union possible plant closings. In the event of a willful failure to give such notice to the Union, the Union may refer such alleged willful breach to an arbitrator who may award to the affected employees an amount that shall not exceed a maximum of one week's pay for each affected employee.

## ARTICLE XVIII — JURY PAY

Employees called to serve on jury duty and thereby required to be absent from their scheduled work shall receive from the Employer for each work day they were absent the difference between their daily jury pay and the regular hourly rate of pay which they would have received at their regular job.

## ARTICLE XIX — NON-DISCRIMNATION

It is the continuing policy of the Employer and the Union that the provisions of this Agreement shall be applied to all employees or applicants for employment without regard to race, color, religious creed, national origin, age, sex, veteran status, disability or genetics. The Employer and Union agree that they will comply with the American With Disabilities Act as it governs any employee with a disability.

## ARTICLE XX — MISCELLANEOUS

Section 1. A representative from the personnel office will be available from 12:00 until 1:00.

Section 2. The Company has agreed to provide a two-minute warning bell prior to the 12:00 and the 4:00 bells. This two-minute bell does not mean to stop work, but is merely a warning bell.

Section 3. The sewing machine mechanics will be responsible for the filling of oil cans used by sewing machine operators.

Section 4. Pioneer agrees to provide protective clothing to wax pot users.

Section 5. Pioneer agrees to provide stools and chairs for Inspectors as required.

Section 6. Pioneer agrees not to use blanket bid jobs unless otherwise agreed to with Workers United for emergency situations.

Section 7. Pioneer agrees to pay employees a Service Anniversary Bonus. Employees will be awarded the following on their anniversary date.

(a)    $25.00 for 5 years of service;
(b)    $50.00 for 10 years of service;
(c)    $75.00 for 15 years of service;
(d)    $100.00 for 20 years of service;
(e)    $125.00 for 25 years of service;
(f)    $150.00 for 30 years of service;
(g)    $175.00 for 35 years of service;
(h)    $200.00 for 40 years of service.
(i)    $225.00 for 45 years of service
(j)    $250.00 for 50 years of service
(k)    $275.00 for 55 years of service

Anniversary bonuses will be paid to the employees on the pay period following the anniversary date and will be included with their regular wages for the period, subject to regular payroll taxes.

Section 8. It is agreed that all "Interim Agreements" will be formalized and signed by representatives of the Company and Officials of the Union. There shall be no individual agreements with bargaining unit employees.

## ARTICLE XXI — TERM OF AGREEMENT

This Agreement shall be effective as of the date first above written and shall continue in effect until October 31, 2023, except that the Agreement shall be reopened no later than sixty (60) days before the first and second anniversary of the Agreement for wage and health insurance negotiations. After October 31, 2023 it shall be automatically renewed from year to year for one year periods unless either party gives written notice to the other sixty (60) days prior to any automatic renewal date of its desire to terminate or amend the Agreement. In the event that notice of desire to terminate is given, the Agreement shall be terminated upon date of October 31st, immediately following the giving of such notice. In the event that notice of desire to amend is so given, the Agreement shall not be terminated on October 31st , immediately following the giving of such notice, but shall continue in effect until such time as an agreement is reached between the parties as to an amended contract, or either party gives written notice to the other that is desires to terminate the Agreement sixty (60) days prior to the desired termination date.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**For the Company**

Brant Stringer
Vice President of Human Resources

Jerry Rowan
President

**For the Union**

Chris Baumann
Southern Regional Director
VP, Workers United SEIU

Bernetha Brown
District Director

Mitch Montgomery

Ida Anthony

Jeraldine Allen

Brenda Daniels

Barbara Dexter

Linda Payne

Evelyn McGowan

Ladessia Bellazer

## SCHEDULE A

I.  WAGES AND RATES OF PAY.

(A)  As agreed the Employer shall pay the rate per hour as set on the Flat Rate Pay Matrix contained herein. These rates are effective as of January 1, 2021, as designated on the schedules infra.

(B)  Effective as set forth below, the minimum rate for certain job classifications shall be as herein provided. In the event that existing minimum rates are higher than the minima hereinafter set forth, such existing minima shall not be decreased.

(C)  All stitching jobs shall be designated by job classification and job categories as designated in the Flat Rate Pay Matrix.

