UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| AVIATION SAFETY RESOURCES, INC., | Case No. 6:23-bk-4639-GER |
| S.E., INC., | Case No. 6:23-bk-4641-GER |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-4643-GER |
| Debtors. | *Jointly Administered Under* |
| / | *Case No. 623-bk-4639-GER* |

## NOTICE OF FILING SUPPLEMENTAL DECLARATION OF CHARLES REARDON ON BEHALF OF ASGAARD CAPITAL LLC, AS PROPOSED FINANCIAL ADVISOR AND TRANSACTION ADVISOR TO THE DEBTORS, EFFECTIVE AS OF THE PETITION DATE

AVIATION SAFETY RESOURCES, INC., S.E., INC., and PIONEER AEROSPACE CORPORATION, as debtors and debtors in possession, hereby give notice of the filing, as Exhibit 1 hereto, of the Supplemental Declaration of Charles Reardon on behalf of Asgaard Capital LLC in support of the Debtors' Application for Authorization to Employ Asgaard Capital LLC as Financial Advisor and Transaction Advisor to the Debtors Effective as of the Petition Date (Doc. No. 59).

*/s/ Daniel R. Fogarty*
Daniel R. Fogarty (FBN 0017532)
Stichter Riedel Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida  33602
Telephone: (813) 229-0144
Email: dfogarty@srbp.com
Attorneys for Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing notice has been furnished on December 18, 2023, by the Court's electronic noticing system to all parties receiving electronic notice.

/s/ Daniel R. Fogarty
Daniel R. Fogarty (FBN 0017532)

4860-8450-0119, v. 1

# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| | |
| AVIATION SAFETY RESOURCES, INC., | Case No. 6:23-bk-04641 |
| S.E., INC. D/B/A STRONG ENTERPRISES, | Case No. 6:23-bk-04643 |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-04639 |
| D/B/A ASR-PIONEER | |
| | *Jointly Administered under* |
| Debtors. | *Case No. 6:23-bk-04639* |

**SUPPLEMENTAL DECLARATION OF CHARLES REARDON
ON BEHALF OF ASGAARD CAPITAL LLC, AS PROPOSED FINANCIAL
ADVISOR AND TRANSACTION ADVISOR TO THE DEBTORS, EFFECTIVE AS OF
THE PETITION DATE**

1.     My name is Charles Reardon.  I am over 18 years of age and competent to make this Supplemental Declaration.

2.     I am the founder, the senior managing director, and the chief executive officer of Asgaard Capital LLC (the "**Firm**" or "**Asgaard**").  I am familiar with the matters set forth herein and make this declaration in further support of the *Debtors' Application for Authorization to Employ Asgaard Capital LLC as Financial Advisor and Transaction Advisor to the Debtors Effective as of the Petition Date* (the "**Application**") (Docket No. 59) filed by the above-captioned Debtors (collectively, the "**Debtors**").  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, I would testify competently thereto.

3.     The purpose of this Supplemental Declaration is to provide further background on the genesis of the transaction-based fees that are part of the Application, including how they were negotiated, the effective hourly discounts to the Debtors for which such fees would compensate Asgaard, and how the structure of such transaction-based fees created incentives to achieve returns

to unsecured creditors at a time where the Debtors' liquidation was a very real possibility.  (As context, while Asgaard was being retained a private equity firm which had been looking into acquiring the Debtors had just determined an acquisition of the Debtors was too risky based on the Debtors' legacy liabilities, no senior management, underfunded pension liability, inaccurate financial data, continued monthly losses, and no new identified customers or pipeline of new business.)

4.      This Supplemental Declaration also clarifies the payment history previously set forth in the Application and supporting documents, including my original declaration (the "***Initial Declaration***," attached as Exhibit A to the Application), compared against the Asgaard payment history set forth in the Debtors' Statement of Financial Affairs (Docket No. 84) at pages 28-30 (which covers all transfers made during the ninety days before bankruptcy), and at page 31 (which covers all transfers made to Asgaard during the entirety of its engagement, dating back to the end of April of 2023).

**Part I:  Asgaard's Transaction Fees**

5.      As set forth in the Application and my Initial Declaration, Asgaard has worked for the Debtors since the end of April, 2023.

6.      At the time Asgaard was originally engaged, no precise transaction fees were agreed upon (but as set forth below both parties agreed, in writing, they would likely be negotiated in the future).  This is not unusual – some of Asgaard's engagements begin with an assessment phase, in which Asgaard works with a client to determine the core source of problems, potential operational solutions, potential finance or M&A solutions, the options available, and the risks and benefits of such options.  Given that this initial scope of work (for a new client, with unique issues, in four separate operating locations, and in severe distress) could be very broad, Asgaard's initial

2

engagement called for a $150,000 flat fee for this assessment and detailed report to the Debtors'

Board.  However, in Asgaard's original engagement letter executed by the Debtors (attached hereto

as **Exhibit A** to this Supplemental Declaration), Asgaard and the Debtors specifically agreed "If

any follow-on services are requested, they will be covered by a separate engagement agreement or

addendum, and if undertaken would likely include some form of hourly or further flat fee, and/or

success or transaction fee to be negotiated in good faith once a mutually acceptable definition of

'success' or 'transaction' can be reached, along with an appropriate fee schedule for such."  *See*

Exhibit A at page 1.

7.      As such, it is important to emphasize that the transaction fees which Asgaard is

seeking were always contemplated, by both the Debtors and Asgaard.  That is because transaction

fees are a market-based term given the expected challenges of this engagement, the risks of this

engagement, and to provide some return to Asgaard for delivering **actual, and by all measure

very successful, results** to a client (and its creditors) in exceptionally challenging conditions.  As

set forth below, those specific transaction-based fees were then fully negotiated, and agreed to,

shortly thereafter.

8.      Very soon after Asgaard started its assessment work in April of 2023, it became

apparent the Debtors were in substantial distress, had no access to further financing, and absent

substantial and drastic change, a liquidation was certain.  As noted above, the Debtors did not have

sufficient finance personnel to complete basic finance functions, especially when the Debtors'

operations spanned multiple companies (that were not integrated) in multiple physical locations.

As such, Asgaard amended its engagement – that is, expanded it beyond the already-complex

assessment phase - to provide two personnel to the Debtors (which billed by the hour), to support

the Debtors' finance team and help develop an integrated, functional financial overview of the

3

companies.  Moreover, the Debtors' operational team was very limited – although the companies had four operating locations in three states, the Debtors had limited management personnel, a recently terminated chief executive officer (and no replacement), no chief operating officer, a part-time chief financial officer, no controller, no accounts payable manager, limited inventory and raw materials controls, and effectively only one operations manager for its Strong facilities in Orlando. In short, the Debtors were facing complex operational and financial challenges that could only be remedied by Asgaard (and in particular Mr. Freeman, along with other Asgaard personnel) taking on substantial additional work, for which the Debtors could not pay.

