UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11, Subchapter V |
| | |
| AVIATION SAFETY RESOURCES, INC., | Case No. 6:23-bk-4639-GER |
| S.E., INC., | Case No. 6:23-bk-4641-GER |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-4643-GER |
| | |
|     Debtors. | *Jointly Administered Under* |
| _____/ | *Case No. 623-bk-4639-GER* |
| | |
| S.E., INC., | Case No. 6:23-bk-4641-GER |
| PIONEER AEROSPACE CORPORATION | Case No. 6:23-bk-4643-GER |
| | |
|     Applicable Debtors. | |
| _____/ | |

## NOTICE OF FILING OF FINAL
## CLOSING DOCUMENTS IN CONNECTION WITH THE STALKING HORSE APA[1]

PIONEER AEROSPACE CORPORATION ("**Pioneer**") and S.E., INC. ("**Strong**" and together with Pioneer, collectively, the "**Debtors**") hereby give notice of the filing of the final closing documents in connection with that certain Asset Purchase Agreement dated November 1, 2023 (as amended, the "**Stalking Horse APA**"), by and between Pioneer and Strong, collectively, as seller, and Paradigm Parachute and Defense, Inc., a Florida corporation (the "**Stalking Horse Purchaser**"), as approved by the *Order Granting Debtors' Motion for Entry of an Order Authorizing (I) the Sale of Substantially All of Their Assets Pursuant to 11 U.S.C. §363, Free and Clear of All Liens, Claims and Encumbrances, and (II) Authorizing the Assumption and Assignment of Contracts* (Doc. No. 74) (the "**Sale Order**") entered in this jointly administered bankruptcy case on November 22, 2023. Attached hereto are the following:

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meaning ascribed to such terms in the Stalking Horse APA (as defined herein) or the Sale Order (as defined herein).

1. Asset Purchase Agreement dated December 8, 2023, by and between the Debtors, as sellers, and the Stalking Horse Purchaser, as buyer  (see attached **Exhibit 1**);

2. First Amendment to Asset Purchase Agreement dated December 8, 2023, by and between the Debtors, as sellers, and the Stalking Horse Purchaser, as buyer, with Schedules (see attached **Exhibit 2**);

3. Bill of Sale dated December 8, 2023, by and between the Debtors, as sellers, in favor of the Stalking Horse Purchaser, as buyer (see attached **Exhibit 3**);

4. Assignment and Assumption Agreement dated December 8, 2023, by and between the Debtors, as sellers, and the Stalking Horse Purchaser, as buyer (see attached **Exhibit 4**); and

5. Intellectual Property Assignment Agreement dated December 8, 2023, by and between the Debtors, as assignors, and the Stalking Horse Purchaser, as assignee (see attached **Exhibit 5**).

Dated: December 18, 2023

*/s/ Daniel R. Fogarty*
Daniel R. Fogarty (FBN 0017532)
Stichter Riedel Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida   33602
Telephone: (813) 229-0144
Email: dfogarty@srbp.com
Attorneys for Debtor

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing notice has been furnished on December 18, 2023, by the Court's electronic noticing system to all parties receiving electronic service.

*/s/ Daniel R. Fogarty*
Daniel R. Fogarty (FBN 0017532)

**<u>EXHIBIT 1</u>**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made and entered into this 1st day of November, 2023 (the "<u>Effective Date</u>"), by and between Paradigm Parachute and Defense, Inc., a Florida corporation or its designee ("<u>Buyer</u>"), on the one hand, and Pioneer Aerospace Corporation, a Delaware corporation d/b/a ASR-Pioneer ("<u>Pioneer</u>"), and S.E., Inc., a Florida corporation d/b/a Strong Enterprises ("<u>Strong</u>," and together with Pioneer, each, a "<u>Seller</u>," and, collectively, the "<u>Sellers</u>"), on the other hand.  Each of the Sellers and Buyer is a "<u>Party</u>" and collectively they are the "<u>Parties</u>" to this Agreement.

## RECITALS

WHEREAS, each Seller is engaged in the business of manufacturing parachutes, pallets, and/or related products for use in the space, defense, and aviation industries (collectively, the "<u>Business</u>");

WHEREAS, in connection with the Business, the Sellers have or had assets on site at certain leased locations located in Columbia, Mississippi (the "<u>Mississippi Location</u>"), Milton, Florida (the "<u>Milton Location</u>" ), and Orlando, Florida (the "<u>Orlando Location</u>," and together with the Mississippi Location, and the Milton Location, each a "<u>Location</u>" and, collectively, the "<u>Locations</u>");

WHEREAS, each Seller and Aviation Safety Resources, Inc., a Florida corporation (collectively, the "<u>Debtors</u>"), have commenced or will commence a voluntary case for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "<u>Bankruptcy Court</u>"), which cases are expected to be jointly administered (the "<u>Bankruptcy Case</u>");

WHEREAS, in the Bankruptcy Case, each Seller has been or will be in possession of its respective assets and in control of its respective business operations as a debtor in possession pursuant to the applicable provisions of the Bankruptcy Code;

WHEREAS, Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, substantially all of the assets, personal and mixed, tangible and intangible, associated with or employed in the operations of the Business and owned by Sellers, as set forth specifically in the schedules attached hereto, and Buyer agrees to assume certain of the obligations of Sellers under specified contracts from and after the Closing (as defined below) and to assume warranty obligations of the Sellers, on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code (the "<u>Transaction</u>");

WHEREAS, Bankruptcy Court approval is required to consummate the Transaction; and

WHEREAS,  the Assets (as defined below) and the Assumed Liabilities (as defined below) include assets and liabilities of Sellers which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving the Transaction (the "<u>Sale Order</u>") pursuant to

Sections 105, 363 and 365 of the Bankruptcy Code and applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which Sale Order shall include the authorization for the assumption and/or rejection by Sellers of certain executory contracts and/or unexpired leases and the assignment of all assumed executory contracts and/or unexpired leases to Buyer pursuant to Section 365 of the Bankruptcy Code and shall further state and conclude that Buyer is not a successor to Sellers, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and in reliance upon the representations, warranties, conditions and covenants contained herein and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF ASSETS

**Section 1.1 Purchase and Sale of Assets**. Subject to the terms and conditions of this Agreement, the Sellers shall sell, transfer, convey, assign and deliver to Buyer and Buyer shall purchase, acquire and accept from the Sellers, effective as of 12:01 a.m. on the Closing Date (as defined in Section 3.1 below) (the "Effective Time"), all of the right, title and interest of the Sellers in and to the following assets, free and clear of all Encumbrances (as defined herein) (collectively, the "Assets").  Without limiting the foregoing, the Assets shall include the following:

(a)    all tangible personal property, including all machinery, rolling stock, equipment, furniture, computer hardware, instruments, supplies, materials, vehicles and other items of tangible personal property and all rights in tangible personal property in the possession of others owned by the Sellers and used in the operation of the Business at each of the Locations;

(b)    all inventories, including supplies, work-in-process, spare parts and finished goods, if any, at each of the Locations;

(c)    all prepaid expenses, prepaid insurance, deposits and other similar items to the extent related to the operation of the Business at each of the Locations;

(d)    all operating data and records of the Sellers, including books, records, sales and sales promotional data, advertising materials, customer lists, credit information, cost and pricing information, supplier lists, business plans, reference catalogs, and computer programs and electronic data processing software related to any of the foregoing items at or related to each of the Locations (the "Seller Data"), except that minute books and corporate records, tax returns and litigation files of the Sellers, along with the other records described in Section 1.2 shall not be included in the Assets;

(e)    all engineering and production designs, drawings, plans, blue prints, formulae, source code, technology, trade secrets, technical information, process technology, confidential information, know-how and other similar data of the Sellers at or related to each of the Locations;

2

(f)      all claims and rights to and under all contracts, licenses, real property leases, equipment leases, instruments, commitments, agreements and other legally binding arrangements of every type and description relating to the Business at each of the Locations and to which either Seller is a party or by which any of the Assets is bound (the "Contracts") to be assumed and assigned to the Buyer (and not rejected by Sellers), as set forth on Schedule 1.1(f) attached hereto (which Schedule 1.1(f) will be mutually agreed to by the Parties and appended to this Agreement prior to Closing, and which Schedule 1.1(f) may include certain Contracts relating to the Connecticut Location, as mutually agreed upon by the Parties (the "Connecticut Contracts")) (each an "Assumed Contract" and collectively, the "Assumed Contracts"), but specifically excluding any Contracts that are not listed on Schedule 1.1(f) attached hereto (collectively, the "Excluded Contracts");

(g)      all patents, patent applications, inventions and discoveries that may be patentable, registered and unregistered trademarks, including those patents, patent applications, inventions, discoveries, and registered and unregistered trademarks listed on Schedule 1.1(g), all fictional business names, trade names, service marks, registered user entries, copyrights in both published works and unpublished works and all right, title and interest of the Sellers in any application for any of the foregoing, and all claims and causes of action relating to any of the foregoing, including claims and causes of action for past infringement as set forth on Schedule 1.1(g) (collectively, the "Intellectual Property Assets");

(h)      all the right, title and interest of the Sellers in, to and under all websites, domain names, email addresses and similar assets related to the operation of the Business;

(i)      all the right, title and interest of the Sellers in, to and under all telephone numbers, including all extensions thereto, used in the operation of the Business at each of the Locations;

(j)      subject to applicable laws and regulations, all transferable licenses, permits, certificates, franchises, approvals and other governmental or regulatory authorizations necessary for or incident to the ownership and operation of the Business at each of the Locations;

(k)      all accounts receivable and notes receivable of Sellers related to each of the Locations;

(l)      all goodwill of the Sellers relating to, attributable to or arising from the Assets or the Business at each of the Locations; and

(m)      rights under outstanding or prospective bids, proposals, offers, or similar items made by the Sellers to potential customers or contract parties ("Assumed Bids") listed on Schedule 1.1(m), and which Schedule 1.1(m) may include certain Assumed Bids relating to the Connecticut Location, as mutually agreed upon by the Parties (the "Connecticut Bids").

**Section 1.2 Excluded Assets**. Notwithstanding anything else contained herein, the following assets are excluded from the Assets being acquired by or transferred to Buyer at the Closing (collectively, the "Excluded Assets"):

(a)      restricted and unrestricted cash and cash equivalents, including cash, cash accounts, insurance policies or programs, marketable securities, certificates of deposit, deposits made with

3

respect to the Excluded Contracts or other Excluded Assets, and utility deposits (the "Retained Cash Equivalents");

(b)      all inventory not owned by a Seller or that is disposed of or exhausted prior to the Effective Time in the ordinary course of business, including but not limited to any inventory, goods, or materials that have been supplied by a customer on a consignment or bailment basis and is not owned by a Seller;

(c)      all items of personal property not owned by a Seller or that are transferred or disposed of prior to the Effective Time in the ordinary course of business, including but not limited to any inventory, goods, or materials that have been supplied by a customer on a consignment or bailment basis and is not owned by a Seller;

(d)      all assets, rights and funds in connection with any "employee benefit plans," as defined in § 3(3) of ERISA, all benefit plans as defined in § 6039D of the Code and the rules and regulations promulgated thereunder, and all other stock purchase, stock option, equity-based, retention bonus, bonus, incentive compensation, deferred compensation, profit sharing, severance, change in control, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit, welfare and other employee benefit plans (whether oral or written, qualified or non-qualified) and employment agreements, programs, policies or other arrangements and any trust, escrow or other funding arrangement related thereto ("Benefit Plans");

(e)      all rights (i) under any insurance policies of the Sellers, and any right to refunds due and/or cash surrender values with respect to such insurance policies, and (ii) under or pursuant to all warranties (express or implied), representations and guarantees made or provided by third parties relating to any Excluded Assets;

(f)      each Seller's corporate record books, minute books and tax records, and any other records which such Seller is required to retain by Law (copies of which may be given to Buyer), but only to the extent that such books and records cannot be transferred to Buyer if Buyer agrees to grant such Seller access to such books and records and to maintain them for the period required by Law.  For purposes of this Agreement, "Law" means any statute, rule, regulation, code, ordinance, resolution, Order, writ, injunction, judgment, decree, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority, and "Governmental Authority" means the government of the United States and any government of a state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of the United States, any state of the United States or any political subdivision thereof, any tribunal or arbitrator(s) of competent jurisdiction and any self regulatory organization;

(g)      any right, title or interest of the Sellers in any Federal, state, local or foreign Tax refunds (and any income with respect thereto), Tax credits, Tax benefits, or other governmental charges.  For purposes of this Agreement, "Tax" means (i) any and all federal, state, local,

4

foreign and other net income, gross income, gross receipts, sales, use, ad valorem, unclaimed property, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other tax, fee, assessment or charge of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (ii) any liability for payment of amounts described in clause (i) as a result of transferee liability or otherwise through operation of law, and (iii) any liability for the payment of amounts described in clauses (i) or (ii) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify any other Person, and "Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or government (whether federal, state, county, city or otherwise, including, without limitation, any instrumentality, division, agency or department thereof);

(h)    any and all of Seller's claims, demands, rights, defenses, counterclaims, suits or actions and all other claims of any value whatsoever of Sellers, whether known or unknown, in law, equity or otherwise, against any third party and the proceeds or benefits thereof ("Causes of Action") (other than Causes of Action (i) with respect to or arising out of any Assumed Contract; and (ii) arising with respect to property, plant or equipment included in the Assets, whether as a result of a warranty or otherwise (collectively, the "Assigned Causes of Action")), including, without limitation, any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of Sellers or the bankruptcy estate of Sellers under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of §§ 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code ("Avoidance Actions"), and Seller's claims or causes of action for breach of fiduciary duty, professional negligence or director and officer liability. For the avoidance of doubt, all claims of the Sellers against Zodiac US Corporation, Safran USA, Inc., or Safran, S.A., or their respective related parties shall be Excluded Assets;

(i)    any rights under this Agreement or any other document entered into with Buyer;

(j)    the Excluded Contracts;

(k)    subject to Section 1.4(b), any contract or permit not assignable by its terms;

(l)    the Carved-Out Assets (as defined herein), if any;

(m)    assets on site at Sellers' leased locations located in Bloomfield, Connecticut (the "Connecticut Location"), except for those Connecticut Contracts and Connecticut Bids, which will transfer to Buyer as provided above;  and

(n)    any other item set forth on Schedule 1.2 attached hereto and made a part hereof.