(D)  All rate increases based on an employee's seniority will be effective beginning the pay period following the employee's anniversary date.

(E)  All lead persons will receive a $0.50 increase in their hourly rate while serving in that position. Additionally a Head Leader will also receive an additional $0.50 increase in their hourly rate in addition to the $0.50 leader pay while serving in that position. It is agreed by both parties that Head Leaders are chosen by management and while a Head leader performs similar responsibilities to that of a Leader, a Head Leader's job is comprised of more comprehensive responsibilities than a Leader (i.e. seeing over an entire line).

(F)  Cutting Room Bundler and Spreader are combined as one job under classification 2 in the Flat Rate Pay Matrix and paid accordingly.

(G)  The following jobs shall be classified as Heavy Duty Handwork jobs in Class 3:

   i.   Setting NB06/B-12 Metal Brackets
        Item Number T3-029 Back Pack (B12) P/N — 56J6126 (P)
        Operation — 2230 Handsew Clamp Assm

   ii.  Inserting NB-6 Metal Ribs
        Item Number T1-095 NB-6 Back Container Assm - P/N 60A114E2 — 53(W)
        Operation — 2310 Insert Stiff (8)

   iii. Gluing NES-12 Pack Tray
        Item Number TI-312 NES-12 Container Assembly — P/N 510AS101-501 AE
        Operation 2080 Insert Frame & Cement &Assm. Riser Retainer Supports

   iv.  Setting T-1-0 Harness Pads
        Item Number RI -325 Troop Harness — P/N 11-1-2143-1 (P)
        Operation — 0670 Handtack Pads

26

v.    Setting MC-6 Harness
Item Number R2-242 Harness Assembly T11&MC — P/N 11-1-7053-2 (D)
Operation — 0962 Handsew Pads

vi.    Setting the Pack & Harness Metal Bracket
Item Number R2-082 Harness & Pack — P/N 65K1533-101 (T) W/O Hardware
Part Number 65K1533 (T) With Hardware
Operation — 3580 Ins Clamp & Tack

vii.    Setting the 30ft Canopy Cutter Bracket
Item Number Q2-282 30' Canopy,24 Gore, 36" — P/N 94453-509 (AC)
Operation — 0980 Handtack Rfg Rngs#5 Pkt Brackets/Hesitator

viii.    Tying Pilot Chute Spring On
Item Number — Q6-526 Drogue Parachute 19" Dia — P/N 8710003-1 (R)
Operation — 0220 Handsew 3 Wire to Drogue after packing Main Issue Tkt to Rig

(H)    The position of WIP Inspector shall be combined with Final Inspection Inspector into the Class 1 position of Inspector.

(I)    All employees hired into the bargaining unit after November 1, 2017, shall be compensated at a rate equal to their job classification and seniority brackets in Schedule A minus $1.00 from the rate posted therein for the first year, minus $0.75 for the second year, minus $0.50 for the third year, and minus $0.25 for the fourth year. At the completion of the fourth year the employee's rate adjusts to the actual published rate with no reduction.

## FLAT RATE PAY MATRIX

Effective January 1, 2021

| | Job Classification | | | |
| --- | --- | --- | --- | --- |
| | 1 | 2 | 3 | 4 |
| Seniority | | | | |
| <5 | $11.20 | $10.70 | $10.45 | $10.25 |
| 5 - < 10 | $11.53 | $10.95 | $10.58 | $10.37 |
| 10 - < 15 | $11.87 | $11.20 | $10.70 | $10.48 |
| 15 - < 20 | $12.20 | $11.45 | $10.83 | $10.60 |
| 20 - < 25 | $12.53 | $11.70 | $10.95 | $10.72 |
| 25 - < 30 | $12.87 | $11.95 | $11.08 | $10.83 |
| 30 - <40 | $13.20 | $12.20 | $11.20 | $10.95 |
| 40+ | $13.40 | $12.40 | $11.40 | $11.15 |
| | | | | |
| | | | | |