9.      Thereafter, after the Debtors had reviewed Asgaard's comprehensive initial assessment delivered in late May, 2023, the Debtors sought to expand Asgaard's engagement to provide on-going, and substantial, operational and support services in various parts of operations, daily finance functions, and exploring finance and M&A alternatives.  However, as mentioned previously, the Debtors did not have sufficient funds or incoming revenue to pay for this work on an ongoing basis, nor to pay Asgaard's standard hourly rates.  As such, Asgaard's engagement letter was amended in June of 2023, to pay Asgaard on a flat-fee basis for two months, and to **also** provide Asgaard the specific transaction-based fees that are before the Court.  That amendment to the Engagement Letter is attached hereto as **Exhibit B**.

10.     I negotiated this amendment personally with Mr. Richard Spencer, the Debtors' board member who led all of the negotiations with Asgaard on behalf of the Debtors.  The amendment was then approved by the Board unanimously.  The hope behind this amendment was that switching Asgaard from an hourly rate to a flat fee (which did not come close to compensating Asgaard for amount and value of its time) would allow Asgaard to continue its critical work to restructure and stabilize operations.  The amendment featured a flat fee rate the Debtors could pay

4

even though it was unlikely to compensate Asgaard for the number of the hours it would dedicate for those months when compared against Asgaard's normal rates.  But Asgaard and the Debtors hoped that Asgaard's operational improvements would bring the Debtors to a "cash neutral" operating position, making the Debtors attractive to a potential buyer and thus position the Debtors for a sale. But this would be a tall task:

- Prior to Asgaard's engagement, the Debtors were losing over $600,000 per month at its Mississippi site and approximately $100,000 per month at its Connecticut site.

- Moreover, the Debtors were still bidding for new work with an outdated and incorrect pricing model used by the Debtors under their prior foreign ownership. This resulted in approximately a 20% loss on all orders actually won and delivered.

- As noted in paragraph 8, above, the Debtors lacked key management and were also overstaffed for production at each of their four locations.  Indeed, the Debtors' Mississippi location had to be closed almost immediately as it alone was losing in excess of $600,000 per month.

- The Debtors had no financing available, except as provided by Board members.

- The Debtors were simply out of liquidity without quickly implementing the many changes (operational, finance, bidding, purchasing, and inventory management) Asgaard had identified.

11.    Without Asgaard implementing these changes, and then showing that the Debtors could still operate, no third party would consider buying the Debtors' operations – they would be walking into a disorganized and money-losing endeavor right from day-one of any purchase. (Indeed, the Battle Group, a defense-focused private equity fund – which otherwise would be a very good acquiror for operations such as the Debtors - had recently determined not to engage in any transaction with the Debtors for these exact reasons.)  Thus, absent the work Asgaard would undertake, liquidation was deemed to be a certainty.

12.    Thus, the transaction-based fees served a variety of purposes.  First, they would provide an incentive to Asgaard to bring a sale to a completion, which the Debtors and their

constituents very much needed.  Second, they would provide some return to Asgaard for the level of support Asgaard was providing.  As noted in the Initial Declaration, Asgaard is not a large advisory firm, and the great needs of the Debtors, if their businesses were to survive, would require the utilization of a substantial amount of all Asgaard personnel.  In engagements such as this, Asgaard negotiates with its clients for additional consideration based on the outcome of the engagement (i.e., transaction-based fees).  But these fees would only be paid on specified events, as most distressed companies cannot (and should not) pay transaction-based fees as they are incurred.  Third, by being based primarily on actual returns to the Debtors (or in this case, their creditors), the transaction-based fees align the interests of professionals and the client.

13.    Moreover, the proposed transaction fees still provided a substantial benefit to the Debtors.  In return for Asgaard billing on fixed fees during various parts of the pre-petition engagement, instead of hourly, the Debtors paid a total of **$480,000** less than what Asgaard's hourly fees would have been.  (And this $480,000 figure is separate and apart from Asgaard's previously disclosed pre-petition write-off of $461,391 for hourly fees which the Debtors did not pay pre-petition in order to continue operating to get to a value-maximizing sale.)  Specifically:

- During the two-month period in which Asgaard only charged the Debtors on a flat fee basis, Asgaard provided over $487,000 in hourly services, but Asgaard was only paid $120,000, resulting in a savings by the Debtors (and an effective discount by Asgaard) of **$367,000**.  Asgaard would not have agreed to such terms – which were essential to allowing the Debtors to stabilize, allowing Asgaard to fix their operational, finance, procurement, inventory, and bidding processes (all of which were substandard and needing corrective action), and prepare for a sale process – absent the transaction-based fees which were agreed to at that time.

- In addition, during Asgaard's initial assessment phase of work (which as noted above, quickly expanded into Mr. Freeman's and others' operational and financial support, *see* paragraph 8 above), Asgaard's "actual time" would have been billed at $263,000, but for which the Debtors instead paid $150,000, resulting in a savings by the Debtors (and a further effective discount by Asgaard) of a further **$113,000**, which, when added to the $367,000 immediately above, resulted in $480,000.

6

14. Indeed, Mr. Spencer, the lead director who negotiated with Asgaard throughout the engagement, requested that Asgaard provide an analysis to the Debtors' board that specifically addressed the "actual costs" of Asgaard's flat fee work. Mr. Spencer relayed to me the Board's request for the total costs of the engagement, and Mr. Spencer asked me to provide (i) a compilation of the time spent over the course of the entire engagement, including the time spent during the flat fee periods of Asgaard's work, and (ii) the amount of Asgaard's write off for Asgaard's hourly fees, which the Debtors had agreed to pay but simply could not during the last months before this bankruptcy.

15. My report to the Debtors' board reflected this, that Asgaard's "flat fee work," instead of hourly work when the Debtors could not afford it, had resulted in a total savings to the Debtors (and a total effective discount by Asgaard) of **$480,000** (that is, $367,000 plus $113,000).

16. With these expected results in mind, the transaction-based fees agreed to in June, 2023 (and as also set forth in the engagement letter attached to the Application), are as follows:

(i) with respect to any financing provided to the Debtors by any **non-insider** third party, a financing fee equal to the greater of (a) $25,000 or (b) 5% of any such financing received or committed,

(ii) with respect to any sale, reorganization, or disposition of any or all of the Debtors' assets or operations, a transaction fee of $250,000, and

(iii) with respect to the receipt of any recoveries or other consideration outside of the ordinary course of business by the Debtors, including tax refunds, claim or litigation recoveries, or other types of assets not sold or disposed of in the ordinary course of business, 10% of such recoveries or consideration.