**Section 1.3 Assumption of Liabilities**.

(a)    Except as set forth on Schedule 1.3, which Schedule 1.3 will be mutually agreed to by the Parties and appended to this Agreement prior to Closing , or otherwise set forth in this Agreement, Buyer will not assume any debts, liabilities, obligations, expenses, taxes, contracts or

5

commitments of the Sellers of any kind, character or description, whether accrued, absolute, contingent or otherwise, no matter whether arising before or after the Closing, and whether or not reflected or reserved against in the financial statements, books of accounts or records of the Sellers. With the exception of those items as specifically set forth on <u>Schedule 1.3</u> attached hereto, Sellers will retain all liabilities directly or indirectly arising out of or related to the ownership and operation of the Assets and the Business before or on the date of the Closing, and directly or indirectly arising out of or related to the ownership and operation of the Excluded Assets before, on or after the Closing. The liabilities and obligations set forth in this Section, including any and all liabilities of Sellers in connection with any Assumed Contract or Assumed Bid with respect to (i) matters occurring thereunder on or after the Closing Date, and (ii) the Cure Amounts, and on <u>Schedule 1.3</u> are herein referred to as the "<u>Assumed Liabilities</u>." For purposes of this Agreement, (i) "<u>Cure Amounts</u>" means the amounts determined by a Final Order of the Bankruptcy Court to be necessary to cure all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults on the part of the Sellers under any of the Assumed Contracts as required by Section 365(b)(1) of the Bankruptcy Code, and (ii) "<u>Final Order</u>" means an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Bankruptcy Case for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, re-argument, rehearing, reconsideration or certiorari has been taken and, unless otherwise agreed by the Buyer, is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.

(b)     Notwithstanding the foregoing, if the Assets include personal property located at the Milton Location or the Mississippi Location, the Parties acknowledge and agree that the Buyer shall be responsible for any fees, costs, and liabilities associated with the post-Closing occupancy of any Assets at the Milton Location and the Mississippi Location, if any, and the fees, costs, and liabilities associated with both the removal of any Assets from the Milton Location and the Mississippi Location, if any, and their delivery to Buyer, if necessary. For purposes of this Agreement, the aforementioned fees, costs and liabilities shall be considered Assumed Liabilities. Any post-Closing occupancy or removal fees, costs, and liabilities at the Milton Location or the Mississippi Location, as applicable, solely attributable to Excluded Assets shall not be Assumed Liabilities.

(c)     Buyer agrees to assume any and all existing warranty obligations given by either Seller to its customers before the Closing and to honor such warranties following the Closing, without recourse or indemnity to such Seller.  Such warranty obligations shall be Assumed Liabilities.

**Section 1.4 Assignment of Contracts**.

(a)     Anything in this Agreement to the contrary notwithstanding, except as otherwise authorized under the Bankruptcy Code and approved in the Sale Order, this Agreement shall not constitute an agreement to assign, and the Assets shall not include, any claim, contract, instrument,

agreement, license, lease, commitment, sales order, purchase order or any claim or right, or any benefit arising thereunder or resulting therefrom, if an attempted assignment thereof, without the consent of a third party thereto, would constitute a breach thereof or in any way affect the rights of Buyer or Sellers thereunder. As necessary, each Seller will use its good faith efforts to obtain the consent of any and all third parties to the assignment of any such Assumed Contract or agreement prior to the Closing. Except as otherwise authorized under the Bankruptcy Code and approved in the Sale Order, if such consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect such rights, each Seller will cooperate with Buyer (but shall not be obligated to incur any expenses in such efforts) in any arrangement designed to provide for Buyer the benefits under any such claims, contracts, instruments, agreements, licenses, leases, commitments, sales orders or purchase orders, including, without limitation, enforcement for the benefit of Buyer of any and all rights of Buyer or the Sellers against a third party thereto arising out of a breach or cancellation by such third party or otherwise; and any transfer or assignment to Buyer of any property or property rights or any contract or agreement which shall require the consent or approval of any third party shall be made subject to such consent or approval being obtained, or as provided otherwise in the Sale Order.

(b)     Each Seller agrees to provide such cooperation (but shall not be obligated to incur any expenses in such efforts) as reasonably necessary to enable Buyer to request consents, waivers, registrations, or novation for any Contracts which are not subject to assumption and assignment under the terms of the applicable Contract or by virtue of applicable law without the consent or approval of the counterparty to the Contract. For the avoidance of doubt, Buyer obtaining approval of such consents, waivers, registrations, or novations shall not be a condition to Closing.  Without limiting the generality of the foregoing, Sellers shall cooperate, support and assist Buyer in having any Government Contract that is an Assumed Contract assigned and/or novated to Buyer (but shall not be obligated to incur any expenses in such efforts). For purposes of this Agreement, a "Government Contract" means any contract or agreement between a Seller and any Governmental Authority (as defined in this Agreement) that is open and has not yet been (and will not be at the Closing) completely performed.

### ARTICLE 2
### CONSIDERATION

**Section 2.1 Purchase Price**.

(a)     In consideration of and in full payment for the purchase of the Business and the Assets and subject to the provisions of this Agreement, Buyer shall pay to Sellers the sum of Two Million Two Hundred Fifty Thousand and 00/100 Dollars ($2,250,000.00) (the "Purchase Price").

(b)     Buyer shall pay a deposit in an amount equal to Two Hundred Twenty Five Thousand and 00/100 Dollars ($225,000.00) (the "Buyer Deposit") to Stichter, Riedel, Blain & Postler, P.A. (the "Escrow Agent") upon the full execution of this Agreement. The Buyer Deposit shall not become property of the Debtors' bankruptcy estates until immediately after Closing of the sale to Buyer. If the transaction contemplated hereunder is consummated in accordance with the terms hereof, the Buyer Deposit shall be credited to the Purchase Price. If Buyer is not the Successful Bidder, as defined herein, the Buyer Deposit, without interest, shall be repaid or

returned to Buyer immediately upon the closing of an alternative transaction approved at the Sale Hearing, as defined herein.

(c)     At the Closing, Buyer shall pay to the Escrow Agent, by wire transfer of good and immediately available funds, the Purchase Price plus the Closing Costs (as defined herein) less the Buyer Deposit less the value of the Carved-Out Assets, if any, as set forth on the Purchase Price Allocation (as defined herein).

## ARTICLE 3
## CLOSING; OBLIGATIONS OF THE PARTIES

**Section 3.1 Closing**. The closing (the "Closing") will take place remotely via the exchange of documents and signatures, at such place and time as may be mutually agreed upon by the parties no later than five (5) business days after all conditions set forth in Article 8 are satisfied, or at such other time and place as the parties mutually agree upon, orally or in writing (the "Closing Date").

**Section 3.2 Obligations of the Parties at the Closing**.

(a)     At the Closing, Buyer shall deliver to Escrow Agent (or the Sellers' agent or such other party(s) as may be designated in writing by the Sellers):

(i)     after taking into account the Buyer Deposit on hand with the Escrow Agent and after deducting from the Purchase Price the value of the Carved-Out Assets, if any, as set forth on the Purchase Price Allocation, an amount in immediately available funds equal to Purchase Price plus the Closing Costs (collectively, the "Cash Payment");

(ii)     executed counterparts to such bills of sale, assignments, intellectual property assignment, and other good and sufficient instruments of conveyance and transfer, in form and substance reasonably satisfactory to Buyer, as shall be effective to vest in Buyer all of the title to and interest of the Sellers in the Assets (collectively, the "Transaction Documents");

(iii)     copies of resolutions duly adopted by the board of directors / manager(s) of Buyer (as applicable) authorizing and approving Buyer's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of the Closing by an appropriate officer of Buyer;

(iv)     certificates of existence and good standing for Buyer, certified by the Secretary of State of Florida, dated within ten (10) business days of the Closing; and

(v)     such other certificates and documents as the Sellers or their counsel may reasonably request.

(b)     At the Closing, the Sellers will deliver to Buyer:

(i)     the Sale Order, which shall be a Final Order, as defined herein, and shall release all Encumbrances, except as set forth in the Sale Order, encumbering any of the Assets, and which shall be in the form and substance acceptable to Buyer in its sole discretion;

(ii)     the Transaction Documents; and

(iii)    such other documents as Buyer or its counsel may reasonably request.

**Section 3.3 <u>As Is</u>.**  IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT BUYER IS PURCHASING THE ASSETS "AS IS" AND "WHERE IS," "WITHOUT RECOURSE," AND WITH ALL FAULTS AND DEFECTS, LATENT OR OTHERWISE, AND THAT SELLERS ARE MAKING NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE QUALITY, PHYSICAL CONDITION, EXISTENCE, LOCATION, OR VALUE OF THE ASSETS, OR THE INCOME OR EXPENSES FROM OR OF THE BUSINESS OR THE OPERATIONS OR RESULTS OF OPERATIONS OR ECONOMIC FORECASTS OR PROJECTIONS CONCERNING EARNINGS OR PROFITS, THE USE RESTRICTIONS AFFECTING THE ASSETS, THE ENFORCEABILITY OF ANY CONTRACT OR OTHER AGREEMENT OR RIGHT ASSIGNED HEREUNDER, OR THE COMPLIANCE OF THE ASSETS OR ANY PART THEREOF WITH ANY LAWS, STATUTES, RULES, ORDINANCES, DECREES OR ORDERS APPLICABLE THERETO. WITHOUT LIMITING THE FOREGOING, IT IS UNDERSTOOD AND AGREED THAT SELLERS MAKE NO WARRANTY OF HABITABILITY, SUITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY PURPOSE.

Buyer acknowledges that Buyer is purchasing the Assets based solely upon Buyer's own independent investigations and findings and not in reliance upon any information provided by Sellers or Sellers' agents or representatives.  Sellers shall not be liable or bound in any manner by any verbal or written statements, representations or information pertaining to the Assets, furnished by any agent, employee, or other person representing or purporting to represent Sellers. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**Section 3.4.  Delivery of Assets**.  At the Closing:

(a)     Sellers shall deliver or cause to be delivered to Buyer duly executed instruments of transfer and assignment in form and substance satisfactory to Buyer and its attorneys, sufficient to vest in Buyer good title to, and all the right, title and interest of Sellers in and to, the Assets, free and clear of all liens, pledges, charges, security interests, claims, options, imperfections of title, tenancies, or other rights, interests or encumbrances of any kind or nature (collectively, "<u>Encumbrances</u>," and each, an "<u>Encumbrance</u>"), except for the Assumed Liabilities.

(b)     Each Seller and Buyer shall execute and deliver, or cause to be executed and delivered, such other certificates, documents and instruments as are set forth in Article 3 hereof.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As of the date hereof and as of the Closing Date, Sellers represent and warrant to Buyer, on a joint and several basis, the following:

9

**Section 4.1 Corporate Capacity**.  Pioneer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Strong is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida.  Subject to and by virtue of the entry of the Sale Order, each Seller has the requisite power and authority to enter into this Agreement and the Transaction Documents and perform its obligations thereunder.

**Section 4.2 Corporate Powers.**  Subject to and by virtue of the entry of the Sale Order, each Seller's execution, delivery and performance of this Agreement and all other agreements referenced herein or ancillary hereto to which it is a party, and each Seller's consummation of the transactions contemplated hereby or thereby are within such Seller's corporate powers and are not in contravention of the terms of its articles of incorporation and bylaws, and have been approved by all requisite corporate action.