# PIONEER AEROSPACE CORPORATION
# FLAT RATE JOB CLASSIFICATIONS

| <u>CLASSIFICATIONS</u> | <u>JOB CATEGORY</u> |
|---|---|
| CLASS 1 | Main Seam |
| CLASS 2 | Inspector |
| CLASS 3 | Cross Seam<br>97-10<br>Binder |
| CLASS 4 | Hemmer<br>Strapper<br>Three + Needle<br>Heavy 1N/2N<br>Packer<br>Repair Operator<br>Line Cutter<br>Heavy Duty Stringer (64' or larger)<br>Heavy Single Needle<br>Heavy Duty Handwork |
| CLASS 4 | Single Needle<br>Two Needle<br>Zig Zag<br>Light Duty Stringer<br>Handwork<br>Stamper<br>Automatic Sewing Machine<br>P.O. Bands<br>Production Bundler |

## INDIRECT SUPPORT PAY SCHEDULE

|                                      | Current Employees<br>Effective 01/01/2021 |
|--------------------------------------|-------------------------------------------|
| Classification                       |                                           |
| **Cutting Room**                     |                                           |
| Markers                              | $12.16                                    |
| **Warehouse**                        |                                           |
| Material Control Clerk               | $11.24                                    |
| **Production Shop**                  |                                           |
| Material Handler                     | $11.21                                    |
| Rigger                               | $12.01                                    |
| **General Time**                     |                                           |
| General Including Janitors           | $11.00                                    |

## Example of Numerical Rating System

| | First Time Q Yield | Efficiency | Conduct Discipline | Attendance | Length of Service | Total Weighted Rating (1-100) |
|---|---|---|---|---|---|---|
| Weight | 0.5 | 0.1 | 0.1 | 0.1 | 0.2 | 1 |
| Possible Points at Max | 50 | 10 | 10 | 10 | 20 | 100 |
| Employee Statistics | 0.8* | 1* | 1* | 2* | 8 | |
| Weighted Score | 40 | 10 | 5 | 5 | 8 | 68 |

*Denotes One Write Up   *Denotes 4 Occurrences   *Denotes 8 Years

## **Exhibit B**

Proposal Made to Union



B. MICHAEL BACHMAN, JR.
RUSSELL M. BLAIN
JODI DANIEL DUBOSE
DANIEL R. FOGARTY

MATTHEW B. HALE
BARBARA A. HART
ELENA PARAS KETCHUM
STEPHEN R. LESLIE

AMY DENTON MAYER
CHARLES A. POSTLER
HARLEY E. RIEDEL, II
MARK F. ROBENS
SCOTT A. STICHTER

DON M. STICHTER
  1929 - 2019
RICHARD C. PROSSER
  1950 - 2017
SUSAN HEATH SHARP
  1954 – 2021
G. CHRISTOPHER MEYER
  1948 – 2023

**REPLY TO TAMPA**

November 29, 2023

<u>*Via Certified U.S. Mail (Return Receipt Requested) & Email*</u>

Chris Baumann, Southern Region Director
Southern Region, Workers United, SEIU
1777 Phoenix Parkway
Suite 230
Atlanta, GA 30349
baumann2468@gmail.com

Workers United, Southern Regional Joint Board
c/o Michael Schoenfeld, Stanford Fagan, LLC
2540 Lakewood Ave.
Atlanta, GA 30315
MichaelS@sfglawyers.com

Re:    *In re Aviation Safety Resources, Inc., et al.*, Case No. 6:23-bk-4639-GER (Jointly Administered), Collective Bargaining Agreement between Pioneer Aerospace Corporation and the Southern Regional Joint Board of Workers United

Dear Chris:

My firm is counsel to Pioneer Aerospace Corporation ("Pioneer") in the above-captioned chapter 11 case pending in the United States Bankruptcy Court, Middle District of Florida, Orlando Division, filed on November 1, 2023 (the "Petition Date"). Pioneer's case is being jointly administrated with the chapter 11 cases of Aviation Safety Resources, Inc. and S.E., Inc. (the "Bankruptcy Case").

Prior to the Petition Date, Pioneer was a party to a Collective Bargaining Agreement (the "CBA"), effective November 1, 2020, to October 31, 2023 with the Southern Regional Joint Board of Workers United (the "Union"). Under the CBA, Pioneer recognized the Union as the bargaining representative for employees at Pioneer's plant located in Columbia, Mississippi (the "Mississippi Plant"). By its terms, the CBA applies only to the Mississippi Plant, and not to any other location operated by Pioneer, or to any other employer.