17. The first of these transaction-based fees is inapplicable – Asgaard would not be compensated for any insider financing.

7

18. The second transaction-based fee is based on a sale. At the time of this agreement, it was not clear if there would be one sale, or multiple sales, or for how much, or even if the Debtors would be able to find a buyer (or buyers) and then close on a sale or sales, in light of their dire conditions. Moreover, given the Debtors' levels of secured debt, payment of any fees would require the Debtors to "clear" several million dollars in sales proceeds, which was very uncertain at the time this transaction-based fee was negotiated. This fee was designed to compensate Asgaard for the risks of the substantial M&A work Asgaard would undertake – which the Debtors could not pay for on any hourly basis. This fee would also be unsecured, or administrative, but in all events behind what appeared to be secured (if contested) debt, so it further incentivized Asgaard to get to a result that would allow for a recovery for unsecured creditors. As it has turned out, Asgaard's work resulted in two separate sales, resulting in double (or more) of the work to get to a transaction, although Asgaard is still only to receive a single fee for the two transactions that recently closed. (It should be noted that by separating the transaction into two separate sales, the Debtors were able to maximize the outcome and provide the greatest return to all interested parties.)

19. The third is a fee based on other recoveries. Asgaard brings great experience to its engagements, and creativity. It often finds assets, or other avenues of recovery, which are not known to a client, separate and apart from M&A or other recoveries. As such, this fee was designed to compensate Asgaard for such efforts, but only if they resulted in **actual** recoveries – especially as the Debtors could not (and indeed, did not) compensate Asgaard on a regular basis for all of the work it did to achieve any result. As to this matter, Asgaard was able to identify that the Debtors, and its financial team, had underestimated the costs and complexity of seeking the benefit of a tax credit designed to compensate companies for keeping employees on staff during

8

the recent economic upheaval from COVID-19.  As such, the Debtors were not planning on seeking this credit.  Asgaard quickly looked into this, evaluated it, realized the potential size of this recovery for creditors, and then worked with the Debtors and their outside tax firm to prepare all data needed for the filing of returns seeking such credits.  The processing  of such credits is currently suspended nationwide (which suspension occurred only after the Debtors filed these returns) due to IRS concern that companies have abused this credit.  However, Asgaard is pleased that, assuming the payments start again in 2024, the Debtors and their creditors may obtain as much as $1.3 million for such efforts.  And of course, if nothing is ever obtained, then this transaction fee is inapplicable.

20.     The transaction-based fees Asgaard negotiated are serving their intended purpose – Asgaard continued to work, for a substantial period on flat fees that undercompensated Asgaard by almost $480,000 (see paragraphs 13-15, above).  This allowed Asgaard to implement the wide range of changes needed to get to a successful sale or sales.  This also allowed the Debtors to devote available funds to substantially restructure the Debtors, keeping operations going, paying employees, and surviving to a sale, in an industry important to national security interests.  Without these efforts the Debtors would not have been able to attract any buyers.  Finally, as the transaction-based fees are behind valid secured debt, they provided a further incentive for Asgaard to seek (and achieve) sales prices that would result in a return to unsecured creditors.  In obtaining these results to date, Asgaard, unfortunately, wrote off over $460,000 in **additional** hourly fees the Debtors could not pay pre-petition, as disclosed in my Original Declaration, and then further described below.

21.     However, Asgaard stands by its clients, and the transaction fees, negotiated months ago and fashioned in a manner to achieve results beyond payment of valid secured debt, help

9

compensate Asgaard for the totality of its work.  The transaction fees also ensure that Asgaard's work results in real, tangible results – operations being sold as a going concern, company employees being retained and new proceeds to the estates of over $4.45 million in cash proceeds (plus another estimated $700,000 in assumed liabilities to date), and the prospect of receiving yet another $1.377 in tax refunds.

**Part II:  Asgaard's Payment History**

22.     This Part of the Supplemental Declaration addresses items raised by this Court on December 12, 2023, relating to Asgaard's payment history, as set forth in the Initial Declaration, and then in the Debtors' Statement of Financial Affairs (which covered different time periods).

23.     My Initial Declaration set forth Asgaard's payment history during the 90 day preference period – it is reprinted below.[1]  It details the retainers paid to Asgaard, their application and other payments, and the running balance owed to Asgaard.  As a result of Asgaard's work and payments made by the Debtors, and as disclosed in my Initial Declaration, Asgaard's pre-petition balance owed was $461,391 as of the Petition Date, which was written off so that Asgaard was not a creditor of the Debtors.  (Again, this $461,391 write-off was in addition to the $480,000 in effective discounts Asgaard provided during the periods of the pre-petition engagement in which Asgaard billed on a flat fee basis, instead of on an hourly basis.)

**Asgaard's Ninety Day Payment History from the Original Declaration**

| Description | Invoice Date | Payment Date | Invoice Amount | Retainer Applied | Retainer Applied Date | Running Balance Owed to Asgaard | Retainer Balance |
|---|---|---|---|---|---|---|---|
| Retainer received from Debtors to be applied to billings | 8/15/23 | 8/18/23 | 62,000.00 | | | | 62,000.00 |

---

1 This data was prepared by Asgaard's accounting personnel, and reviewed by Asgaard's counsel, both at my direction, but it is not based on my direct personal knowledge.

| Description | | | | | | | |
|---|---|---|---|---|---|---|---|
| Retainer received from Debtors to be applied to billings | 9/5/23 | 9/6/23 | 68,500.00 | | | | 130,500.00 |
| Retainer received from Debtors to be applied to billings | 9/18/23 | 9/19/23 | 50,000.00 | | | | 180,500.00 |
| Retainer received from Debtors to be applied to billings | 9/21/23 | 10/5/23 | 50,000.00 | | | | 230,500.00 |
| Retainer received from Debtors to be applied to billings | 10/3/23 | 10/5/23 | 62,500.00 | | | | 293,000.00 |
| Asgaard Billing Aug 19-31 | 10/3/23 | | 167,255.25 | (167,255.25) | 10/3/23 | 0.00 | 125,744.75 |
| Mike Freeman expenses (9/8) | 10/3/23 | | 1,781.92 | (1,781.92) | 10/3/23 | 0.00 | 123,962.83 |
| Asgaard Billing Sep 1- 30 | 10/3/23 | | 276,555.25 | (123,962.83) | 10/5/23 | 152,592.42 | 0.00 |
| Asgaard Billing Oct 1-15 | 10/17/23 | 10/19/23 | 173,309.25 | | | 325,901.67 | 0.00 |
| Mike Freeman expenses (10/6 & 10/13) | 10/17/23 | | 5,825.83 | | | 331,727.50 | 0.00 |
| Retainer received from Debtors to be applied to billings | 10/18/23 | 10/19/23 | 50,000.00 | | | | 50,000.00 |
| Retainer applied | | | | (50,000.00) | 10/19/23 | 281,727.50 | 0.00 |
| Retainer received from Debtors to be applied to billings | 10/25/23 | 10/25/23 | 100,000.00 | | | | 100,000.00 |
| Asgaard Billing Oct 16-25 | 10/25/23 | | 150,248.55 | | | 431,976.05 | 100,000.00 |
| Mike Freeman expenses (10/25) | 10/25/23 | | 3,594.15 | | | 435,570.20 | 100,000.00 |
| Retainer applied | | | | (90,000.00) | 10/25/23 | 345,570.20 | 10,000.00 |
| Asgaard Billing Oct 26-31 | 10/31/23 | | 115,207.75 | | | 460,777.95 | 10,000.00 |
| Mike Freeman expenses (10/27) | 10/31/23 | | 613.57 | | | 461,391.52 | 10,000.00 |
| Retainer received from Debtors to be applied to billings | 10/25/23 | | 60,000.00 | | | 461,391.52 | 70,000.00 |
| Balances as of Petition Date (with all pre-petition amounts owed being written off) | | | | | | 461,391.52 | 70,000.00 |