**Section 4.3 Title to Assets**.  Subject to the entry of the Sale Order, upon the sale, assignment, transfer and delivery of the Assets to the Buyer under this Agreement and the related sale documents, there will be vested in the Buyer good, marketable and indefeasible title to the Assets, free and clear of all Encumbrances except as set forth in the Sale Order.  Sellers represent, warrant, covenant, and agree that, in the exercise of their good faith efforts, the Seller Data transferred and sold as part of the Assets has been segregated from other data of the Sellers, will be sold and made available exclusively to Buyer, and will not be sold or made available to any other purchaser of the properties or assets of the Sellers (including with respect to the Connecticut Location).

**Section 4.4 Binding Agreement.**  Subject to the entry of the Sale Order, this Agreement has been and, on the Closing Date, all of the agreements and documents to which each Seller shall be a party in connection with this Agreement shall have been, duly executed and delivered by such Seller, and shall be the valid and legally binding obligation of such Seller, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

**Section 4.5 Legal Proceedings.** Except as disclosed in the Sellers' Bankruptcy Schedules, otherwise known to the Buyer or as set forth on Schedule 4.5 attached hereto, there is no arbitration, audit, hearing, investigation, litigation suit or other similar action by or before a Governmental Authority (each a "Proceeding") or any judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority (each an "Order") pending or, to the knowledge of Sellers, threatened against or affecting either Seller or any of its properties or rights.  Each Seller expressly represents and warrants that, to its knowledge, there are no Procedings or Orders currently pending that challenge or may otherwise have the effect of preventing, delaying, making illegal or otherwise interfering with or increasing the costs of any of the transactions contemplated by this Agreement.  To the knowledge of each Seller, no event has occurred or circumstance exists that may give rise to a basis for such a Proceeding or Order.

**Section 4.6 Brokers and Finders.**  With the exception of the engagement of the Sellers' financial advisor, payment for which will come solely from Sellers or an Affiliate, neither Sellers nor any Affiliate thereof nor any employee, officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereby.  For purposes of this Agreement, "Affiliate" means, with respect to any Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, (b) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, twenty-five percent (25%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (c) any other Person who is a director, officer, joint venture or partner (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES BY BUYER

As of the date hereof and as of the Closing Date, Buyer represents and warrants to Sellers the following:

**Section 5.1 Corporate Capacity.**  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida. Buyer has the requisite power and authority to enter into this Agreement and the Transaction Documents, perform its obligations hereunder and to conduct its businesses as now being conducted.

**Section 5.2 Corporate  Powers; Consents; Absence of Conflicts With Other Agreements.**  Buyer's execution, delivery and performance of this Agreement and all other agreements referenced in or ancillary hereto to which Buyer is a party, and Buyer's consummation of the transactions contemplated hereby or thereby:

(a) are within Buyer's corporate powers and are not in contravention of the terms of Buyer's articles of incorpoation or bylaws and have been approved by all requisite corporate action;

(b) has been or will be approved by or consented to by any Governmental Authority which is required by Law or the regulations of any Governmental Authority;

(c) shall not violate any Law to which Buyer may be subject;

(d) shall not violate any order of any court or Governmental Authority to which Buyer may be subject;

(e) shall not render Buyer insolvent or otherwise unable to pay its debts as they become due; and

(f) are not subject to any financing contingencies.

11

**Section 5.3 Binding Agreement.** Subject to the entry of the Sale Order, this Agreement has been and, at the Effective Time, all of the agreements and documents to which Buyer is a party in connection with this Agreement shall have been duly executed and delivered by Buyer, and shall be the valid and legally binding obligation of Buyer, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

**Section 5.4 Legal Proceedings.** There is no Proceeding or Order pending or, to the knowledge of Buyer, threatened against or affecting Buyer or any of its properties or rights that challenges or may otherwise have the effect of preventing, delaying, making illegal or otherwise interfering with any of the transactions contemplated by this Agreement. To the knowledge of Buyer, no event has occurred or circumstance exists that may give rise to a basis for such a Proceeding or Order.

**Section 5.5 Brokers and Finders.** Neither Buyer nor any Affiliate thereof nor any employee, officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereby.

## ARTICLE 6
## COVENANTS AND AGREEMENTS OF THE SELLERS

**Section 6.1 Bankruptcy Court Approval.**

(a)      No later than five (5) business days following the execution and delivery of this Agreement, Sellers shall file a motion (the "Sale Motion") with the Bankruptcy Court, inform and substance acceptable to Buyer in its sole and absolute discretion, seeking the entry of an order, in form and substance acceptable to Buyer in its sole and absolute discretion and in substantially the form attached hereto as Exhibit "A", approving the sale of the Assets to Buyer and the Transaction pursuant to the terms and conditions of this Agreement, subject to higher and better bids, and approving certain bid procedures and bid protections in connection with the sale of the Assets (the "Sale Procedure Order").

(b)      The Sale Procedure Order shall prescribe the procedures that shall govern an auction sale of the Assets (the "Auction"), including but not limited to (i) approving this Agreement as an approved stalking horse bid; (ii) establishing the date of the Auction (the "Auction Date") and the location of the Auction; (iii) a requirement that in order to be qualified to bid on the Assets at the Auction, prospective bidders must deposit the cash amount of not less than the greater of (i) ten percent (10%) of the Initial Upset Bid, as defined herein, or (ii) Two Hundred Thousand and 00/100 Dollars ($200,000.00), with Escrow Agent as an earnest money deposit (the "Bidder's Deposit") and submit a signed asset purchase agreement in substantially the same form as this Agreement (black-lined to show the changes against this Agreement), in each case by no later than 5:00 p.m. (Eastern Prevailing Time) on the date that is two (2) business days prior to the Auction Date (the "Bid Deadline"); (iv) the nature of the financial information that prospective bidders must submit to establish their financial capacity to consummate a successful bid for the Assets (in at least the amount of the Initial Upset Bid, as defined herein), which shall be delivered

by no later than the Bid Deadline; (v) the nature of the notice of the Auction and the Sale Motion that must be disseminated to creditors of the Sellers, parties in interest in the Bankruptcy Case, and potential interested prospective bidders; (vi) the minimum upset bid required to start the auction sale which in any event shall be no less than $250,000.00 above the Purchase Price (the "Initial Upset Bid"); (vii) in the event Buyer is not the successful bidder at the Auction for all (and not less than all) of the Assets proposed to be purchased by Buyer hereunder (such successful bidder, the "Successful Bidder"), (i) the reimbursement and payment by the Successful Bidder to Buyer for its reasonable expenses incurred for due diligence, contract negotiation and contract preparation, in the amount of $75,000.00 (the "Expense Reimbursement"), and (ii) providing for the rights of Buyer in the event of any Carved-Out Assets, consistent with Section 6.1(c) of this Agreement; (viii) following an Initial Upset Bid, the incremental amount by which each bid must exceed the prior bid, which amount shall be $100,000.00 (the "Overbid Amount"); (ix) setting the date for the hearing to be held by the Bankruptcy Court on the Sale Motion (the "Sale Hearing"); (x) setting the deadline for the filing with the Bankruptcy Court of objections to the Sale Motion, which shall be two (2) business days prior to the Auction Date; (xi) setting procedures for the assumption and assignment of the Assumed Contracts and for asserting Cure Claims; and (xii) such other procedures as requested by the Sellers and approved by the Bankruptcy Court as reasonable under the circumstances of the Bankruptcy Case (and as acceptable to Buyer in its sole and absolute discretion).

(c)     Notwithstanding the foregoing or anything else contained in this Agreement, if any bids for all of the Assets located at or related to any Location(s) are deemed by the applicable Seller to be higher and better bids for those Assets than those as contemplated in this Agreement and valued by the Buyer as set forth in the Purchase Price Allocation (subject to adjustment as provided below), then, subject to the bidding rights of such bidder(s) and the Buyer at the Auction and the outcome of the Auction and the Sale Hearing, such Seller(s) may proceed to a closing of the sale of the Assets located at or related to such Location(s) (the "Carved-Out Assets") to the winning bidder and the Purchase Price shall be reduced by the value of the Carved-Out Assets as set forth on the Purchase Price Allocation. The Carved-Out Assets shall be Excluded Assets. Notwithstanding any of the foregoing to the contrary, exclusion of the Carved-Out Assets will be subject to the following additional terms and conditions:

(i)     In the event that Carved-Out Assets are excluded from the Transaction, Buyer will be entitled to a prorated return of the Buyer Deposit, as well as payment of a prorated portion of the Expense Reimbursement, which such proration to be made in each case based upon the Purchase Price Allocation.

(ii)     Buyer shall retain the right and option to adjust the Purchase Price Allocation at the Auction in order to respond to competitive bids that may be submitted at the Auction for discreet Assets, or portions thereof.

(iii)     In the event that the value of the Carve-Out Assets exceeds 40% of the value of the total Assets (as determined under the Purchase Price Allocation), Buyer will have the right and option (but not the obligation) to terminate this Agreement, including Buyer's obligation to proceed to Closing on the Transaction. For clarification, upon termination of this Agreement pursuant to this Section 6.1(c)(iii), Buyer will be entitled to the full $75,000 Expense Reimbursement (without any proration).

13

(d)      Each Seller agrees to assume in the Bankruptcy Case and assign to the Buyer any Assumed Contract to which such Seller is a party.  Assumption and assignment of the Assumed Contracts shall include any ancillary or related agreements, or rights appurtenant thereto, pursuant to which the applicable Seller has rights or licenses granted in connection with or under the Assumed Contracts, so long as such ancillary or related agreements do not create additional obligations of the Sellers or the Buyer beyond those set out in the Assumed Contracts (unless the Buyer subsequently agrees to such obligations). The Buyer shall be responsible for and shall pay all Cure Amounts in connection with the assumption and assignment of any Assumed Contract to the Buyer.  Pursuant to Section 365 of the Bankruptcy Code and the Sale Procedures Order, and as requested by parties to the Assumed Contracts and required by the Bankruptcy Court, the Buyer shall provide adequate assurance of future performance under and with respect to the Assumed Contracts. Buyer shall have the right to add or remove any executory contract or unexpired lease from the list of Assumed Contracts until the Closing Date. After the Closing Date, the Debtor shall be released from any further Liability under the Assumed Contracts as provided for under Section 365(k) of the Bankruptcy Code.

**Section 6.2 Access; Further Assurances**. From and after the Effective Date, Buyer and its representatives and agents will have the right to access the premises of the Sellers during regular business hours to review, inspect and copy any and all books, records, documents or other information concerning the Assets or the operation of the Business as Buyer or its representatives or agents may reasonably request and subject to the terms of the existing confidentiality agreement in place between the Sellers and the Buyer (the "Confidentiality Agreement"). At any time and from time to time after the Closing, at Buyer's request and without further consideration, each Seller will execute and deliver such other instruments of sale, transfer, conveyance, assignment, and delivery and confirmation and take such action as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Buyer and to place Buyer in possession and control of, and to confirm Buyer's title to, the Assets, and to assist Buyer in exercising all rights and enjoying all benefits with respect thereto.

**Section 6.3 Confidentiality Covenant**. Following the Closing Date, no Seller will, directly or indirectly, use for any purpose or disclose to any third party, any trade secret, supplier or patient list, financial data, price list, pricing or marketing policy or plan, financial information, prices, costs, treatment methods, strategic planning information, processes, plans, methods of doing business or any other proprietary or confidential information that is the property of Buyer (or of any of its Affiliates). This restriction will not apply to any information that (i) is or becomes generally available to and known by the public (other than as a result of unpermitted disclosure directly or indirectly by a Seller or such Seller's Affiliates, advisors or representatives); (ii) is or becomes available to such Seller on a non-confidential basis from a source other than Buyer or its Affiliates, advisors or representatives, provided that, at the time of disclosure to such Seller, such source was not bound by a confidentiality agreement with or other obligation of secrecy to Buyer or any of its Affiliates; or (iii) has already been or is hereafter independently acquired or developed by such Seller without violating any confidentiality agreement with or other obligation of secrecy to Buyer.

# ARTICLE 7
## COVENANTS AND AGREEMENTS OF BUYER

**Section 7.1 Taxes**. Buyer will be responsible for, and hereby agrees to assume and pay, all sales and use or similar taxes that may be due to any jurisdiction or governmental body as a result of the sale and transfer of the Assets. Each Seller shall be responsible for its own income or capital gains taxes as a result of this Agreement and the transactions related thereto.