By its terms, the CBA expires on October 31, 2023. As part of the discussions following the closing of the Mississippi Plant in May, 2023, it is Pioneer's position that the desire to terminate the CBA as of October 31, 2023 was given, and therefore the CBA has expired and

110 EAST MADISON ST, SUITE 200
TAMPA, FLORIDA 33602-4700
T 813.229.0144
F 813.229.1811

1533 HENDRY ST, SUITE 300
FORT MYERS, FLORIDA 33901-2936T
T 239.939.5518
F 239.939.5568

41 NORTH JEFFERSON ST, SUITE 111
PENSACOLA, FLORIDA 32502-5669
T 850.637.1836
F 850.791.6545

4475 LEGENDARY DRIVE, SUITE 40
DESTIN, FLORIDA 32541-9306
T 850.460.7676
F 850.424.6604

SRBP.com

November 29, 2023
Page 2

been terminated as of that date. Alternatively, this letter provides written notice to the Union that Pioneer desires to terminate the CBA, with termination to be effective as of the Petition Date.

If the Union disagrees, and contends that the CBA remained in effect, then, as discussed below, due to the circumstances surrounding the operations of the Mississippi Plant before July, 2023, the lack of continued business operations at the Mississippi Plant, the termination of Pioneer's lease for the Mississippi Plant by Zodiac US Corporation as the landlord, and the lack of any interest by purchasers in restarting operations at the Mississippi Plant, Pioneer is not able to offer any alternative other than rejecting the CBA in the Bankruptcy Case.

Pioneer's operation of the Mississippi Plant was unsustainable for a number of reasons, including but not limited to the lack of sufficient funding for operating losses suffered at the Mississippi Plant, the on-going quality and product issues associated with the Mississippi Plant and the other significant operational issues caused by Pioneer's prior ownership group, and ultimately the termination of the lease at the Mississippi Plant.

Based on this relevant information, Pioneer is unable to reopen the Mississippi Plant. Additionally, in its discussions with potentially interested bidders in connection with a sale of substantially all of its assets, Pioneer received no indication that a purchaser for the limited equipment and inventory at the Mississippi Plant has any interest in reopening the Mississippi Plant, regardless of any modifications to the CBA, or in assuming the expired or terminated CBA.

During the Bankruptcy Case, on notice to the Union, Pioneer filed a motion for entry of bidding procedures in connection with the sale of substantially all of its operating assets, and a motion to sell in conformance with the bid procedures, with the sale to be free and clear of any and all liens, claims, and encumbrances pursuant to § 363(f) of the Bankruptcy Code. On November 22, 2023, the Bankruptcy Court entered its *Order (I) Authorizing the Sale of Substantially all of the Debtor's Assets Relating to the Connecticut Location Pursuant to 11 U.S.C. § 363, Free and Clear of all Liens, Claims and Encumbrances, and (II) Authorizing the Assumption and Assignment of Contracts* (Doc. No. 73), and its *Order Granting Debtors' Motion for Entry of an Order Authorizing (I) The Sale Of Substantially all of Their Assets Pursuant to 11 U.S.C. § 363, Free and Clear of all Liens, Claims and Encumbrances, and (II) Authorizing the Assumption and Assignment of Contracts* (Doc. No. 74) (collectively, the "Sale Orders"). As stated above, the purchaser of the limited equipment and inventory located at the Mississippi Plant has indicated that it has no intention of resuming operations at the Mississippi Plant.

Thus, Pioneer is not able to offer modifications to the CBA to allow for restarting operations at the Mississippi Plant under Pioneer or under a purchaser under the Sale Orders, and has no choice but to reject the CBA as it will not be assumed or assigned as part of the Sale Orders. Pioneer intends to file in the Bankruptcy Case a motion to reject the CBA under § 1113 of the Bankruptcy Code, to the extent the CBA was not terminated or expired pre-petition.

November 29, 2023
Page 3

       To the extent that you feel that any additional or further information is necessary, please do not hesitate to contact me.

                      Sincerely,

                      *Daniel R. Fogarty*

                      Daniel R. Fogarty