11

24.     The data from the Statement of Financial Affairs indicates a few slightly different payment dates.  **First**, this is primarily owing to the fact that when the Debtors send wires to Asgaard, **depending** on the time of day the wire is initiated, the funds are shown as leaving the Debtors account on "Day X," and then Asgaard's bank shows the funds as "pending" on that "Day X," but only received and available to Asgaard on Day "X+1."  In other words, the receiving bank (in this case, TD Bank, which is Asgaard's bank), depending on timing of initiation and receipt of the wire, sometimes holds the funds overnight.  **Second**, the SOFA shows a payment of $112,500 to Asgaard on 10/4, which Asgaard treated as two payments, of $62,500 and $50,000 as the payment covered two different retainer invoices (and those two retainer invoices were separate line items on Asgaard's payment history).  **Third**, my Original Declaration shows an Asgaard bill on October 17, 2023, and then has a "payment date" in my Original Declaration of October 19, 2023.  That date should not have been included there – as the running balance further to the right of the page indicates that bill was not paid, and was instead added to Asgaard's running balance (as also indicated in the SOFA).  So showing a payment date there in my Original Declaration was incorrect.  **Fourth**, my original Declaration showed that two invoices were dated 10/3/23. Actually, that was the date of the **draft** invoices, which were then reviewed and revised by me and other Asgaard personnel and then finalized and issued on 10/4/23 (and paid or partially paid on 10/4 from retainer funds on hand, and so not a preference in any event).  **Fifth**, my Original Declaration indicated that a final payment by the Debtors, of $60,000, took place on 10/25 when actually it took place on 10/31.  This was an error on Asgaard part (or its counsel's part), both of which apologize to the parties and this Court, as record-keeping to the day and the dollar are hallmarks of Asgaard and its counsel.  It appears in the transfer of data from Asgaard to its counsel for finalization of the 90-day payment chart, and then to my original Declaration, it was unclear

12

when this final payment was made.  However, as this was a retainer payment by the Debtors for **post-petition services**, and **not** applied to pre-petition debt, this error does not change the preference analysis in any way.

25.    The corrected 90-day payment history is below, with highlighting and footnotes that reflect the corrections, and the basis therefore (which is also described above).

### Asgaard's *Corrected* Ninety Day Payment History

| Description | Invoice Date | Payment Date | Invoice Amount | Retainer Applied | Retainer Applied Date | Running Balance Owed to Asgaard | Retainer Balance |
|---|---|---|---|---|---|---|---|
| Retainer received from Debtors to be applied to billings | 8/15/23 | 8/18/23[2] | 62,000.00 | | | | 62,000.00 |
| Retainer received from Debtors to be applied to billings | 9/5/23 | 9/6/23 | 68,500.00 | | | | 130,500.00 |
| Retainer received from Debtors to be applied to billings | 9/18/23 | 9/19/23 | 50,000.00 | | | | 180,500.00 |
| Retainer received from Debtors to be applied to billings | 9/21/23 | 10/5/23[3] | 50,000.00 | | | | 230,500.00 |
| Retainer received from Debtors to be applied to billings | 10/3/23 | 10/5/23[4] | 62,500.00 | | | | 293,000.00 |
| Asgaard Billing Aug 19-31 | 10/4/23[5] | | 167,255.25 | (167,255.25) | 10/5/23 | 0.00 | 125,744.75 |
| Mike Freeman expenses (9/8) | 10/4/23[6] | | 1,781.92 | (1,781.92) | 10/5/23 | 0.00 | 123,962.83 |

2 Shown on the Debtors' SOFA as the Debtors paying this amount (i.e., initiating the wire transfer) on 8/17, 2023. Shown by Asgaard as having been received on 8/18/23, as that is when Asgaard's bank made the funds available after an overnight hold per bank rule and custom.

3 Shown on the Debtors' SOFA as the Debtors initiating the wire on 10/4, 2023, and as a single payment of $112,500, whereas this chart reflects that Asgaard treated it as two payments, which collectively totaled $112,500, as the payments pertained to two separate retainer invoices.

4 Shown on the Debtors' SOFA as the Debtors initiating the wire on 10/4, 2023, and as a single payment of $112,500, whereas this chart reflects that Asgaard treated it as two payments, which collectively totaled $112,500, as the payments pertained to two separate retainer invoices.

5 Shown on the Initial Declaration as 10/3/2023.  10/3/23 was the date of a **draft** bill, which Asgaard was reviewing. Once the bill was finalized, it was issued on 10/4/23, and dated on 10/4/23.

6 Shown on the Initial Declaration as 10/3/2023.  10/3/23 was the date of a **draft** bill, which Asgaard was reviewing. Once the bill was finalized, it was issued on 10/4/23, and dated on 10/4/23.