**Section 7.2 Confidentiality**.  Buyer shall, and shall use its reasonable best efforts to cause its employees, representatives and agents to, hold in confidence, as if it were confidential information of Buyer, all information of any kind concerning Sellers or the Business, obtained directly or indirectly from a Seller or its Affiliates in connection with the transactions contemplated by this Agreement except information (a) ascertainable or obtained from public or published information, (b) received from a third party not known by Buyer to be under an obligation to Sellers to keep such information confidential, (c) which is or becomes known to the public (other than through a breach of this Agreement), or (d) which was in Buyer's possession prior to disclosure thereof to Buyer in connection herewith (the "<u>Confidential Information</u>"), unless compelled to disclose such infonnation by judicial or administrative process or, in the opinion of counsel, by other legal requirements, and Buyer shall not disclose Confidential Information to any Person, except as otherwise may be reasonably necessary to carry out the transactions contemplated by this Agreement, including any business or the diligence review by or on behalf of Buyer. Notwithstanding anything contained herein or in the Confidentiality Agreement to the contrary, Buyer is permitted to share or disclose Sellers' due diligence and other Confidential Information with its employees, contractors, personnel, representatives, financing sources, attorneys, and other professional advisors, as may be reasonably necessary to carry out the transactions contemplated by this Agreement, including any business or the diligence review by or on behalf of Buyer.  If this Agreement is terminated, then upon Sellers' written request, Buyer shall within twenty (20) days return or cause to be returned to Sellers all documents and all copies thereof furnished by Sellers and held by Buyer, its representatives or agents containing such Confidential Information. Buyer recognizes that any breach of this Section would result in irreparable harm to Sellers and that therefore Sellers shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash or otherwise, in addition to all of their other legal and equitable remedies.

**Section 7.3 Employment**.  As of the Effective Time, each Seller shall terminate all of its employees and the Buyer shall offer employment effective as of the Effective Time to such employees of each such Seller that Buyer elects and determines to offer employment to, on terms and conditions determined by the Buyer in its sole and absolute discretion.  Such employees who accept the Buyer's offer of employment shall be referred to herein as the "<u>Hired Employees</u>".  To facilitate the Buyer's determination of which employees to whom Buyer desires to offer employment as a Hired Employee, each Seller shall provide the Buyer, within a reasonable period prior to the Closing, a true and correct list of all of its employees, including with respect to any inactive employee, the reason for such inactive status and, if applicable, the anticipated date of return to active employment.  With respect to the Hired Employees, after the Effective Time, the Buyer shall be responsible for all liabilities, obligations and commitments of the Buyer and its Affiliates relating to all wages, salaries, bonuses, vacation, sick leave and other forms of compensation and related expenses, workers' compensation claims, and employee benefit liabilities under any and all plans, programs and arrangements maintained or contributed to by the Buyer and its Affiliates for the benefit of the Hired Employees, if and to the extent incurred or accrued after the Effective Time. The Sellers shall have no responsibility whatsoever for any

liabilities or obligations that relate in any way to such Hired Employees' employment with the Buyer or any subsequent termination of employment of any Hired Employee by the Buyer. Buyer shall not assume, and shall have no responsibility whatsoever for, any liabilities or obligations that relate in any way to such Hired Employees' employment with the Sellers prior to the Effective Time, including any liabilities or obligations related to the termination of employment of such Hired Employees by the Sellers.

## ARTICLE 8
## CONDITIONS TO CLOSING

**Section 8.1 Conditions to Buyer's Obligations.** All obligations of Buyer hereunder are subject to the fulfillment or waiver, prior to or at the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties</u>. The representations and warranties made by the Sellers in this Agreement and the statements contained on the Schedules attached hereto or in any instrument, list, certificate or writing delivered by the Sellers pursuant to this Agreement shall be true in all material respects when made and at and as of the time of the Closing as though such representations and warranties were made at and as of the Closing.

(b)    <u>Sale Procedure Order</u>. Entry by the Bankruptcy Court of the Sale Procedure Order, in the form and substance acceptable to Buyer in its sole and absolute discretion and in substantially the form attached hereto as <u>Exhibit "A"</u>, expressly approving and authorizing bid procedures and including a provision that if Buyer is not the Successful Bidder at the Auction sale, then (i) the Sellers shall pay to Buyer upon Bankruptcy Court approval of a bid of another entity as shall be determined by the Bankruptcy Court to be "a higher and better bid" for the Assets (with the express exception of the Carved-Out Assets, if any) than that of Buyer (the "<u>Higher Auction Transaction</u>") and the closing of the Higher Auction Transaction, the Buyer Deposit, and (ii) the Successful Bidder shall pay to Buyer upon Bankruptcy Court approval of the Higher Auction Transaction and the closing of the Higher Auction Transaction, the Expense Reimbursement. Payment of the Expense Reimbursement, and the Buyer Deposit shall be the sole remedy of Buyer for the failure of Sellers to complete the sale of the Assets (with the express exception of the Carved-Out Assets, if any, which will be subject to the Expense Reimbursement (prorated or otherwise), as provided above) to Buyer as a result of a Higher Auction Transaction.

(c)    <u>Sale Order</u>. Entry by the Bankruptcy Court of the Sale Order in the form and substance acceptable to Buyer in its sole discretion, expressly making Section 363(m) of the Bankruptcy Code applicable to this Agreement, and the Sale Order shall be a Final Order. For clarification, Buyer's obligation to close on the Transaction shall in all cases be subject to and contingent upon Buyer being named the Successful Bidder for the Assets (with the express exception of the Carved-Out Assets, if any).

(d)    <u>Performance by the Sellers</u>. Each Seller shall have performed and complied in all material respects with all covenants, agreements, obligations and conditions required by this Agreement, and any exhibits thereto, including, but not limited to, the execution and delivery of the documents listed in Section 3.2(a)(ii) to the satisfaction of Buyer.

**Section 8.2 Conditions to Seller's Obligations**.  All obligations of the Sellers under this Agreement are subject to the fulfillment or waiver, prior to or at the Closing, of each of the following conditions:

(a)    <u>Representations and Warranties</u>. The representations and warranties made by Buyer in this Agreement and the statements contained in any instrument, list, certificate or writing delivered by the Buyer pursuant to this Agreement shall be true in all material respects when made and at and as of the time of the Closing as though such representations and warranties were made at and as of the Closing.

(b)    <u>Purchase Price</u>.  Buyer shall have delivered the Cash Payment to the Escrow Agent or other parties as directed by Sellers.

(c)    <u>Performance</u>. Buyer shall have performed and complied in all material respects with all agreements, obligations and conditions required by this Agreement and any exhibits thereto, to be so complied with or performed including payment and delivery of the Purchase Price and the execution and delivery of the documents listed in Section 3.2(a)(ii) to the satisfaction of Sellers.

(d)    <u>Litigation</u>. On the date of the Closing, there shall be no lawsuits pending against Buyer seeking to enjoin, prohibit, restrain or otherwise prevent the transactions contemplated hereby.

**ARTICLE 9**
**SURVIVAL OF REPRESENTATIONS, WARRANTIES**
**AND AGREEMENTS; EXPENSES**

**Section 9.1 Survival**.  All representations and warranties of Sellers and Buyer contained in this Agreement and the Transaction Documents shall survive until and expire at the Closing.

**Section 9.2 Expenses**.

(a)    Whether or not the transactions contemplated by this Agreement are consummated, each party hereto shall pay all of such party's own fees and expenses incident to the negotiation, preparation and execution of this Agreement, including the fees and expenses of such party's own legal counsel, accountants and other advisors.  Sellers shall also remain solely responsible for the fees and expenses of Sellers' financial advisor.

(b)    Buyer shall be responsible for all costs and expenses due to any third parties and associated with the Closing (the "<u>Closing Costs</u>"), including, without limitation: (i) to the extent applicable, any and all sales or other transfer, stamp or similar taxes incurred in connection with the sale, transfer and assignment of the Assets and from Sellers to Buyer, (ii) any financing related expenses, and (iii) any other costs and fees incurred in connection with the sale, transfer and assignment of the Assets and from Sellers to Buyer hereunder at Closing or otherwise. For clarification, Closing Costs will exclude fees and expenses for which Sellers are responsible under Section 9.2(a).

17

## ARTICLE 10
## TERMINATION

Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated at any time: (a) on or prior to the Closing Date by mutual written consent of Buyer and Sellers; (b) by Buyer, effective upon written notice to Sellers, if any of the conditions specified in Section 8.1 of this Agreement to the Buyer's obligation to close has not been satisfied and shall not have been waived by Buyer prior to or at the Closing; (c) by Sellers, effective upon written notice to Buyer, if any of the conditions specified in Section 8.2 of this Agreement to the Sellers' obligations to close has not been satisfied and shall not have been waived by Sellers prior to or at the Closing; (d) by Sellers, if Sellers accept and the Bankruptcy Court approves a Higher Auction Transaction for the Assets (with the express exception of the Carved-Out Assets, if any, which will be subject to a return to Buyer of a prorated portion of the Buyer Deposit, as provided above); (e) by Sellers, as provided in Section 6.1(c)(iii) above; or (f) by either party hereto, effective upon written notice to the other, if the Sale Procedure Order is not entered by the Bankruptcy Court in the Bankruptcy Case on or before the later of (i) the date that is fourteen (14) days after the filing of the Sale Motion and (ii) November 3, 2023. Further, the Buyer Deposit shall only be repayable or refundable to Buyer if (i) a Higher Auction Transaction (with the express exception of a Higher Auction Transaction as to the Carved-Out Assets, if any, which will be subject to a return to Buyer of a prorated portion of the Buyer Deposit and the Expense Reimbursement (prorated or otherwise), as provided above) closes pursuant to Section 8.1(b) of this Agreement; or (ii) even if a Higher Auction Transaction does not close, if the Agreement is terminated pursuant to (a), (b), (e) or (f) above (in which case Sellers will cause such Buyer Deposit to be refunded to Buyer no later than five (5) business days following any such termination of this Agreement pursuant to (a), (b), (e) or (f) above). For the avoidance of doubt, and subject to the terms and conditions of this Agreement (including Buyer's right to terminate this Agreement in accordance with this Article 10, as well as Buyer's right to receive a return of the Buyer Deposit and Expense Reimbursement), Sellers retain the right to pursue any transaction or restructuring strategy that, in the Sellers' business judgment, will maximize the value of their estates in the Bankruptcy Case.

## ARTICLE 11
## MISCELLANEOUS

**Section 11.1 Assignability; Parties in Interest**.

(a)    Subject to the terms of this section, Buyer may assign any or all of its rights under this Agreement to any direct or indirect subsidiary of Buyer. Buyer shall first advise the Sellers in writing of any such assignment and shall designate such party as the assignee and transferee of the Assets purchased under this Agreement. Any such assignee shall have ability to perform all of Buyer's duties and obligations under this Agreement and shall assume all of Buyer's duties, obligations and undertakings hereunder. Notwithstanding any such assignment, Buyer also shall remain liable hereunder for all of Buyer's duties and obligations under this Agreement.

(b)    No Seller may assign, transfer or otherwise dispose of any of its respective rights hereunder without the prior written consent of Buyer.

(c)      All the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of and shall be enforceable by the respective successors and permitted assigns, provided that the rights and obligations under all licenses of trademarks being assigned hereunder shall under no circumstances be assignable.

**Section 11.2 Allocation of Purchase Price**. Buyer and Sellers agree that the Purchase Price shall be allocated among the Assets of Sellers in accordance with Section 1060 of the Internal Revenue Code and the Treasury Regulations thereunder. Attached hereto as Exhibit "B" is the proposed allocation of the Purchase Price, itemized by Seller, Asset, and Location, as determined by Buyer as of the Effective Date (the "Purchase Price Allocation"). Prior to the Closing, the Purchase Price Allocation shall be finalized by Buyer and Sellers, and, absent agreement of the Buyer and Sellers, shall be determined by the Bankruptcy Court. Such allocation shall be binding upon Buyer and Sellers, and Buyer and Sellers shall report the transactions contemplated hereby on all tax returns, including, but not limited to Form 8594. If it becomes necessary or appropriate to amend the allocation and any tax returns which incorporate such allocation, Buyer and Sellers shall cooperate with each other in good faith to agree on an amendment to such allocation and shall file any necessary amendments to tax returns to reflect such amendment. If, contrary to the intent of the parties hereto as expressed in this Section 11.2, any taxing authority makes or proposes an allocation different from the allocation determined under this Section 11.2, Buyer and Sellers shall cooperate with each other in good faith to contest such taxing authority's allocation (or proposed allocation); provided, however, that, after consultation with the party (or parties) adversely affected by such allocation (or proposed allocation), the party (or parties) hereto may file such protective claims to tax returns as may be reasonably required to protect its (or their) interests.  For clarification, Buyer shall reserve the right to adjust the Purchase Price Allocation as provided in Section 6.1(c)(ii) above.

**Section 11.3 Knowledge**. An individual will be deemed to have "knowledge" of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual could reasonably be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter. Buyer will be deemed to have "knowledge" of a particular fact or other matter if any individual who is currently serving as a director, officer or trustee of Buyer (or in any similar capacity) has, or at any time had, knowledge of such fact or other matter. Each Seller will be deemed to have "knowledge" of a particular fact or other matter if one or more of the following persons has knowledge of such fact or other matter: Mike Rinaldi, Charlie Hietala, or Allan Davis.

**Section 11.4 Entire Agreement; Amendments**. This Agreement, including the Schedules, lists and other documents and writings referred to herein or delivered pursuant hereto, which form a part hereof, contain the entire understanding of the parties with respect to its subject matter. There are no restrictions, agreements, promises, warranties, covenants or undertakings other than those expressly set forth herein or therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to its subject matter. This Agreement may be amended only by a written instrument duly executed by all parties or their respective successors or permitted assigns. Any condition to a party's obligations hereunder may be waived but only by a written instrument signed by the party entitled to the benefits thereof. The failure or delay of any party at any time or times to require performance of any provision or to exercise its rights with

respect to any provision hereof, shall in no manner operate as a waiver of or affect such party's right at a later time to enforce the same.