13

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Asgaard Billing Sep 1- 30 | 10/3/23 | | 276,555.25 | (123,962.83) | 10/5/23 | 152,592.42 | 0.00 |
| Asgaard Billing Oct 1-15 | 10/17/23 | 10/19/23[7] | 173,309.25 | | | 325,901.67 | 0.00 |
| Mike Freeman expenses (10/6 & 10/13) | 10/17/23 | | 5,825.83 | | | 331,727.50 | 0.00 |
| Retainer received from Debtors to be applied to billings | 10/18/23 | 10/19/23 | 50,000.00 | | | | 50,000.00 |
| Retainer applied | | | | (50,000.00) | 10/19/23 | 281,727.50 | 0.00 |
| Retainer received from Debtors to be applied to billings | 10/25/23 | 10/25/23 | 100,000.00 | | | | 100,000.00 |
| Asgaard Billing Oct 16-25 | 10/25/23 | | 150,248.55 | | | 431,976.05 | 100,000.00 |
| Mike Freeman expenses (10/25) | 10/25/23 | | 3,594.15 | | | 435,570.20 | 100,000.00 |
| Retainer applied | | | | (90,000.00) | 10/25/23 | 345,570.20 | 10,000.00 |
| Asgaard Billing Oct 26-31 | 10/31/23 | | 115,207.75 | | | 460,777.95 | 10,000.00 |
| Mike Freeman expenses (10/27) | 10/31/23 | | 613.57 | | | 461,391.52 | 10,000.00 |
| Retainer received from Debtors to be applied to billings | 10/25/23 | 10/31/23[8] | 60,000.00 | | | 461,391.52 | 70,000.00 |
| Balances as of Petition Date (with all pre-petition amounts owed being written off) | | | | | | 461,391.52 | 70,000.00 |

26.    **Finally**, SOFA Question 11.2 (Docket No. 84, page 31 of 39), asks for disclosure of all payments made to Asgaard during the **one year** prior to the bankruptcy petition date.  The figure shown there is 1,030,495.35.  This figure is correct, as it covers from the **inception of**

---

7 Showing any date here is an error.  This invoice was not paid, as indicated by the "Running Balance Owed to Asgaard" column **increasing** due to the issuance of this invoice.

8 This date was shown as 10/25/31 in my Original Declaration, which is an error.  10/31/23 is the correct date, and matches the SOFA.

14

**Asgaard's engagement in late April, 2023**, through the petition date.  The data in my Original Declaration, and also above, covers the **ninety days** prior to bankruptcy, to allow parties in interest and this Court to evaluate if preferential payments were made (and in this case, to indicate there were none, and that Asgaard wrote off $461,391 of unpaid pre-petition fees).  To the extent that is the discrepancy, it is because the SOFA covers a longer time period than my Original Declaration.

[Remainder of this page intentionally blank.]

15

27.     This concludes my Supplemental Declaration.

### 28 U.S.C. 1746 Declaration

I declare under penalty of perjury that the foregoing is true and correct.


**ASGAARD CAPITAL LLC**

By: _Charles Reardon_

    Charles Reardon
    Senior Managing Director

16

**<u>EXHIBIT A</u>**



April 26, 2023

Aviation Safety Resources, Inc.
141 Hendren Way
Nicholasville, KY 40356

Dear Sir:

This letter agreement (the "Agreement") sets forth the terms under which Aviation Safety Resources, Inc., Pioneer Aerospace Corporation, and S.E. Inc. d/b/a Strong Enterprises (collectively, the "Company") shall engage Asgaard Capital LLC ("Asgaard") as of the date this is countersigned by you (the "Effective Date"), to provide financial advisory and consulting services. The primary purpose of this limited Phase I engagement is to assist the Company's board of directors identify and evaluate what strategic alternatives might be available to the Company. If any follow-on services are requested, they will be covered by a separate engagement agreement or addendum, and if undertaken would likely include some form of hourly or further flat fee, and/or success or transaction fee to be negotiated in good faith once a mutually acceptable definition of "success" or "transaction" can be reached, along with an appropriate fee schedule for such.

For purposes of this Agreement covering the initial evaluation and advice described below, the term "Company" shall include each of the above entities, their controlled affiliates, and direct and indirect subsidiaries, and shall include any successor or assignee of all or a portion of the assets or businesses of the Company.[1]

1.      Description of Services

Asgaard will, if appropriate and requested, perform the following at the direction of the Company:

> i.      review the Company's financial information and familiarize itself with the Company's operations, opportunities, and business plan;

---

[1] The inclusion of entities that may be formed to consummate transaction, as well as the inclusion of successors to the Company and the like, in this definition is not intended to create a client relationship with anyone other than the Company. All duties or obligations owed by Asgaard shall run solely to the Company, and not any insider, lender, investor, successor, or similar party. In addition, while Asgaard's advice may be provided to the Company as well as its equity holders, as would be the case of any closely held company, Asgaard's client relationship shall be only with the Company.

ii.   meet with the Company's management to better understand any existing financial projections (the "Existing Projections," and as may be modified hereinafter by the Company, the "Projections"), with a particular focus on the achievability thereof, including;

    a.   review on a line item basis the requisite people, sales pipelines, contract backlogs, revenue waterfall analysis, systems, and support needed to achieve the Projections;

    b.   help the Company identify key employees and develop appropriate communication and retention programs;

    c.   review existing contracts and customers, particularly in the context of whether each can be reasonably maintained at the levels contained in the Projections;

    d.   obtain a better understanding of the Company's IP, manufacturing capacities, and know how that might be attractive to parties in interest;

    e.   work with the Company to better develop a vision for the future that might be attractive to prospective buyers or investors in the event a sale, investment, or similar transaction (whether in the short or long term) may be contemplated;

iii.   help the Company understand the types of transactions available to it, under a variety of contexts, including dealing with matters such as liquidity, union issues, pension issues, and possible dealings with prior ownership, all in the context of strategic alternatives that might be available; and

iv.   such other services as may be requested and agreed to by the parties for this summary phase engagement.

As noted above, the purpose of these tasks will be to assist the Company in considering its strategic alternatives. All of Asgaard's work product may only be used by the Company, and not, absent Asgaard's prior written approval, be utilized by the Company or its agents or representatives in soliciting any buyer, investor, or the like.

During Asgaard's engagement, the Company agrees to furnish Asgaard with all information which Asgaard deems appropriate and will provide Asgaard with access to the Company's officers, directors, employees, accountants, counsel and other representatives (collectively, the "Company Representatives") who the Company will authorize and direct to cooperate fully. Asgaard will rely upon such information supplied by the Company and the Company Representatives without assuming any responsibility for independent investigation or verification thereof. The Company represents and warrants that any financial information provided to Asgaard will be prepared reflecting the best currently available estimates of the past and future financial results of the Company. The Company will, in writing, promptly notify Asgaard of any material inaccuracy or misstatement in, or material omission from, any information previously delivered to Asgaard or any interested party.

ASR-Pioneer Engagement Letter
April 26, 2023
Page 3

2.    <u>Compensation</u>

In consideration of Asgaard's acceptance of this engagement and performance of Asgaard's services hereunder, the Company will pay Asgaard as follows:

A.  <u>Initial Retainer</u>.  Upon execution of this Agreement, Asgaard shall be paid an initial retainer of $150,000 (the "<u>Initial Retainer</u>"), which shall cover the first thirty days following the Effective Date.  At the conclusion of such thirty day period, Asgaard shall deliver to the Company's board an oral report, with summary slides or other summary written materials, of its findings and recommendations consistent with the above.  To the extent this Agreement is terminated prior to such time, then the Initial Retainer shall be fully earned by Asgaard and not subject to rebate or proration.