**Section 11.5 Headings**. The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretations of this Agreement.

**Section 11.6 References**. References to a section or subsection when used without further attribution shall refer to the particular section or subsection of this Agreement.

**Section 11.7 Severability**. The invalidity of any term or terms of this Agreement shall not affect any other term of this Agreement, which shall remain in full force and effect.

**Section 11.8 Notices**. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including electronic mail, facsimile and telex) or when delivered by overnight courier, or five days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested to the following address:

|  |  |
|---|---|
| If to either or both Sellers: | Pioneer Aerospace Corporation<br>S.E., Inc.<br>Attn: Michael Rinaldi<br>6448 Pinecastle Blvd., Suite 104<br>Orlando, Florida  32809<br>Email: Mike.Rinaldi@ASR-Pioneer.com |
|  | With Copy to Counsel: |
|  | Daniel R. Fogarty, Esq.<br>Stichter, Riedel, Blain & Postler, P.A.<br>110 East Madison Street, Suite 200<br>Tampa, Florida  33602<br>Email: dfogarty@srbp.com |
| If to Escrow Agent: | Daniel R. Fogarty, Esq.<br>Stichter, Riedel, Blain & Postler, P.A.<br>110 East Madison Street, Suite 200<br>Tampa, Florida  33602<br>Email: dfogarty@srbp.com |
| If to Buyer: | Paradigm Parachute and Defense, Inc.<br>4040 Ashland Avenue<br>Pensacola, Florida 32534<br>Attn:  Aaron Nazaruk, Chief Executive Officer |

4892-5980-3269, v. 9

Email: aaron.nazaruk@paradigmparachute.com

With Copy to Counsel:     Alexander Gorelik, Esq.
Taft Stettinius & Hollister LLP
200 Massachusetts Avenue, NW, Suite 500
Washington 20001-5875
Email: Agorelik@taftlaw.com

or to such other address as any party may have furnished to the others in writing in accordance herewith, except that notices of change of address shall only be effective upon receipt.

**Section 11.9 Governing Law**. This Agreement, and any dispute, controversy or claim arising out of or relating to this Agreement or a breach thereof, shall be governed by and construed and enforced in accordance with the laws of the State of Florida without regard to its conflict of laws rules or principles that might refer the governance or the construction of this Agreement to the law of another jurisdiction. The prevailing party in any dispute arising out of this Agreement shall be entitled to its reasonable attorneys' fees and costs from the other party in addition to any other relief granted.

**Section 11.10 Waiver of Jury Trial.** EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW. ANY AND ALL RIGHTS TO TRIAL BY JURY IN CONNECTION WITH ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.11 Counterparts**. This Agreement may be executed simultaneously in one or more counterparts, with the same effect as if the signatories executing the several counterparts had executed one counterpart, provided, however, that the several executed counterparts shall together have been signed by all parties to be bound hereby. This Agreement shall be binding upon each signatory hereto when one or more counterparts, as provided above, have been signed by Buyer and Sellers. All such executed counterparts shall together constitute one and the same instrument. Fax and electronic signatures (with originals to be delivered by a nationally recognized express mail service) shall have the same effect as original signatures for all purposes under this Agreement.

**Section 11.12 Publicity**. Buyer and Sellers will coordinate all publicity related to this Agreement and the activities contemplated hereunder and no party will issue any press release, publicity statement, or other written public notice relating thereto without the prior consent of the other.

**Section 11.13 Drafting.** No provision of this Agreement shall be interpreted for or against either party hereto on the basis that such party was the draftsman of such provision, both parties having participated equally in the drafting hereof, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**Section 11.14 Time of Essence.** Time is of the essence in the performance of this Agreement.

**Section 11.15 Further Assurances.**  On and after the Closing Date, Buyer and Sellers will take all appropriate action and execute all documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the provisions hereof, including putting Buyer in possession of the Assets or to convey title to the Assets to Buyer.

**Section 11.16 Exclusive Jurisdiction.**  The parties acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto or any of a Seller's creditors or other parties in interest in the Bankruptcy Case affected hereby pertaining directly or indirectly to this Agreement or to any matter arising herefrom or related hereto; provided, however, that if the Bankruptcy Court determines that it lacks or abstains from exercising such jurisdiction the parties or creditors agree that the United States District Court for the Middle District of Florida, Orlando Division, shall have exclusive jurisdiction.

*[SIGNATURE PAGE FOLLOWS]*

4892-5980-3269, v. 9

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of the Buyer and Sellers on the Effective Date first above written.

**BUYER:**

Paradigm Parachute and Defense, Inc.
a Florida corporation

By: _Aaron Nazaruk_
    Aaron Nazaruk, Chief Executive Officer

**SELLERS:**

Pioneer Aerospace Corporation,
a Delaware corporation d/b/a ASR-Pioneer

By: _____
Print Name: _____
Its: _____


S.E., Inc.,
a Florida corporation d/b/a Strong Enterprises

By: _____
Print Name: _____
Its: _____

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized representatives of the Buyer and Sellers on the Effective Date first above written.

**BUYER:**

Paradigm Parachute and Defense, Inc.
a Florida corporation

By: _____
    Aaron Nazaruk, Chief Executive Officer

**SELLERS:**

Pioneer Aerospace Corporation,
a Delaware corporation d/b/a ASR-Pioneer

By: _____
Print Name: Mike Rinaldi
Its: President

S.E., Inc.,
a Florida corporation d/b/a Strong Enterprises

By: _____
Print Name: Mike Rinaldi
Its: President

23

4892-5980-3269, v. 9

## INDEX TO EXHIBITS AND SCHEDULES

Exhibit "A"          Form of Sale Procedure Order
Exhibit "B"          Purchase Price Allocation

Schedule 1.1(f)      Assumed Contracts
Schedule 1.1(g)      Intellectual Property Assets
Schedule 1.1(m)      Assumed Bids
Schedule 1.2         Other Excluded Assets
Schedule 1.3         Assumed Liabilities
Schedule 4.5         Legal Proceedings

4892-5980-3269, v. 9

**<u>Exhibit "A"</u>**

**Form of Sale Procedure Order**

**Exhibit "B"**

**Purchase Price Allocation**

| | |
|---|---|
| Columbia Location | $200,000 |
| Milton Location | $1,200,000 |
| Orlando Location | $850,000 |

**EXHIBIT 2**

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT (the "**Amendment**") is entered into as of December 8, 2023, by and among **PARADIGM PARACHUTE AND DEFENSE, INC.**, a Florida corporation ("**Buyer**"), on the one hand, and **PIONEER AEROSPACE CORPORATION**, a Delaware corporation d/b/a ASR-Pioneer ("**Pioneer**"), and **S.E., INC.**, a Florida corporation d/b/a Strong Enterprises ("**Strong**," and together with Pioneer, each, a "**Seller**," and, collectively, the "**Sellers**"), on the other hand.  Each of the Sellers and Buyer is a "**Party**" and collectively they are the "**Parties**" to this Agreement.

### RECITALS

WHEREAS, the Parties are parties to that certain Asset Purchase Agreement, dated as of November 1, 2023 (the "**Purchase Agreement**"), pursuant to which at the Closing, Sellers agreed to sell, transfer and assign the Assets to Buyer, in exchange for payment of the Purchase Price;

WHEREAS, the Purchase Agreement contemplated that certain Exhibit and certain Schedules (the "**Schedules**") to the Purchase Agreement would be established and finalized at or prior to Closing; and

WHEREAS, the Parties desire to amend the Purchase Agreement in order to memorialize and confirm their agreements and understandings concerning completion and enforceability of the Exhibits and Schedules to the Purchase Agreement.

NOW THEREFORE, in consideration of the foregoing, and of the terms and conditions set forth herein, the Parties hereto agree as follows:

1. <u>Defined Terms</u>.  Except as otherwise provided in, or modified by, this Amendment, capitalized terms used in this Amendment shall have the meanings defined in the Purchase Agreement.

2. <u>Schedules</u>.  The Schedules attached to this Amendment as **Schedule I** are hereby acknowledged, consented, and agreed to, and shall serve as the Schedules to the Purchase Agreement.

3. <u>Delayed Designation Contracts; Delayed Designation Bids</u>.  Notwithstanding anything contained herein or in the Purchase Agreement to the contrary, those Assumed Contracts listed on Schedule 1.1(f) and those Assumed Bids listed on Schedule 1.1(m) that have been designated as a "**Delayed Designation Contract**" or as a "**Delayed Designation Bid**" on Schedule 1.1(f) or Schedule 1.1(m) (as applicable) may be either assumed and assigned or rejected by Sellers at Buyer's sole direction during the twenty (20) day period immediately following the Closing Date (which period may be extended up to a maximum period not to exceed forty-five (45) days following the Closing Date, by mutual written agreement of the

Parties) (the "**Post-Closing Period**"). During the Post-Closing Period, Buyer shall have the right to notify Sellers in writing of any Delayed Designation Contract or any Delayed Designation Bid that it wishes to reject. Sellers shall not reject any Delayed Designation Contracts or any Delayed Designation Bids prior to expiration of the Post-Closing Period. Any Delayed Designation Contract (or other Assumed Contract not assigned at the Closing) and any Delayed Designated Bid that Buyer elects to reject prior to expiration of the Post-Closing Period shall not constitute an Assumed Contract or an Assumed Bid (as applicable), shall constitute an Excluded Contract and an Excluded Bid, and shall be rejected by Sellers upon the expiration of the Post-Closing Period. Notwithstanding the foregoing, Buyer acknowledges that Sellers shall have no obligation to comply with or perform under any Delayed Designation Contract or under any Delayed Designation Bid.  Buyer is not responsible for any Delayed Designation Contract that Buyer designates as an Excluded Asset during the Post-Closing Period, or for any liabilities associated with any such Delayed Designation Contract designated as an Excluded Contract under Section 1.2(j), after the date of any such designation as an Excluded Contract under Section 1.2(j) of the Purchase Agreement. For clarification, Buyer shall have no obligation to pay Cure Amounts with respect to any Delayed Designated Contract for which Buyer has timely elected to reject prior to expiration of the Post-Closing Period, but shall be obligated to pay any fees and costs incurred in connection with any Delayed Designation Contracts during the Post-Closing Period.

4. <u>Purchase Price Allocation</u>.  Notwithstanding anything contain in the Purchase Agreement (including Section 11.2 thereof) or this Amendment to the contrary, the Purchase Price Allocation shall not be agreed upon and appended to the Agreement at Closing.  Instead, the time period during which the Purchase Price Allocation shall be finalized by Buyer and Sellers is hereby extended until the end of the Post-Closing Period.

5. <u>Recitals</u>. The recitals set forth in the beginning of this Amendment are an integral part of this Amendment and are incorporated herein by reference as if fully rewritten.

6. <u>Further Assurances</u>.  Each Party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other Party may reasonably request in order to carry out the intent and accomplish the purposes of this Amendment and the consummation of the transactions contemplated hereby.

7. <u>Effect of Amendment</u>.  The terms of this Amendment amend and modify the Purchase Agreement as if fully set forth in the Purchase Agreement. Each provision of the Purchase Agreement shall be deemed amended to give effect to the provisions of this Amendment without need for referencing any specific term, section, or other provision of the Purchase Agreement by name.  By execution of this Amendment, each of the Parties hereto confirms and ratifies their respective obligations under the Purchase Agreement, as modified by this Amendment.  If there is any conflict between the terms, conditions and obligations of this Amendment and the Purchase Agreement, this Amendment's terms, conditions and obligations shall control.

8. <u>Governing Law</u>. This Amendment and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Amendment and the transactions contemplated hereby and thereby shall be governed and

enforced by, and construed in accordance with, the laws of the State of Florida. Disputes under this Amendment will be resolved by the Bankruptcy Court in a manner consistent with Section 11.16 of the Purchase Agreement (or any successor provision).

9.      <u>Counterparts; Recitals; Entire Agreement</u>. This Amendment may be executed in counterparts, each of which will be deemed an original, and all of which together will constitute one instrument. Facsimile and electronically scanned signatures (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) shall be deemed the same as originals and shall be legally binding. The recitals are deemed to be an integral part of this Amendment, and are hereby incorporated herein by this reference. This Amendment constitutes the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

*[Signature Pages Follow]*

DocuSign Envelope ID: 493E5215-9BE4-4C09-8788-8CF8D4165E6E

This Amendment has been duly executed by each of the Parties hereto, effective as of the date first set forth above.