B.  <u>Further Payments</u>.  Upon the completion of the first thirty days of Asgaard's engagement, we will engage with you on a further payment structure, whether hourly, flat per month (or other applicable period), or transaction-based, or some combination thereof.  If we cannot arrive at a payment structure at that time which is mutually agreeable, then you or Asgaard may terminate this engagement immediately.

3.    <u>Term and Termination</u>

This Agreement shall have an initial term of 30 days following the Effective Date, but can be extended thereafter upon the written agreement of the parties.

Aside from the termination provision above if a future fee structure cannot be agreed upon, the Agreement may be terminated by either party without cause by giving 15 days' written notice to the other party; termination for cause by either party shall be effective immediately upon the provision of notice of such termination.  No termination of this Agreement shall affect the Company's indemnification or any other obligations set forth in this Agreement, whether present or future, including the Company's obligation to pay any and all fees, expenses, and other amounts due (including fees and expenses that accrued prior to but were invoiced subsequent to such termination).

4.    <u>Expenses</u>

In addition to the fees described above, the Company agrees to promptly reimburse Asgaard, on a monthly basis, for all reasonable out-of-pocket expenses incurred by Asgaard in connection with this Agreement, including (a) travel, lodging, meals, duplicating, related out-of-pockets costs, mailing or messenger charges, and telephone charges, all of which shall be charged at cost in accordance with the then effective Asgaard policy, without regard to volume-based or similar rebates or credits Asgaard may receive, and (b) research costs, database and similar information charges, production costs, and other client-related services not capable or being identified with, or charged to, a particular client or engagement, based on a uniformly applied monthly assessment.

The expenses described in the previous sentence shall not exceed $15,000 per thirty day period, absent your written consent. In addition, the Company agrees to promptly reimburse Asgaard for the fees and expenses of Asgaard's counsel in the drafting and negotiation of this Agreement, or in carrying out Asgaard's duties during the term of this Agreement (provided, however, that any such fees of Asgaard's counsel in the drafting and negotiation of this Agreement shall not exceed $5,000).

Asgaard shall also be reimbursed for the reasonable fees and expenses of its counsel incurred in connection with any litigation (or threatened litigation) that would trigger indemnification hereunder, or in the enforcement of this Agreement.

All fees and expenses will be billed on a monthly basis and will be payable (except to the extent previously paid) upon receipt of the bill therefore.

5.    Relationship of the Parties

The parties intend that an independent contractor relationship will be created by this Agreement in order to provide the services described above to the Company. The Company acknowledges that Asgaard's advice will be solely for the use and benefit of the Company, and not any of its equity holders, creditors, investors, or any other party, nor for any investment banker or other professional of the Company or any potential investor or buyer. Neither Asgaard nor any of its Representatives (as defined below) is acting as a fiduciary of the Company, the Company's equity holders, creditors, or investors or any other persons in connection with this engagement, and expressly disclaims any such duties or responsibilities under this Agreement or under any applicable law. Asgaard will not provide any management services to the Company unless separately contracted to do so pursuant to a separate written agreement, and neither Asgaard nor any of its personnel or subcontractors is to be considered an employee of the Company, an officer, director, or managing agent of the Company, nor is Asgaard nor any of its personnel or subcontractors providing or making any decisions for the Company, as all decisions (and their execution) shall be the responsibility of management of the Company and its board.

For purposes of this Agreement, "Representatives" of Asgaard shall mean all of Asgaard's owners, equity holders, officers, directors, members, managers, employees, agents, and independent contractors.

The personnel and subcontractors of Asgaard are not entitled to any of the benefits the Company provides for the Company's employees.

Asgaard makes no representation or guarantee that an appropriate outcome or transaction can be obtained or formulated, that any proposal is the best course of action for the Company, or that the execution of any proposal will be approved by the Company's board (including any special committee thereof, if any), or the Company's equity holders or other constituents. The Company acknowledges that Asgaard's services will be made on a reasonable good faith basis. Further, Asgaard assumes no responsibility for the selection and approval of any specific proposal.

ASR-Pioneer Engagement Letter
April 26, 2023
Page 5

The Company agrees it will be solely responsible for ensuring that any course of action, including any transaction, it elects to pursue (if any) complies with applicable law. The Company understands Asgaard is not undertaking to provide any legal, regulatory, accounting, insurance, tax, or similar professional advice.

6.    Other Services

If Asgaard is requested by the Company to perform any financial or other advisory services outside the scope of this Agreement the fees for such services shall be mutually agreed upon by Asgaard and the Company in writing, and shall be in addition to the fees and expenses described above. In addition, if Asgaard must deal with any pending or threatened litigation or regulatory matters, the Company shall pay Asgaard's then-current hourly rates for any time spent on such matters, including time for familiarization, detailed understanding, meetings, conferences, preparation, travel, and all related reasonable out-of-pocket costs and expenses, including the reasonable legal fees and expenses of Asgaard's legal counsel in connection therewith.

7.    No Third Party Beneficiary

The Company acknowledges that all advice (written or oral) given by Asgaard to the Company in connection with this engagement is intended solely for the benefit and use of the Company in considering the matters to which this engagement by the Company relates. The Company agrees that no such advice shall be used for any other purpose or reproduced, disseminated, quoted, or referred to at any time in any manner or for any purpose without Asgaard's prior written approval (which shall not be unreasonably withheld), except as required by law. Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Persons (as defined in Schedule A), and their respective successors, heirs. and permitted assigns, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Asgaard hereunder.

8.    Indemnification and Limitation of Liability

The Company agrees to be bound by Schedule A attached hereto, which is incorporated herein and made a part hereof. Termination of this engagement shall not affect Schedule A, which shall remain in full force and effect.

With respect to all services provided by Asgaard or its Representatives under this Agreement, such parties shall only be liable to the Company in the case of gross negligence or willful misconduct, and in all respect, the liability of either Asgaard or its Representatives shall not exceed the amount of fees actually paid by the Company to Asgaard.

9.    <u>Miscellaneous</u>

This Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes any prior communications, understandings, and agreements between the parties relating to the subject matter hereof. This Agreement shall be binding on the parties hereto and their respective successors, heirs, and permitted assigns.