**BUYER:**

Paradigm Parachute and Defense, Inc.
a Florida corporation

By: _Aaron Nazaruk_____
     Aaron Nazaruk, Chief Executive Officer


**SELLERS:**

Pioneer Aerospace Corporation,
a Delaware corporation d/b/a ASR-Pioneer

By: _____
Print Name: _____
Its: _____


S.E., Inc.,
a Florida corporation d/b/a Strong Enterprises

By: _____
Print Name: _____
Its: _____

     This Amendment has been duly executed by each of the Parties hereto, effective as of the date first set forth above.

**BUYER:**

Paradigm Parachute and Defense, Inc.
a Florida corporation

By: _____
    Aaron Nazaruk, Chief Executive Officer

**SELLERS:**

Pioneer Aerospace Corporation,
a Delaware corporation d/b/a ASR-Pioneer

By: _____
Print Name: Mike Rinaldi
Its: President

S.E., Inc.,
a Florida corporation d/b/a Strong Enterprises

By: _____
Print Name: Mike Rinaldi
Its: President

## **SCHEDULE I**

## **SCHEDULES TO ASSET PURCHASE AGREEMENT**

(see attached)

**Schedule 1.1(f)**

**Assumed Contracts**

I. *Customer Agreements*

| Name | Customer Classification | Order | Description | Delayed Designation Contract? |
|---|---|---|---|---|
| NATICK CONTRACTING DIVISION | Government | CO 4037BPO | SIDE RAIL, 32 FT. | **Delayed Designation** |
| DLA Aviation | Government | CO 6556 | Ribbon Canopy accessory | **Delayed Designation** |
| DLA Aviation | Government | CO 6664 | Ribbon Canopy accessory | **Delayed Designation** |
| PARA-GUARD PTY. LTD. | Foreign | CO 94092 | Platforms & accessories | **Assume** |
| PARA-GUARD PTY. LTD. | Foreign | CO 94084 | Platforms & accessories | **Assume** |
| DLA AVIATION | Government | CO 94017 | NOSE BUMPER | **Assume** |
| Paradigm Para & Def, Inc | Commercial | CO 94091 | Platforms & accessories | **Assume** |
| Astro Machine Works Inc. | 1st Tier | CO 94093 | panel | **Delayed Designation** |
| NATICK CONTRACTING DIVISION | Government | TBD | Nose Bumper | **Delayed Designation** |
| Paradigm Para & Def, Inc | Commercial | CO 94075 | Platforms & accessories | **Assume** |
| Paradigm Para & Def, Inc | Commercial | CO 94080 | Platforms & accessories | **Assume** |
| Paradigm Para & Def, Inc | Foreign | CO 94095 | Development | **Assume** |
| USSOCOM | Government | CO 94081 | Platforms & accessories | **Delayed Designation** |
| DLA AVIATION | Government | CO 94001 | NOSE BUMPER | **Delayed Designation** |
| Paradigm Para & Def, Inc | Commercial | CO 94099 | Development | **Assume** |
| Aerojet | Commercial | CO 94102 | Honeycomb | **Assume** |
| NATICK CONTRACTING DIVISION | Government | 94094/1 | W911QY-23-P-0108 | **Delayed Designation** |
| NATICK CONTRACTING DIVISION | Government | 94094/2 | W911QY-23-P-0108 | **Delayed Designation** |
| NATICK CONTRACTING DIVISION ACC/DTA DCMA | Government | CO 4037-01/0041AA | W56HZV-21-D-022 / W56HZV23F0038 | **Delayed Designation** |

| Name | Customer Classification | Order | Description | Delayed Designation Contract? |
|---|---|---|---|---|
| ORLANDO | | | | |
| NATICK CONTRACTING DIVISION ACC/DTA    DCMA ORLANDO | Government | CO    4037-01/0051AA | W56HZV-21-D-022    /  W56HZV23F0038 | **Delayed Designation** |
| NATICK CONTRACTING DIVISION ACC/DTA    DCMA ORLANDO | Government | CO 4037BPO | W56HZV-21-D-022 | **Delayed Designation** |
| W6QK ACC-APG Natick Division | Government | | W911QY-16-D-0052 (G-15 IDIQ) | **Delayed Designation** |

**Note: Any Task or Delivery orders listed above also include their respective base contracts as "Delayed Designation Contracts"**

II. *Active POs*

| PO Number | Date | Description | Delayed Designation Contract? |
|---|---|---|---|
| PO 20232V07 -  D-EA-AF-77000000-S-23-030348_APROBACION CONTRATO    MENOR 20232V07 20231027 | | Ministerio    De    Defensa (Colombia?) | **Delayed Designation** |
| Strong NATIC W911QY-16-D-0052 Mod P4 | 6/10/2016 | S.E., Inc. | **Delayed Designation** |
| P035513 Milton | 8/10/2012 | DLA Contracts and Supply Chain POs/Redacted Supply Chain    POs    (Seller's Purchase) | **Delayed Designation** |
| P035571 Milton | 12/6/2022 | DLA Contracts and Supply Chain POs/Redacted Supply Chain    POs    (Seller's Purchase) | **Delayed Designation** |
| P035630 Milton | 5/4/203 | DLA Contracts and Supply Chain POs/Redacted Supply Chain    POs    (Seller's Purchase) | **Delayed Designation** |
| P035636 Milton | 5/17/2023 | DLA Contracts and Supply Chain POs/Redacted Supply Chain    POs    (Seller's Purchase) | **Delayed Designation** |
| P035665 Milton | 9/11/2023 | DLA Contracts and Supply Chain POs/Redacted Supply Chain    POs    (Seller's | **Delayed Designation** |

| | | | Purchase) | |
|---|---|---|---|---|
| P035667 Milton | 9/14/2023 | | DLA Contracts and Supply Chain POs/Redacted Supply Chain POs (Seller's Purchase) | **Delayed Designation** |
| P035668 Milton | 9/18/2023 | | DLA Contracts and Supply Chain POs/Redacted Supply Chain POs (Seller's Purchase) | **Delayed Designation** |

## III. *Additional Contracts*

| Description | Delayed Designation Contract? |
|---|---|
| Industrial Building Lease dated August 29, 2016 for premises located at 6448 Pinecastle Blvd., Orlando, Florida, by and between 6448 Pinecastle Investors, LLC, a Delaware limited liability company, and S.E., Inc. d/b/a Strong Enterprises | Assume |
| Lease for 6503 Pine Castle Blvd, Suite A & Suite B dated as of May __, 2021 and entered into by and between Adam Freeman and Aviation Safety Resources, Inc. | Assume |
| Client Service Agreement dated effective as of June 1, 2022, and entered into between Computer Services and Solution, Inc. and ASR-Pioneer. | Delayed Designation |
| Konica Copier Lease dated October 21, 2021 | Delayed Designation |
| Internet Agreement with AT&T | Delayed Designation |
| Vendor Agreement with Spectrum | Delayed Designation |

## IV. *Strong Open Orders*

| Creation Date | Customer No. | Customer | Due Date | Order No. | Sales Category | Delayed Designation Contract? |
|---|---|---|---|---|---|---|
| 07/29/2021 | 17955 | KIRK, KENNETH | 02/22/2024 | 40183 | Complete Systems | Delayed Designation |
| 11/23/2022 | 18272 | INDUSTRIAL SMOKE & MIRRORS | 12/16/2023 | 41553 | Custom | Delayed Designation |
| 12/19/2022 | 11141 | LEOW CHAI HENG | 05/07/2024 | 41606 | Complete Systems | Delayed Designation |
| 02/23/2023 | 18341 | MILTECH | | 41782 | Custom | Delayed Designation |
| 03/06/2023 | F5336 | NO Limits skydiving | | 41817 | Repairs | Delayed Designation |
| 04/12/2023 | 18080 | Paradigm Parachute & Defense | 10/31/2023 | 41937 | Complete Systems | Delayed Designation |
| 04/12/2023 | 18273 | SKJ AVIATION (Hazanhaniya 2019 Ltd) | 07/03/2024 | 41939 | Complete Systems | Delayed Designation |
| 04/13/2023 | 15522 | Wings & Wheels | 11/02/2023 | 41954 | Complete | Delayed |

| Creation Date | Customer No. | Customer | Due Date | Order No. | Sales Category | Delayed Designation Contract? |
|---|---|---|---|---|---|---|
| | | INC | | | Systems | Designation |
| 04/18/2023 | 15522 | Wings & Wheels INC | 11/09/2023 | 41972 | Complete Systems | Delayed Designation |
| 05/10/2023 | P0051 | PHANTOM AIRBORNE BRIGADE | | 42049 | Repairs | Delayed Designation |
| 05/10/2023 | 17379 | GOLD CAP LLC (dba OLDE THYME AVIATION) | 11/30/2023 | 42064 | Complete Systems | Delayed Designation |
| 05/24/2023 | 18271 | MILSPEC SERVICES PTY LTD | 12/14/2023 | 42086 | Complete Systems | Delayed Designation |
| 06/01/2023 | 15522 | Wings & Wheels INC | 12/21/2023 | 42104 | Complete Systems | Delayed Designation |
| 06/01/2023 | 15522 | Wings & Wheels INC | 12/14/2023 | 42110 | Complete Systems | Delayed Designation |
| 06/05/2023 | 10608 | HIGH ENERGY SPORTS ( HES ) | 12/15/2023 | 42112 | Custom | Delayed Designation |
| 06/13/2023 | A127 | DBS AVIO PARA SERVICE | 12/21/2023 | 42135 | Complete Systems | Delayed Designation |
| 06/14/2023 | 15522 | Wings & Wheels INC | 12/21/2023 | 42142 | Complete Systems | Delayed Designation |
| 06/14/2023 | 17379 | GOLD CAP LLC (dba OLDE THYME AVIATION) | 12/21/2023 | 42143 | Complete Systems | Delayed Designation |
| 06/19/2023 | 17827 | THE FLYING BULLS GmbH | 12/21/2023 | 42153 | Complete Systems | Delayed Designation |
| 06/21/2023 | 18307 | CLAFA | 12/14/2023 | 42162 | Complete Systems | Delayed Designation |
| 06/22/2023 | 16413 | China Skydivers | 01/11/2024 | 42166 | Components | Delayed Designation |
| 06/26/2023 | 13174 | NIAGARA SKYDIVING | | 42179 | Repairs | Delayed Designation |
| 06/27/2023 | P148 | PIONEER AEROSPACE CORP | 12/31/2023 | 42183 | Repairs | Delayed Designation |
| 06/28/2023 | S237 | SUNRISE MANUFACTURING - WINGS | | 42188 | Warranty | Delayed Designation |
| 06/28/2023 | S237 | SUNRISE MANUFACTURING - WINGS | | 42189 | Warranty | Delayed Designation |
| 07/05/2023 | 14246 | GILAD pinhas SPORTS & EXTREME SERVICES | 01/11/2024 | 42191 | Complete Systems | Delayed Designation |
| 07/10/2023 | 10608 | HIGH ENERGY SPORTS ( HES ) | | 42199 | Custom | Delayed Designation |
| 07/12/2023 | P017 | The New Piper Aircraft, INC. | | 42203 | Repairs | Delayed Designation |
| 07/17/2023 | 17379 | GOLD CAP LLC (dba OLDE THYME AVIATION) | 02/05/2024 | 42217 | Complete Systems | Delayed Designation |

| Creation Date | Customer No. | Customer | Due Date | Order No. | Sales Category | Delayed Designation Contract? |
|---|---|---|---|---|---|---|
| 07/17/2023 | 18444 | Evolution Aircraft Inc. | | 42218 | Other | Delayed Designation |
| 07/20/2023 | 15269 | Mee Loft Parachute Rigging Services | 02/05/2024 | 42227 | Complete Systems | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42228 | Repairs | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42229 | Repairs | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42230 | Repairs | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42231 | Repairs | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42232 | Repairs | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42233 | Repacks | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42234 | Repairs | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42235 | Repacks | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42236 | Repairs | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42237 | Repairs | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42238 | Repairs | Delayed Designation |
| 07/20/2023 | 17662 | Munoz | 01/18/2024 | 42239 | Repairs | Delayed Designation |
| 07/20/2023 | 16889 | Galactic Enterprises, LLC | | 42243 | | Delayed Designation |
| 07/26/2023 | 18451 | KRILL AIRCRAFT | 02/15/2024 | 42250 | Complete Systems | Delayed Designation |
| 07/26/2023 | 18452 | LYNCH, JAMES | 02/15/2024 | 42251 | Complete Systems | Delayed Designation |
| 08/07/2023 | 17344 | MARKHAM CONSTRUCTION | 03/07/2024 | 42284 | Complete Systems | Delayed Designation |
| 08/08/2023 | 17399 | GULF COAST AVIONICS | 03/14/2024 | 42298 | Complete Systems | Delayed Designation |
| 08/08/2023 | 8163 | MUHLE | 02/15/2024 | 42300 | Complete Systems | Delayed Designation |
| 08/08/2023 | 18463 | NORMAN, CHARLES | 01/25/2024 | 42304 | Components | Delayed Designation |
| 08/08/2023 | 18464 | RAPP, G. | 02/15/2024 | 42305 | Complete Systems | Delayed Designation |
| 08/08/2023 | 18465 | MESA, E. | 02/15/2024 | 42306 | Complete Systems | Delayed Designation |
| 08/08/2023 | 18466 | DELAMER | 02/22/2024 | 42308 | Complete Systems | Delayed Designation |
| 08/08/2023 | 18467 | HARRAH, M. | 02/15/2024 | 42309 | Complete Systems | Delayed Designation |
| 08/09/2023 | 18469 | HUSKEY | 02/22/2024 | 42311 | Complete Systems | Delayed Designation |