This Agreement may not be assigned nor may the obligations of a party hereunder be delegated without the prior written consent of the other party hereto, provided that Asgaard may utilize one or more affiliates or independent contractors in performing services hereunder; if so, then references to Asgaard herein shall include references to such parties, but in no instance shall any additional fee be charged to the Company for the use of such parties without the prior written consent of the Company.

Neither during the term of this engagement, nor during the two year period following its termination, will the Company independently employ or utilize the services of any of Asgaard's Representatives, other than within the scope of this Agreement, absent Asgaard's advanced written consent.

No waiver, amendment, or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby.

Prior to the closing of any transaction that does not explicitly or by operation of law provide for the assumption of the obligations of the Company herein, the Company will notify Asgaard in writing of its arrangements for the Company's obligations herein to be assumed by another creditworthy party (for instance through insurance, surety bonds, or the creation of an escrow) upon terms and conditions reasonably satisfactory to Asgaard.

This Agreement and any claim relating in any way to or arising in any way from the Agreement or Asgaard's services under the Agreement, shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to principles of conflicts of laws that would defer to the laws of another jurisdiction. The parties hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the courts of the State of Virginia located in the City of Arlington and the United States District Court for the Northern District of Virginia (and if such courts decline jurisdiction, to any other applicable court) for any legal action or proceeding arising out of this Agreement, and agree to bring (to the extent permitted by law) any such action or proceeding in such courts. Each of the parties hereby irrevocably consents to service of process in any such action or proceeding by certified or registered mail, or by any nationally recognized express mail service, at the address for such party set forth above. THE PARTIES HEREBY AGREE FOR THEMSELVES AND, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF THEIR RESPECTIVE CREDITORS AND EQUITY HOLDERS, TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM, PROCEEDING, OR OTHER ACTION RELATING IN ANY WAY TO OR ARISING IN ANY WAY FROM THE AGREEMENT OR ASGAARD'S

SERVICES UNDER THE AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE).

The USA PATRIOT Act, which imposes certain anti-money laundering requirements on brokerage firms and financial institutions, requires you to provide Asgaard with your tax identification number and may also require you to provide Asgaard with certain other identification documents or other information in order for Asgaard to be permitted to effect transactions for you. In addition, Asgaard may also be required to make certain inquiries of other organizations for information about you in order to fulfill any responsibilities under Federal regulations.

The Company acknowledges that Asgaard may, at its option and expense, place announcements and advertisements or otherwise publicize its services to the Company hereunder (which may include the reproduction of the Company's corporate logo). Furthermore, if requested by Asgaard, the Company shall include a mutually acceptable reference to Asgaard in any press release or other public announcement made by the Company regarding the matters described in this Agreement.

The invalidity or unenforceability of any provision in this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

The Company has the requisite power and authority to enter into and perform under this Agreement. This Agreement has been duly and validly authorized by all necessary action on the part of the Company, has been duly executed and delivered by the Company, and constitutes a legal, valid, and binding agreement of the Company (including its controlled affiliates and direct and indirect subsidiaries), fully enforceable by its terms. If the Company comprises of more than one entity, the obligations of the Company hereunder are joint and several, and any consent, direction, approval, demand, notice, or the like given to any one of such entities shall be deemed given to all of them, and as such, shall be binding on the entirety of the Company. This Agreement has been reviewed by the signatories hereto and their counsel. There shall be no construction of any provision against Asgaard because this Agreement was drafted by Asgaard, and the parties waive any statute or rule of law to such effect.

This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

ASR-Pioneer Engagement Letter
April 26, 2023
Page 8

Asgaard is delighted to accept this engagement and looks forward to working with you. If the foregoing is acceptable to you, kindly sign below and return an executed copy of this Agreement to Asgaard.

Very truly yours,

**ASGAARD CAPITAL LLC**

By: _Charles C Reardon_
    Charles Reardon
    Senior Managing Director

Accepted and agreed to as April 2 8, 2023:

Aviation Safety Resources, Inc.

By: _Dave P Mayfield_
    Name:
    Title: CHAIRMAN of THE BOARD

### Schedule A

This Schedule A is incorporated by reference into Asgaard Capital LLC's letter agreement attached hereto.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Agreement.

The Company agrees to indemnify and hold harmless Asgaard and its Representatives (with Asgaard, the "Indemnified Persons") from and against all losses, claims, damages, liabilities, or expenses (or any of the foregoing in any pending or threatened actions or proceedings, including those brought by security holders, creditors, or others), joint and several, relating in any way to or arising in any way from the Agreement or Asgaard's services under the Agreement (collectively, a "Claim" and/or "Loss").  The Company will reimburse all Indemnified Persons promptly for all expenses (including counsel's reasonable fees and expenses) as they are incurred in connection with the investigation of, preparation for, familiarization with, detailed understanding of, defense of, settlement or compromise of, or response to any pending or threatened Claim or Loss, or any such action or proceeding arising therefrom.  In addition, if requested by Asgaard or any other Indemnified Person, the Company shall advance funds to them as security for the Company's obligations hereunder.  The Company shall indemnify and hold harmless all Indemnified Persons whether or not such Indemnified Person is a formal party to any such action or other proceeding (a "Proceeding"), including any Proceeding in which any Indemnified Person is subject to a subpoena or other legal process requiring the response of any Indemnified Person, and whether or not such Proceeding is initiated by or brought on the Company's behalf.

An Indemnified Person is not entitled to the foregoing indemnification if such Claim or Loss is finally judicially determined to have resulted solely from such Indemnified Person's gross negligence or willful misconduct.  The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on the Company's behalf or in the Company's right, except to the extent that such Claim or Loss is finally judicially determined to have resulted solely from such Indemnified Person's gross negligence or willful misconduct.  In no event, regardless of the legal theory advanced, shall the Indemnified Person be liable for any consequential, indirect, incidental, punitive, or special damages of any nature.  In addition, no Indemnified Person (nor all Indemnified Persons) will be liable for any damages of any kind that exceed the amount of fees actually paid to Asgaard in this matter.

If the indemnity rights referred to above are, for any reason whatsoever, unenforceable, unavailable, or otherwise insufficient to hold each Indemnified Person harmless, the Company agrees to contribute to amounts paid or payable by an Indemnified Person in respect of such Indemnified Person's Claims or Losses so that each Indemnified Person ultimately bears only a portion of such Claims or Losses as is appropriate (i) to reflect the relative benefits received (or anticipated to be received) by each such Indemnified Person, respectively, on the one hand, and the Company (and the Company's creditors or equity holders) on the other hand, or (ii) if the allocation on that basis is not permitted by

applicable law, to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of each such Indemnified Person, respectively, and the Company, as well as any other relevant equitable considerations.