| Creation Date | Customer No. | Customer | Due Date | Order No. | Sales Category | Delayed Designation Contract? |
|---|---|---|---|---|---|---|
| 08/09/2023 | 18470 | ERIC SCHER - TOM WOOD, INC | 02/22/2024 | 42312 | Complete Systems | Delayed Designation |
| 08/09/2023 | 18196 | LARSEN, BRIAN | 02/22/2024 | 42314 | Complete Systems | Delayed Designation |
| 08/10/2023 | 9621 | oopee ratings & rigging LTD | 11/30/2023 | 42322 | Warranty | Delayed Designation |
| 08/10/2023 | 17379 | GOLD CAP LLC (dba OLDE THYME AVIATION) | 03/28/2024 | 42323 | Complete Systems | Delayed Designation |
| 08/21/2023 | 14243 | hughes-gage | 02/01/2024 | 42337 | Repairs | Delayed Designation |
| 08/21/2023 | 14046 | Skydive central NC | | 42338 | | Delayed Designation |
| 08/23/2023 | 9243 | Complete Parachute Solutions, Inc. | | 42343 | Loaner | Delayed Designation |
| 08/23/2023 | 18126 | LEDFORD | 03/14/2024 | 42344 | Complete Systems | Delayed Designation |
| 08/28/2023 | 18444 | Evolution Aircraft Inc. | | 42350 | ASR-Pioneer | Delayed Designation |
| 08/31/2023 | 15188 | PACIFIC GYRE | 11/02/2023 | 42362 | Custom | Delayed Designation |
| 08/31/2023 | 12741 | ATSC (FORMERLY STARA) | 11/09/2023 | 42363 | Complete Systems | Delayed Designation |
| 08/31/2023 | S237 | SUNRISE MANUFACTURING - WINGS | | 42364 | Custom | Delayed Designation |
| 09/06/2023 | 16952 | MRV SYSTEMS | 11/22/2023 | 42373 | Custom | Delayed Designation |
| 09/06/2023 | 12439 | PATHANA UPAKORN LTD. PART. | 04/11/2024 | 42374 | Complete Systems | Delayed Designation |
| 09/07/2023 | D084 | DANIELS MANUFACTURING CORPORATION | 03/07/2024 | 42379 | Custom | Delayed Designation |
| 09/12/2023 | 18305 | LOGLINEAR GROUP, LLC | 01/25/2024 | 42380 | Custom | Delayed Designation |
| 09/13/2023 | 18181 | PARKER, JEFF | 10/12/2023 | 42388 | Custom | Delayed Designation |
| 09/18/2023 | 17379 | GOLD CAP LLC (dba OLDE THYME AVIATION) | 04/11/2024 | 42394 | Complete Systems | Delayed Designation |
| 09/18/2023 | 17124 | VINTAGE PAIR (PETTERS) *SPONSORED* | 04/11/2024 | 42395 | Complete Systems | Delayed Designation |
| 09/19/2023 | 15522 | Wings & Wheels INC | 04/11/2024 | 42400 | Complete Systems | Delayed Designation |
| 09/19/2023 | 15522 | Wings & Wheels INC | 04/11/2024 | 42401 | Complete Systems | Delayed Designation |
| 09/20/2023 | 15522 | Wings & Wheels INC | 04/18/2024 | 42404 | Complete Systems | Delayed Designation |
| 09/20/2023 | 15522 | Wings & Wheels INC | 04/18/2024 | 42405 | Complete Systems | Delayed Designation |

| Creation Date | Customer No. | Customer | Due Date | Order No. | Sales Category | Delayed Designation Contract? |
|---|---|---|---|---|---|---|
| 09/20/2023 | 15522 | Wings & Wheels INC | 04/18/2024 | 42406 | Complete Systems | Delayed Designation |
| 09/20/2023 | 15522 | Wings & Wheels INC | 04/18/2024 | 42407 | Complete Systems | Delayed Designation |
| 09/20/2023 | 15522 | Wings & Wheels INC | 04/18/2024 | 42408 | Complete Systems | Delayed Designation |
| 09/20/2023 | 15522 | Wings & Wheels INC | 04/18/2024 | 42409 | Complete Systems | Delayed Designation |
| 09/20/2023 | 15522 | Wings & Wheels INC | 04/18/2024 | 42410 | Complete Systems | Delayed Designation |
| 09/25/2023 | F5336 | NO Limits skydiving | 01/04/2024 | 42418 | Repairs | Delayed Designation |
| 09/27/2023 | 15522 | Wings & Wheels INC | 04/18/2024 | 42424 | Complete Systems | Delayed Designation |
| 10/03/2023 | 15269 | Mee Loft Parachute Rigging Services | 04/25/2024 | 42432 | Complete Systems | Delayed Designation |
| 10/05/2023 | A122 | Aero Products Company | 12/14/2023 | 42439 | Components | Delayed Designation |
| 10/05/2023 | 15522 | Wings & Wheels INC | 04/25/2024 | 42442 | Complete Systems | Delayed Designation |
| 10/05/2023 | 15522 | Wings & Wheels INC | 04/25/2023 | 42443 | Complete Systems | Delayed Designation |
| 10/09/2023 | 18505 | BURDA | 05/02/2024 | 42445 | Complete Systems | Delayed Designation |
| 10/11/2023 | 17398 | LBI Corp. | 11/16/2023 | 42449 | Repairs | Delayed Designation |
| 10/11/2023 | 18341 | MILTECH | | 42453 | Custom | Delayed Designation |
| 10/16/2023 | 1445 | remelin | 05/09/2024 | 42457 | Complete Systems | Delayed Designation |
| 10/18/2023 | S122 | Vilar | 11/21/2023 | 42463 | Components | Delayed Designation |
| 10/31/2023 | 17124 | VINTAGE PAIR (PETTERS) *SPONSORED* | 05/23/2024 | 42486 | Complete Systems | Delayed Designation |
| 10/31/2023 | 17911 | Heimdall Defence Sdn Bhd | 12/07/2023 | 42489 | Complete Systems | Delayed Designation |
| 11/01/2023 | 18521 | GUNDERSON | 05/23/2024 | 42493 | Complete Systems | Delayed Designation |
| 11/01/2023 | 9621 | oopee ratings & rigging LTD | 11/30/2023 | 42494 | Warranty | Delayed Designation |
| 11/06/2023 | 16952 | MRV SYSTEMS | 03/28/2024 | 42502 | Custom | Delayed Designation |
| 11/13/2023 | 1445 | REMELIN | 11/30/2023 | 42515 | Complete Systems | Delayed Designation |
| 11/16/2023 | 12589 | SKYDIVE RICKS | | 42521 | | Delayed Designation |
| 11/16/2023 | 18529 | J&N METAL PRODUCTS LLC | 06/20/2024 | 42524 | Complete Systems | Delayed Designation |
| 11/27/2023 | 18532 | STILTS | 12/18/2023 | 42527 | Repacks | Delayed Designation |
| 11/27/2023 | 12215 | MUSTANG HIGH | 12/11/2023 | 42528 | Repacks | Delayed |

| Creation Date | Customer No. | Customer | Due Date | Order No. | Sales Category | Delayed Designation Contract? |
|---|---|---|---|---|---|---|
| | | FLIGHT | | | | Designation |
| 11/28/2023 | J020 | JUMP AND FLY (ITALY) | 06/20/2024 | 42532 | Complete Systems | Delayed Designation |
| 11/28/2023 | J020 | JUMP AND FLY (ITALY) | 06/20/2024 | 42533 | Complete Systems | Delayed Designation |
| 11/28/2023 | 17379 | GOLD CAP LLC (dba OLDE THYME AVIATION) | 06/20/2024 | 42534 | Complete Systems | Delayed Designation |
| 11/28/2023 | 12439 | PATHANA UPAKORN LTD. PART. | | 42535 | Other | Delayed Designation |
| 11/28/2023 | 8379 | SYDNEY SKYDIVERS | 12/20/2023 | 42536 | Complete Systems | Delayed Designation |
| 11/28/2023 | 8379 | SYDNEY SKYDIVERS | 03/28/2024 | 42537 | Complete Systems | Delayed Designation |
| 11/29/2023 | 17379 | GOLD CAP LLC (dba OLDE THYME AVIATION) | 06/20/2024 | 42538 | Complete Systems | Delayed Designation |
| 11/29/2023 | F123 | FIGHTER ENTERPRISES, INC. | 12/11/2023 | 42539 | Repacks | Delayed Designation |
| 11/30/2023 | 18241 | EXTREME YETI ADVENTURES | 01/25/2024 | 42540 | Components | Delayed Designation |

**Schedule 1.1(g)**

**Intellectual Property Assets**

Designs, manuals, documentation, specifications, and blueprints (and to the extent not owned by Sellers, access to or copies of the foregoing in the possession of Sellers consistent with any use or other rights and limitations) related to any of the following products or types of products that are designed, produced, manufactured, repaired, or held at the Mississippi Location, the Milton Location, or the Orlando Location, or that are principally associated with the Mississippi Location, the Milton Location, or the Orlando Location, or any Assumed Contract or Assumed Bid:

- Type 5 Platform System
- All Strong Enterprises Products
- All derivatives of the foregoing
- Other component parts utilized in the manufacturing and delivering any of the foregoing

All of Sellers' data, logs, documentation related to any of the following data derived from products or types of products that are designed, produced, manufactured, repaired, or held at the Mississippi Location, the Milton Location, or the Orlando Location, or that are principally associated with the Mississippi Location, the Milton Location, or the Orlando Location, or any Assumed Contract or Assumed Bid:

- Work Instructions
- Inspection Instructions/Reports
- Pre-flight videos
- Seam and joint test results
- Manufacturing and First Article Packages including those samples as applicable
- QMS Documents controlled as respective location's QMS
- Patterns, Designs, sketches, or unique trade secret equipment, etc for production tooling and production aids
- Production line and facility layouts, and characteristics

All systems, written instructions, instructional videos, know-how, and processes utilized by Sellers in connection with products or the types of products that are designed, produced, manufactured, repaired, or held at the Mississippi Location, the Milton Location, or the Orlando Location, or that are principally associated with the Mississippi Location, the Milton Location, or the Orlando Location, or any Assumed Contract or Assumed Bid:

- Procure components/raw material
- Raw material requirements and test procedures
- Procedures to producing parachutes
- Procedures to producing type 5 platforms

- Procedures to producing extraction slings
- Assembly/Work instruction procedures for parachutes
- Assembly/Work instruction procedures for extraction slings
- Preparation, packing and rigging for parachutes
- Preparation and rigging for extraction slings
- Repair procedures and standard repair handbooks for parachutes
- Repair procedures and standard repair handbooks for extraction slings
- Final delivery procedures and verifications
- Quality inspection processes

All work in progress, developments, modifications, and licenses for the use thereof.

Notwithstanding anything to the contrary in the Agreement or this Schedule 1.1(g):

(a) Sellers do not purport to transfer, assign, or sell any right, title, or interest in any of the foregoing Intellectual Property Assets to Buyer that exceed the rights, title, and interest held by Sellers with respect to such Intellectual Property Assets on the Closing Date;

(b) (i) Sellers shall deliver to Buyer all physical or digital embodiments of the Intellectual Property Assets identified herein and in Section 1.1(g) only to the extent that Sellers possess and/or control such physical or digital embodiments of the Intellectual Property Assets, (ii) Sellers shall not deliver such Intellectual Property Assets to any third-party without Buyer's written consent, (iii) Sellers shall have no obligation to obtain possession or control over such Intellectual Property prior to the Closing from any third-parties, and (iv) Sellers' failure to deliver any physical or digital embodiments of such Intellectual Property Assets shall not constitute a breach of Sellers' obligations under Section 8.1 of the Agreement; and

(c) Buyer acknowledges that Sellers are unable to identify and separate from assets owned by third parties certain Intellectual Property Assets, including, without limitation, Intellectual Property Assets located at or stored among physical assets located at the Mississippi Location, and that Sellers will make no effort to identify or separate those assets other than as required under Section 4.3 of the Agreement.