The Company will not, without Asgaard's prior written consent, enter into any settlement or compromise of, or consent to any judgment in, a Proceeding in which Asgaard or any other Indemnified Person could be an actual or potential party (including as a witness in such Proceeding), unless (i) such settlement, compromise, or judgment includes an explicit and unconditional release from the party bringing such Proceeding of all Indemnified Persons from all liability arising therefrom and any requirement to respond to any subpoena or other legal process, (ii) the amount involved in any such settlement, compromise, or judgment is paid in full directly by the Company or on behalf of the Company and (iii) such compromise settlement, or judgment does not (x) acknowledge any liability of or wrongdoing by an Indemnified Person, (y) adversely affect the business of an Indemnified Person or (z) limit the future conduct of an Indemnified Person whether by injunction, consent decree, or otherwise.

Promptly after an Indemnified Person's receipt of notice of the commencement of any Proceeding, an Indemnified Person shall notify the Company in writing of the commencement thereof, but a failure to notify the Company will not relieve the Company from any liability which the Company may have to such Indemnified Person, except to the extent the Company suffers actual prejudice as a result of such failure, and will not relieve the Company from the Company's obligation to provide reimbursement of all Losses and Claims (including counsel's reasonable fees and expenses). The Company further agrees the Indemnified Persons are entitled to retain separate counsel of their choice in connection with any of the matters in respect of which indemnification, reimbursement, or contribution may be sought under this Agreement, and the reasonable fees and expenses of such counsel shall be included in the indemnification hereunder.

The Company will pay to Asgaard and each other Indemnified Person, in addition to the other fees and expenses payable to it, the fees and charges as incurred and as reasonably determined by Asgaard for any time of any Representatives of Asgaard devoted to familiarizing or understanding any applicable matter or details, appearing and preparing to appear as witnesses or deponents, or assisting in preparation for hearings, trials, or any pretrial matters.

The foregoing shall be in addition to any rights Asgaard or any other Indemnified Person may have at common law or otherwise. The Agreement including this Schedule A shall be binding upon and inure to the benefit of Asgaard's, all other Indemnified Persons', and the Company's successors, assigns, heirs, and personal representatives.

In connection with Asgaard's engagement, Asgaard may be requested to act for the Company in one or more additional capacities, and the terms of any such additional engagement may be embodied in one or more separate agreements. The obligations set forth in this Schedule A shall apply to each of Asgaard's engagements by the Company

Schedule A – Page 3

and any modification of any of such engagements, and shall remain in full force and effect following their completion or termination.

The provisions of this Schedule A may not be modified except in a writing by Asgaard and the Company and shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws that would defer to the laws of another jurisdiction. The Company hereby consents to personal jurisdiction and venue in any court in which any claim which is subject to the provisions of this Schedule A is brought against an Indemnified Person. The Company hereby irrevocably consents to service of process in any action or proceeding by any Indemnified Party by certified or registered mail, or by any nationally recognized express mail service, at the address for the Company set forth on the first page of the Agreement. THE COMPANY HEREBY AGREES FOR ITSELF AND, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS CREDITORS AND EQUITY HOLDERS, TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM, PROCEEDING OR OTHER ACTION RELATING IN ANY WAY TO OR ARISING IN ANY WAY FROM THE AGREEMENT OR ASGAARD'S SERVICES UNDER THE AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE), INCLUDING THE PROVISIONS OF THIS SCHEDULE A AND ANY SUCH MATTER PERTAINING TO ANY INDEMNIFIED PARTY.

**EXHIBIT B**



June 16, 2023

Aviation Safety Resources, Inc.
141 Hendren Way
Nicholasville, KY 40356

Dear Sir:

This third amendment (the "Third Amendment") is to the letter agreement (as previously amended, the "Agreement") between Aviation Safety Resources, Inc., Pioneer Aerospace Corporation, and S.E. Inc. d/b/a Strong Enterprises (collectively, the "Company") and Asgaard Capital LLC ("Asgaard"). Capitalized terms not defined herein shall have the meaning ascribed to them in the Agreement.

A.    Section 1 ("Description of Services") is amended to include:

For the period from June 10, 2023 onward, Asgaard shall continue to support the Company's board in various operational and finance matters, and consideration of alternatives, in all respects in a consultant capacity, and not as an officer or managerial role.

B.    Section 2 ("Compensation") is amended to include:

The Company shall provide Asgaard with a security retainer of $35,000 plus $2,000 in expected expenses, which Asgaard shall apply against the fees and expenses incurred (in addition to the balance of funds currently on hand with Asgaard, which may also be applied to future amounts due from the Company).

For the period from June 10, 2023 onward, Asgaard shall be paid at the hourly rates for its personnel using the rate structure as set forth in the Second Amendment to the Agreement. Provided, however, if Asgaard and the Company so agree in writing, then on and after June 19, 2023 (or on and after such subsequent date, if agreed to by the Company and Asgaard) the Company may from that certain point forward instead pay a fixed fee of $60,000 per month (with each such monthly fee payable in advance), plus expenses, for the services of Asgaard thereafter; and provided further, however, that such fixed fee amount shall not apply in the event of the commencement of any insolvency or related proceeding with respect to the Company, and instead, during the pendency of such proceeding, Asgaard shall be paid according to its rates and hours, plus expenses.  In addition to the monthly fees, whether calculated on a fixed fee or later on an hourly basis following a filing, Asgaard

ASR-Pioneer Engagement Letter Third Amendment
Page 2

will be paid the following transaction based fees (the terms and conditions of which will be set forth in a subsequent agreement or amendment) of (i) with respect to any financing provided to the Company by any non-insider third party, a financing fee equal to the greater of (a) $25,000 or (ii) 5% of any such financing received or committed, and (ii) with respect to any sale, reorganization, or disposition of any or all of the Company's assets or operations, a transaction fee of $250,000.

Asgaard shall submit bills to the Company periodically, which bills shall be satisfied from the security retainer (plus any excess, as noted above) until it is exhausted. For so long as Asgaard is being paid via its hourly rate structure, Asgaard personnel shall keep time in summary format, in ¼ hour increments.

C.      Section 3 ("Term and Termination") is amended to include:

At any time hereafter, either the Company or Asgaard may terminate, without cause, Asgaard's services under the Agreement, by issuing a written notice to the other party. In all other respects, Section 3 of the Agreement remains unchanged.

In all other respects the Agreement, as amended, shall remain in full force and effect, and is ratified by the Company.

Very truly yours,

**ASGAARD CAPITAL LLC**

By: *Charles Reardon*

Charles Reardon
Senior Managing Director

Accepted and agreed:

Aviation Safety Resources, Inc.
Pioneer Aerospace Corporation
S.E. Inc. d/b/a Strong Enterprises

By: *Dan Manfred.*

Name: DARIO MANFREDI

Title: CHAIRMAN OF THE BOARD