## Schedule 1.1(m)

### Assumed Bids

| Description | Delayed Designation Bid? |
|---|---|
| Blue Origin | Delayed Designation |
| Honduras | Delayed Designation |
| Lockheed Martin (Phase 6 Rapid Dragon) | Delayed Designation |

## **Schedule 1.2**

**Other Excluded Assets**

None

**Schedule 1.3**

**Assumed Liabilities**

None

## **Schedule 4.5**

### **Legal Proceedings**

None

**EXHIBIT B**
**PURCHASE PRICE ALLOCATION**

| | Mississippi Location ($200,000) | Milton Location ($1,200,000) | Orlando Location ($850,000) |
|---|---|---|---|
| **Class I Assets** | | | |
| **Class II Assets** | | | |
| **Class III Assets** | | | |
| **Class IV Assets** | | | |
| **Class V Assets** | | | |
| **Class VI and VII Assets** | | | |

**<u>EXHIBIT 3</u>**

## BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, **PIONEER AEROSPACE CORPORATION**, a Delaware corporation d/b/a ASR-Pioneer ("Pioneer"), and **S.E., INC.**, a Florida corporation d/b/a Strong Enterprises ("Strong," and together with Pioneer, each, a "Seller," and, collectively, the "Sellers"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to **PARADIGM PARACHUTE AND DEFENSE, INC.**, a Florida corporation ("Buyer"), all of each Seller's right, title and interest in and to the tangible personal property included in the Assets, as such term is defined in that certain Asset Purchase Agreement, dated November 1, 2023 (the "Purchase Agreement"), by and among Buyer and Sellers, to have and to hold unto Buyer, its successors and assigns, forever.

Each Seller hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, such Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, title to the Assets sold, conveyed and transferred by this Bill of Sale.

[Signature page follows]

IN WITNESS WHEREOF, each Seller has duly executed this Bill of Sale effective as of December 8 , 2023.

**"Sellers"**

**S.E., INC.**

By: _Michl Rinaldi_____

Print Name: **Mike Rinaldi**

Its: **President**

**PIONEER AEROSPACE CORPORATION**

By: _Michl Rinaldi_____

Print Name: **Mike Rinaldi**

Its: **President**

**EXHIBIT 4**

DocuSign Envelope ID: C69D856F-9DA8-4593-86C4-46BF212590F9

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Agreement"), effective as of December 8, 2023 (the "Effective Date"), is entered into by and among **PIONEER AEROSPACE CORPORATION**, a Delaware corporation d/b/a ASR-Pioneer ("Pioneer"), **S.E., INC.**, a Florida corporation d/b/a Strong Enterprises ("Strong," and together with Pioneer, each, a "Seller," and, collectively, the "Sellers"), and **PARADIGM PARACHUTE AND DEFENSE, INC.**, a Florida corporation ("Buyer").

WHEREAS, Sellers and Buyer have entered into that certain Asset Purchase Agreement, dated as of November 1, 2023 (the "Purchase Agreement"), pursuant to which, among other things, Sellers have agreed to assign all of its rights, title and interests in, and the Buyer has agreed to assume all of each Seller's duties and obligations under, the Assumed Contracts, the Assumed Bids, and the Assumed Liabilities (as such terms are defined in the Purchase Agreement).

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Definitions. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2. Assignment and Assumption. Each Seller hereby sells, assigns, grants, conveys and transfers to Buyer all of such Seller's right, title and interest in and to the Assumed Contracts, the Assumed Bids, and the Assumed Liabilities. Buyer hereby accepts such assignment and assumes all of each Seller's duties and obligations under the Assumed Contracts, the Assumed Bids, and the Assumed Liabilities and agrees to pay, perform and discharge, as and when due: (a) all of the obligations of each Seller under the Assumed Contracts, the Assumed Bids, and the Assumed Liabilities accruing on and after the Effective Date; and (b) the "Cure Amounts" (as defined and to the extent provided for under the terms of the Purchase Agreement).

3. Terms of the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Assumed Contracts, the Assumed Bids, and the Assumed Liabilities are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

1

DocuSign Envelope ID: C69D856F-9DA8-4593-86C4-46BF212590F9

4.  Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction).

5.  Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

6.  Further Assurances. Each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, the parties have executed this Assignment and Assumption Agreement to be effective as of the Effective Date first above written.

**"Sellers"**

**S.E., INC.**

By: _Mike Rinaldi_ _____

Print Name: **Mike Rinaldi**

Its: **President**


**PIONEER AEROSPACE CORPORATION**

By: _Mike Rinaldi_ _____

Print Name: **Mike Rinaldi**

Its: **President**


**"Buyer"**

**PARADIGM PARACHUTE AND DEFENSE, INC.**

By: _____

Print Name: _____

Its: _____

**[Signature Page to Assignment and Assumption Agreement]**

DocuSign Envelope ID: C69D856F-9DA8-4593-86C4-46BF212590F9

IN WITNESS WHEREOF, the parties have executed this Assignment and Assumption Agreement to be effective as of the Effective Date first above written.

**"Sellers"**

**PIONEER AEROSPACE CORPORATION**

By:_____

Print Name:_____

Its:_____

**S.E., INC.**

By:_____

Print Name:_____

Its:_____

**"Buyer"**

**PARADIGM PARACHUTE AND DEFENSE, INC.**,

By: _Aaron Nazaruk_____
      FD348F314DA0448...
    Aaron Nazaruk, Chief Executive Officer

**[Signature Page to Assignment and Assumption Agreement]**

**EXHIBIT 5**

DocuSign Envelope ID: C69D856F-9DA8-4593-86C4-46BF212590F9

### INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

**THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** (this "Assignment"), effective as of the 8th day of December, 2023 (the "Effective Date"), is made by and among **PARADIGM PARACHUTE AND DEFENSE, INC.**, a Florida corporation ("Assignee"), **PIONEER AEROSPACE CORPORATION**, a Delaware corporation d/b/a ASR-Pioneer ("Pioneer"), and **S.E., INC.**, a Florida corporation d/b/a Strong Enterprises ("Strong," and together with Pioneer, each, an "Assignor," and, collectively, the "Assignors").

.

### W I T N E S S E T H :

WHEREAS, pursuant to the terms and conditions of the Asset Purchase Agreement dated the 1st day of November, 2023 by and among Assignors, as sellers, and Assignee, as buyer (the "Asset Purchase Agreement"), and approved by the United States Bankruptcy Court, Middle District of Florida, Orlando Division, by the entry of its Order Granting Debtors' Motion for Entry of an Order Authorizing (I) the Sale of Substantially All of Their Assets Pursuant to 11 U.S.C. §363, Free and Clear of All Liens, Claims and Encumbrances, and (II) Authorizing the Assumption and Assignment of Contracts (Doc. No. 74) entered in jointly administered Case No. 6:23-bk-4641-GER on November 22, 2023, the Assignors desire to sell, convey, transfer, assign and deliver to Assignee all of each Assignor's right, title and interest in, to Assignors' intellectual property assets and rights and constituting "Intellectual Property Assets" as defined in the Asset Purchase Agreement, including those certain patents, trademarks, copyrights, and domain names set forth on Schedule 1 hereto, and Assignee desires to acquire and accept all of the Assignors' entire right, title and interest in, to and under such Intellectual Property Assets.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and as more fully set forth in the Asset Purchase Agreement and subject to the terms and conditions therein, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2.      The Assignors hereby sell, convey, transfer, assign and deliver to Assignee, and Assignee does hereby acquire and accept, all of the Assignors' right, title and interest in, to and under the Intellectual Property Assets throughout the world and all rights corresponding thereto, together with all goodwill associated therewith and all income, royalties or payments now or hereafter due or payable in relation to the Intellectual Property Assets, and all benefits, privileges, causes of action, common law rights, and remedies relating thereto throughout the world.

3.      The parties hereto acknowledge and agree that the representations, warranties, covenants, indemnities, limitations and other terms contained in the Asset Purchase Agreement

DocuSign Envelope ID: C69D856F-9DA8-4593-86C4-46BF212590F9

shall not be superseded hereby but shall remain in full force and effect to the fullest extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

4.      Upon the reasonable written request by Assignee, the Assignors shall execute all documents and take all actions as may be necessary to enable Assignee to perfect, enforce, defend, register and/or record its right, title and interest in, to and under the Intellectual Property Assets, in each case, without further compensation from, but at the sole expense of, Assignee.

5.      The Assignors hereby authorize and request the officials of the United States Copyright Office and the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign jurisdiction, to record and register Assignee as assignee and owner of the entire right, title and interest in, to and under the Intellectual Property Assets.

6.      Assignors for themselves, their successors and assigns, hereby covenant and agree that, at any time and from time to time upon the written request of Assignee, each Assignor will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Assignee in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Assignee, its successors and assigns, title to the assets sold, conveyed, and transferred by this Assignment.

7.      This Assignment is binding upon, and inures to the benefit of, the parties hereto and their respective legal representatives, successors and assigns. No waiver, modification or change of any provision of this Assignment shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

8.      This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Assignment delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

[SIGNATURE PAGE FOLLOWS]

4857-4665-5381, v. 3

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

ASSIGNORS:

S.E., INC.

By: _Michl Rinaldi_ _____

Print Name: **Mike Rinaldi**

Its: **President**


**PIONEER AEROSPACE CORPORATION**

By: _Michl Rinaldi_ _____

Print Name: **Mike Rinaldi**

Its: **President**


ASSIGNEE:

**PARADIGM PARACHUTE AND DEFENSE, INC.**

By:_____

Print Name:_____

Its:_____

3

DocuSign Envelope ID: C69D856F-9DA8-4593-86C4-46BF212590F9

IN WITNESS WHEREOF, the parties hereto, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

ASSIGNORS:

**PIONEER AEROSPACE CORPORATION**

By:_____

Print Name:_____

Its:_____


**S.E., INC.**

By:_____

Print Name:_____

Its:_____

ASSIGNEE:

**PARADIGM PARACHUTE AND DEFENSE, INC.**

By: _____
 *Aaron Nazaruk*
—FD348F314DA0448—

Aaron Nazaruk, Chief Executive Officer

3

**Schedule I**

**Intellectual Property Assets**

Designs, manuals, documentation, specifications, and blueprints (and to the extent not owned by Sellers, access to or copies of the foregoing in the possession of Sellers consistent with any use or other rights and limitations) related to any of the following products or types of products that are designed, produced, manufactured, repaired, or held at the Mississippi Location, the Milton Location, or the Orlando Location, or that are principally associated with the Mississippi Location, the Milton Location, or the Orlando Location, or any Assumed Contract or Assumed Bid:

- Type 5 Platform System
- All Strong Enterprises Products
- All derivatives of the foregoing
- Other component parts utilized in the manufacturing and delivering any of the foregoing

All of Sellers' data, logs, documentation related to any of the following data derived from products or types of products that are designed, produced, manufactured, repaired, or held at the Mississippi Location, the Milton Location, or the Orlando Location, or that are principally associated with the Mississippi Location, the Milton Location, or the Orlando Location, or any Assumed Contract or Assumed Bid:

- Work Instructions
- Inspection Instructions/Reports
- Pre-flight videos
- Seam and joint test results
- Manufacturing and First Article Packages including those samples as applicable
- QMS Documents controlled as respective location's QMS
- Patterns, Designs, sketches, or unique trade secret equipment, etc for production tooling and production aids
- Production line and facility layouts, and characteristics

All systems, written instructions, instructional videos, know-how, and processes utilized by Sellers in connection with products or the types of products that are designed, produced, manufactured, repaired, or held at the Mississippi Location, the Milton Location, or the Orlando Location, or that are principally associated with the Mississippi Location, the Milton Location, or the Orlando Location, or any Assumed Contract or Assumed Bid:

- Procure components/raw material
- Raw material requirements and test procedures
- Procedures to producing parachutes

- Procedures to producing type 5 platforms
- Procedures to producing extraction slings
- Assembly/Work instruction procedures for parachutes
- Assembly/Work instruction procedures for extraction slings
- Preparation, packing and rigging for parachutes
- Preparation and rigging for extraction slings
- Repair procedures and standard repair handbooks for parachutes
- Repair procedures and standard repair handbooks for extraction slings
- Final delivery procedures and verifications
- Quality inspection processes

All work in progress, developments, modifications, and licenses for the use thereof.

Notwithstanding anything to the contrary in the Agreement or this Schedule:

(a) Sellers do not purport to transfer, assign, or sell any right, title, or interest in any of the foregoing Intellectual Property Assets to Buyer that exceed the rights, title, and interest held by Sellers with respect to such Intellectual Property Assets on the Closing Date;

(b) (i) Sellers shall deliver to Buyer all physical or digital embodiments of the Intellectual Property Assets identified herein and in Section 1.1(g) only to the extent that Sellers possess and/or control such physical or digital embodiments of the Intellectual Property Assets, (ii) Sellers shall not deliver such Intellectual Property Assets to any third-party without Buyer's written consent, (iii) Sellers shall have no obligation to obtain possession or control over such Intellectual Property prior to the Closing from any third-parties, and (iv) Sellers' failure to deliver any physical or digital embodiments such Intellectual Property Assets shall not constitute a breach of Sellers' obligations under Section 8.1 of the Agreement; and

(c)     Buyer acknowledges that Sellers are unable to identify and separate from assets owned by third parties certain Intellectual Property Assets, including, without limitation, Intellectual Property Assets located at or stored among physical assets located at the Mississippi Location, and that Sellers will make no effort to identify or separate those assets other than as required under Section 4.3 of the Agreement.